UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,       ) Criminal Action
                                     ) No. 21-597
vs.                             )
                             )
JAVIER ALGREDO VAZQUEZ,      ) April 27, 2023
         Defendant.      ) 11:30 a.m.
                             ) Washington, D.C.
* * * * * * * * * * * * * * * *

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES**</u>:

FOR THE UNITED STATES:
        KATE M. NASEEF
        KAITLIN SAHNI
        U.S. Department of Justice
        Narcotic and Dangerous Drug Section
        45 N Street, NE
        Washington, DC 20530
        (202) 353-8810
        Email: kate.naseef@usdoj.gov

FOR THE DEFENDANT:
        SANDI S. RHEE
        228 S. Washington Street
        Alexandria, VA 22314
        (571) 800-6900

ALSO PRESENT:  CHRISTINE SCHUCK, Pretrial Agent

                 TERESA SALAZAR, Spanish Language Interpreter

Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
              Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Matter before the Court, Criminal Case No. 21-597, United States of America versus Javier Algredo Vazquez.

Your Honor, for the record, Pretrial Agent Christine Schuck is here, present in the courtroom.  And the interpreter is Teresa Salazar.

Counsel, please come forward and state your names for the record, starting with the government.

THE COURT:  Just one second.

Is Mr. Algredo Vazquez having trouble hearing?

All right.  Now we're ready to proceed.

Could government counsel identify herself for the record.

MS. NASEEF:  Good morning. Kate Naseef and co-counsel at counsel table, Kaitlin Sahni.

THE COURT:  Yes.  Good morning.

MS. RHEE:  Good morning. Sandy Rhee for Mr. Javier Algredo Vazquez.

THE COURT:  Yes.  Good morning, Ms. Rhee.

All right.  So we're here this morning for consideration of Mr. Algredo Vazquez's renewed motion for pretrial release.  It's been about 18 months, by my count, from his last detention hearing on September 29, 2021, when I ordered him to be held detained pending trial.

So we have received a whole bunch of paperwork in connection with this renewed motion, including a document submitted just yesterday by the defense which included the affidavit of the defendant's wife, Lorena Algredo [sic], and transcripts of the two phone calls that Ms. Rhee mentioned in her motion.

Ms. Rhee, it's your motion, so I will hear from you first.

MS. RHEE:  Thank you, Your Honor.

We understand that there is a presumption against bond and the defense has a high burden at this point.  But as more information is being learned, I think, consequently, it appears that the weight of the government's evidence is not as strong as portrayed by the government.

We have two witnesses, according to the government's disclosure letters.  One who has affirmatively told -- affirmatively told the government that Mr. Algredo Vazquez was not the individual that he knew as "Men" [sic] who ran a secret underground meth lab in -- somewhere in Mexico.  Then we have another witness in another disclosure, from April the 7th, who states that -- well, the government says that he couldn't identify Mr. Algredo Vazquez either from the photo lineup that was shown to him.

Then we have --

THE COURT:  Well, let's -- since one of these

people is the person who was identified in the March 31 letter from the government, and since this person's name, I think, is subject to a protective order, the name shouldn't be -- is that person's name not public?

I want to make the record clear who we're talking about here because Ms. Rhee's references to various witness gets a little confused in the paperwork.

And so what I would like to do -- if I am correct that the person referenced in the March 31 letter has not been publically revealed, I would like to just call that particular witness "the March 31 witness."

Does that work for everybody?

MS. NASEEF:  Yes, Your Honor.

THE COURT:  And in that March 31 letter, that witness said he could not identify -- or he identified this defendant and said that this defendant was not the person this witness knew as "Men."

MS. RHEE:  Who ran a secret underground meth lab in Mexico.

THE COURT:  Right.

So your papers refer to that statement as a recantation, as if it's undermining the evidence that the government was using to support the indictment against your client.  And I think that's a lot of smoke going on there, Ms. Rhee, because it's not clear to me, one, that the

March 31 witness ever recanted, as we understand that statement; and, two, whether that March 31 witness was ever used by the government to support the charges against this defendant.

So your use of the March 31 letter to say that it's both a recantation of evidence identifying this defendant as the person who ran the meth lab called "Men," and -- based on that to say that it undermines the government's evidence, I think that's a bit of a leap.

MS. RHEE:  I apologize.  I didn't --

THE COURT:  Hasn't the government made it clear that the March 31 witness was never a witness the government was going to use at trial, that that was not a witness whose evidence was being used to support the charges against this defendant.  And so how does that -- I mean, couldn't there be more than one person who uses the nickname "Men"?

MS. RHEE:  There could be, Your Honor.

But another individual who uses the same nickname "Men" who happens to run a secret underground lab that this individual -- and this individual was interviewed by the government.  And he had been talking:  Oh, I feel so bad about identifying him because he is not the guy now that I see him.

I don't mean to throw any smoke and mirrors because I think the evidence is what it is.  He had

previously identified Mr. Algredo Vazquez, I don't understand the circumstances.  I had tracked down some witnesses that he had been freely speaking to while he was incarcerated saying that he felt bad that he identified Mr. Algredo Vazquez as "Men," when he was, in fact, not the individual that he knew.

Now, the fact that the government interviewed him at all -- I don't think they were sitting around talking about another case and then the government says:  Oh, by the way, do you happen to know this guy?  And he says:  Oh, yeah, it's not "Men."

They didn't interview him just for no reason, or he didn't just volunteer:  Oh, by the way, I -- that's not the guy that I knew as "Men"; there was some process.  And I believe the identification process -- the whole identification process is called into question because he is not the only one now from the -- moving on to the April 7th individual, he -- and I don't know who that is.  That disclosure -- that individual wasn't able to identify Mr. Javier Algredo Vazquez either, even though he had worked with an individual nicknamed "Men."  And so those two together, I think, undermines the government's -- the weight of the government's evidence.

Plus, what I have been able to find, with the help of Mr. Algredo Vazquez, is --

THE COURT:  So but let me ask you, why do you think the 3/31 witness recanted?  Why do you use the word "recanted"?

MS. RHEE:  Because my understanding is that he had previously identified Mr. Algredo Vazquez as "Men," the individual who ran the secret underground lab.

THE COURT:  And how had he previously identified him, with a photo or in some other way?

MS. RHEE:  My understanding, it was through a photo.  I may be incorrect, but this is what I heard from other witnesses.  And that when he was interviewed again, at that point he said:  No, this is not the man that I thought was the "Men" -- the man nicknamed "Men."

THE COURT:  Okay.  So you used the word "recant" because in your view the 3/31 witness had previously, at some point, told the government:  That photo is the defendant, Algredo Vazquez.  That photo is the person I know as "Men."  That's the person I know who ran the underground meth lab in Mexico and then, only subsequently, looked at a photo and said:  Whoops, that's not the "Men" I know.

MS. RHEE:  Yes, Your Honor.  That is my understanding.

THE COURT:  That's your understanding based on conversations you have had with the witness in the 3/31 letter?

MS. RHEE:  No.

THE COURT:  It's based on what?

MS. RHEE:  Other conversations I have had with other people who were housed with miss -- the 3/31 witness.

THE COURT:  I see.

And so if it turns out that the 3/31 witness had never seen a photo of this defendant prior to the time he looked at the photo that is reported in the 3/31 letter, would you say that the use of the word "recantation" is a bit of an overstatement?

MS. RHEE:  I would say it would be a slight bit of an overstatement, Your Honor.

THE COURT:  Okay.  So -- all right.  So now we're turning to the person identified as CS1 that's referenced in the warrant affidavits.  Is that the other person that you think is -- that's the person referenced in the April 7th letter?

MS. RHEE:  I don't know, Your Honor, who CS1 -- who the government is referring to.

I had initially been told by previous counsel that her understanding was there were only two witnesses -- two principal witnesses against Mr. Algredo; and I believe that was based on all of the affidavits that were submitted for search warrants and such.

Now, after reading another -- I believe, in the

April 7th disclosure, it appears there might be other witnesses against Mr. Algredo.

But another factual point that I wanted to -- that I have raised is that in their affidavits they mentioned that there is a CW1 who met Algredo Vazquez in, approximately, 2013 or 2014 at a meeting in Guadalajara and that the alleged coconspirators, Carlos and Pulido were also present at the meeting.

And so according to CW1, Carlos introduced Algredo Vazquez as his brother, and explained that they were working together to import chemicals from China to Mexico.  At the meeting, Algredo Vazquez agreed to sell CW1 and Pulido iron and dulce.  And so it continues that Algredo Vazquez provided CW1 and Pulido with shipments of two chemicals from the meeting until approximately 2016.

The phone calls that I submitted yesterday, Your Honor, and I had referenced in my letter -- in my motion, show that -- and I apologize -- I transcribed it.  It is a rough draft, which I put -- but the gist of the phone calls, Francisco Pulido receives a text message and -- several text messages.  And so he sends it to an individual --

THE COURT:  So am I supposed to think that -- you are thinking that CW1 is Francisco Pulido?

MS. RHEE:  No.  I'm sorry, Your Honor.

CW1 claims that he worked with Francisco Pulido

and Mr. Algredo, and that CW1 says that Mr. Algredo provided him and Pulido with these chemicals that they can make meth.

THE COURT:  Oh.  Back in 2013 and 2014?

MS. RHEE:  Yes.

THE COURT:  So, hence, these December 3, 2021, transcripts of communications are transcripts of intercepted communications with Francisco Pulido, who you think is the same "Pulido" referenced in the -- referenced by CW1 in the affidavits.

MS. RHEE:  Yes, Your Honor.  Because they're --

THE COURT:  Saying who is --

MS. RHEE:  Who is Javier Algredo?

THE COURT:  Yeah, Algredo.

Where does he use that name?

MS. RHEE:  And then the government argued in their response that they might have been -- maybe Francisco Pulido was pretending to forget Mr. Algredo, and that they knew they were being listened to.  So we found another phone call, maybe about 20, 30 minutes earlier, where he calls this individual and says:  Look, I got another text message. I'm getting these text messages from this guy.  What do I do?  What do you recommend to me?

And this other individual says:  It's probably an extortion scheme, just block your number.

And then Mr. Francisco Pulido then calls Carlos

Algredo and says:  Do you know who this Javier Algredo is?  He doesn't say -- he goes on to say:  Could it be Danielle?  Could it be Daniel?  He doesn't say:  Could this be the individual that we know as "Men"?  Instead, he says:  Who is this?  I don't know him.  Do you know him to be in jail?

And Carlos says:  No, not as far as I know.  He is not -- he hasn't been in jail.  He is not in jail.

So our argument is:  Why doesn't Pulido, who allegedly worked with Mr. Algredo receiving chemicals and then receiving meth in return -- why does he not know Mr. Javier Algredo?  And our position is because this is not the "Men."  This is not the individual who was selling meth -- or has a secret laboratory, who was making meth in a secret laboratory.  That's our position, Your Honor.

THE COURT:  But doesn't this -- one of these phone calls -- which one do you say comes first?

MS. RHEE:  The first one is --

THE COURT:  Is with the unidentified male?

MS. RHEE:  Yes, Your Honor.

Because that's when Pulido gets the phone call and says:  I got these phone calls -- this is actually the second of two.  The first one he --

THE COURT:  Yes.  This is where the unidentified male and Francisco Pulido -- the unidentified male is very

concerned about:  Which phone are you using to speak to me?  And Francisco Pulido makes it clear that he got the message from this purported DEA agent on another phone that he thought was being tapped.

So these are pretty savvy people on the phone who are quite concerned about wiretaps and being intercepted.

MS. RHEE:  I don't think they believe they were being wiretapped by the DEA.  They believed that they were being wiretapped by the Mexican police, and they knew that.

THE COURT:  Which could have been right.

MS. RHEE:  Well, it is right.  That turned out to be correct.

THE COURT:  Yes.  Right.  So, I mean, it's a little bit -- with explicit conversation about being tapped, doesn't it --

MS. RHEE:  This does not -- they don't think this is the phone that's being tapped.

THE COURT:  Well, they think it's the other one being tapped.  But the fact that they're sensitive to being wiretapped, doesn't that raise a question about everything that's -- whether everything that's being said here is either a sham for whoever they think may be listening as opposed to an accurate conversation?

MS. RHEE:  Well, you would think, Your Honor.  But they don't believe this phone is being tapped, they believe

the other phone is being tapped.  And so when he calls Carlos Algredo to say:  Hey, do you know who this Javier is?

THE COURT:  When he calls Carlos Algredo, he calls him -- Pulido calls him "Chief."  Why does he call him "Chief"?

MS. RHEE:  Well, I didn't -- it's "Patrón."  They call each other "Patrón."  Patrón is boss, chief --

THE COURT:  Carlos Algredo, is he currently a fugitive?  Is he under indictment?

MS. RHEE:  The indictment was revealed, I want to say the 8th of February or the 8th of March.  When -- it was just recently that it was revealed.

THE COURT:  And was it revealed in connection with an extradition request?  Maybe I need to ask the government that, or was it unsealed?

MS. NASEEF:  Yes, Your Honor.

The indictment against Carlos Algredo and Francisco Pulido was unsealed.  I don't have the exact date.  It was unsealed within the last month or two.  The date on the indictment predates that.

THE COURT:  And it was unsealed in connection with extradition requests, or -- both Francisco Pulido and Carlos Algredo, are they both fugitives or are they under arrest?

MS. RHEE:  They are both -- they are both fugitives in Mexico.

THE COURT:  Okay.  And is it consistent with what you understand about the hierarchy in this DTO, that Francisco Pulido would call Carlos Algredo "Boss" or "Patrón" or "Chief"?

MS. RHEE:  It's a term of respect.

I don't know that -- I would not say that Francisco Pulido reports directly to Carlos Algredo or anything like that.  I would just say that it's a term of respect that he would use.

THE COURT:  Right.  Okay.  Thank you.

Sorry to interrupt you, Ms. Rhee, but just to cut to the basic facts here.

In this conversation with Francisco Pulido and Carlos Algredo where Carlos identifies this defendant as "my brother," and when asked, "Is he in jail or what?"  Carlos says:  Well, no.  As far as I know, no.

But wasn't this defendant already in jail by the time of this phone call?

MS. RHEE:  He was, Your Honor.

THE COURT:  So either Carlos didn't know his brother was in jail or he is lying on this phone call.

MS. RHEE:  I don't know, Your Honor.  I --

THE COURT:  Who knows?

But that does raise a question of whether what was being said on this phone call has to be taken with a giant

grain of salt because his brother, by the time of this phone call, had been incarcerated since September of 2021.

MS. RHEE:  Your Honor, I think that --

THE COURT:  It would be surprising if he didn't know his brother was incarcerated on a drug conspiracy charge that involved Carlos himself, possibly.

MS. RHEE:  My response would be that if these individuals really knew that this phone was being wiretapped and listened into by the DEA they would have changed phones, not used it on a phone call where they're trying to figure out what's going on.  Why is this individual claiming to be a DEA agent writing to me?  It would have been just as easy to throw that phone away, but they didn't --

THE COURT:  This is a very interesting transcript that you gave me, Ms. Rhee, because not only does Carlos -- despite the fact that his brother had been in jail since September, and this is December -- so September, October, November, December -- like four months later, say:  No, he is not in jail.

He goes on to say, Carlos:  No, not that I know. He doesn't deal with anything.  No, he doesn't have anything to do with the chemicals.

Why would he, all of a sudden, surprisingly start denying that his brother was in jail, doesn't deal with anything illegal including not with chemicals?  Sort of, out

of the blue, he starts a denial that seems intended almost from this conversation, which hasn't previously talked about chemicals or anything like that, like it's intended for other ears and not necessarily Pulido's ears.

MS. RHEE:  Unless -- unless this is the only thing the two individuals have worked with -- have done --

THE COURT:  That's possible.

MS. RHEE:  -- Carlos Algredo and Francisco Pulido. And that the only reason that a possible DEA agent would be contacting Pulido would be because the chemicals.  And so that would be the only reason Carlos would say:  No, he doesn't have anything to do with this.  Why -- why would he be arrested?

THE COURT:  It just struck me the way that, all of a sudden, this defendant's brother wanted to make some pretty clear exculpatory statements about specific things by his brother that are actually pretty closely related to the charges his brother is facing and was under arrest -- it just seems quite suspicious to me.

MS. RHEE:  Well, I believe these individuals continue to use these exact same phones because we have hundreds of phone calls even after this recording.  And so I don't believe these individuals knew that they were being listened to.

And if they knew that they were being listened to

and all of this was a put-on, then I guess the government's entire audiotapes can't be used either because it's all a put-on. So I think that it's either they have it or they don't.

So our position is they didn't know. They didn't know they were being listened to.

But, Your Honor, just --

THE COURT: One the statements that you make in your brief that I wanted you to elaborate on, if you could, is -- your memo suggests, and I quote, that Mr. Algredo Vazquez -- and I quote: May have unsuspectingly operated a brokerage firm for his alleged coconspirator and older brother.

What do you mean by that?

MS. RHEE: There is no dispute --

THE COURT: Is that because of all of the paperwork involved with this defendant's name on it?

MS. RHEE: We don't know what his brother was up to. As far as Mr. Algredo, the defendant here, understood, everything was legitimate.

Actually, that is one of the -- this case -- I have separated this case into two parts: The importation of the chemicals, and the second part is the allegation of the meth lab.

There is no dispute or -- he does not deny --

Mr. Algredo does not deny that he imported chemicals into Mexico.

THE COURT:  Massive amounts of chemicals.

MS. RHEE:  Yes, Your Honor.

THE COURT:  From the United States and other places into Mexico that were precursor chemicals for the manufacture of meth.

MS. RHEE:  Not necessarily, Your Honor.

We are working on -- part of our investigation is looking into the companies who purchased the chemicals because, as far as Mr. Algredo understands, there was no warehouse that his brother operated.  He understood that, when the chemicals were ordered, they were sent to Mexico, and before they even arrived -- well, let me just go back.

They were ordered by companies.  So they knew exactly what they wanted, and the quantities.  So when it arrived in Mexico, it would be sent to trailers, or the companies would come and pick up the -- the chemicals. There was no storage of the chemicals.

Mr. Algredo doesn't have a warehouse either.

So what happens to the chemicals -- as far as he understands, they're going to legitimate companies. Companies --

THE COURT:  Within Mexico?

MS. RHEE:  In Mexico, who were using it for

cleaning products or food products.  They had chemists on staff who had to verify the quality of certain chemicals -- if it was food grade, depending on what the companies ordered.  And so I am working now to try to get those documents to support our defense as to the importation of the chemicals.

The second part is the meth lab.  And I know the government has stated in the past -- and I just -- I was reading the transcript from the September 29th hearing.  And it didn't occur to me previously, but the government stated that Mr. Algredo was a frequent traveler to Mexico, and that's just not true.

I obtained -- I obtained a border -- the Customs and Border Patrol records because I was -- I wanted to use it at trial because one of the witnesses said that in their affidavit -- that they had met Mr. Algredo Vazquez in December of 2015.  And so I was trying to figure out, was he really there?

He said he wasn't.  So I obtained the customs and border patrol record.  Sure enough, he wasn't there in December of 2015 or 2014.  He wasn't there anytime in December.

Then, this morning -- when I was reading over the transcript of the previous hearing, the government stated that he was a frequent traveler to Mexico, that he had

traveled between seven and eight times to Mexico from 2019 and 2021. I looked at the records today, this morning, and realized that wasn't accurate either. He traveled every year, as he had told me, to Mexico with his family in the summer. Every time his kids were out of school, he traveled down to Mexico.

In 2019 his father got ill, so he made an extra trip by himself. And then, in 2021, the reason he was there was one of his brothers died. And so between 2019 and 2021 he was there three times: Once with his family for -- this is before the pandemic, once before -- for his family vacation with the entire family, once because his father was ill, and then -- right during the pandemic, when his brother died of COVID. And he -- and the records show that he missed his flight because he himself got COVID and he had to stay another week.

All of the evidence that I have seen so far support the fact that this is not an individual who is traveling back and forth who is managing some meth lab, who is having secret conversations, text messages -- there is nothing of that sort.

I am still waiting for some other records; we're still conducting investigations. But at this point it's very, very difficult for me to, I guess, review all of the discovery, talk to him, going to the -- and I don't mean to

make it sound like I am whining, but --

THE COURT:  You can whine if you want, that's okay.  I mean, I am glad you are getting to this because -- with respect to the sort of challenge to the weight of the evidence, I am not finding that particularly persuasive right now; but I do want to hear from the government about -- for some clarification.

But you have also made a motion for temporary release under 3142(i)(4) stating that you need his assistance more conveniently for preparation for trial which is looming.  And one of the things that really made me sit back was your statement that there are literally over 10,000 pages of documents and hundreds of hours of Spanish-language untranslated audio recordings that need to be thoroughly reviewed.  And then, apparently, last week you realized that another 13,000 pages of discovery had not yet been turned over to you.

So what -- what is going on with 13,000 pages?

MS. RHEE:  I had an external hard drive.  And I was going through the hard drives, and I kept on getting confused because every time I clicked one a whole bunch of other subfolders would come down.  And then, when I clicked on something -- so what I did was I clicked on everything, and I took screenshots of all of the pages.

And I couldn't find the emails that Mr. Algredo

allegedly sent.  And there -- and there was an affidavit or a search warrant for it.  So I called the prosecutor, and I said:  Could you please help me find this?  And I think --

THE COURT:  On the discovery hard drive you were given?

MS. RHEE:  On the hard drive.  Where is it?  I have the numbers, and it's 21,000 and something.  I can't find it, please help me.

And I think that he was a little suspicious of me.  He said:  Are you sure?

And I said:  I can show you whatever.  I can come to our office.  I just don't know -- I have been looking for this for days now, and I have -- my head hurts; I can't find it.

And then I talked to him about an hour later, and he said:  Oh, it looks like we haven't given that to you.  Maybe previous counsel had it, but you hadn't received it.

So I said:  Oh, my God, when can I get it?  I need it now.

And he said:  Well, we can have it ready for you by Tuesday morning.

That was two days ago.  And I got an email on Monday afternoon that said:  You can pick it up today.

But I had already -- I was -- I think at the time I was in the jail.  So when I got the text message or the

email there was no way I could go pick it up on Monday.  So I picked it up on Tuesday morning, and I overestimated my ability to scan very quickly.  I realize there are literally, I think, 13,000 pages that I still haven't even started to look at.

The evidence that I have viewed so far -- I think I have just scratched the surface, and this is not the only case that I have.  We have two and a half months, and it's coming really fast.

Going to the jail is -- I cannot express to you how stressful it is, the -- how they treat an individual.  I get yelled at because I stood on this side of the door instead of that side of the door.  There is a gate that I -- no one can get out of, but I'll say:  Can I just leave the door open?

No.  You need to close the door.

There is no air conditioning.  The elevator hasn't been working for over two months -- because I complained about it.  I said:  It's been two months now, right?  When are you going to get the elevator fixed?

I have to walk up three flights of stairs.  And sometimes I walk up the three flights of stairs, it's hot, and then I can't see my client.

Or the other day we were there and the fire alarm went off.  It was ba-ba (utterance).  And I was sitting

there, like this (indicating), and he's like:  Oh, it's okay.  It happens all the time.

I'm just like, How can you think?  How can -- and nobody moved.  And we sat there until -- and it was -- and I am not exaggerating; it had to have been a good half and hour we sat there.  And I sat there this whole time like this (indicating), and he's just reviewing the discovery because he needed to see the discovery.  And that's not the first time it happened.

It's -- there is so much that I feel that we can do.  This is not going to be a case where we're just going to cross-examine the government's witnesses.  There is evidence that I need to get.  And sometimes -- his wife is not a substitute.  I will call the wife and go:  Do you know -- or I'll text her, and I'll say:  Do you know this?

She doesn't know anything.

Do you know how I can get this?

No.

And when I say that -- once I went to the jail, I got there at 2:30; it was on a weekend.  They said they only had one floor open because it was the weekend.  And they said:  Well, we are going to start count soon; you need to be back at 4:30.

I didn't go home; I sat in the jail parking lot and waited.  I got there at 4:30.  I guess their -- I should

have gotten there earlier because all the rooms were filled, and there was already a line of several people.  I literally waited another hour and a half, two hours until an attorney room became available.  By that time, it was close to seven o'clock.  And I have a child, I can't -- I left her alone -- she's 15.  She's not a small child, but I had to go home.  So I didn't --

THE COURT:  Hasn't this defendant been moved from wherever facility he was closer in?

MS. RHEE:  He was in Lewisburg.  And I -- I only met him here at the D.C. jail.

THE COURT:  Right.  So I have had him moved closer to make it more convenient for you to meet with him.  So he is now at the D.C. jail?

MS. RHEE:  He is now at the D.C. jail.  I believe he was moved because there was a trial pending -- a jury trial pending in March that didn't happen.  And then he switched counsel, and the jury trial was moved to July.

But just going -- moving on, Your Honor, the history and characteristics, he is 55 years old.  He has been a resident of New York for 38 years.  His wife of 31 years -- his whole life is here.  His family is here; his two sons -- one is in college, one is severely autistic.  And he has had no involvement with the law whatsoever.  This has been a huge change for him.  He has adjusted, as I

explained when I was complaining about the fire alarm and he was more interested in looking through the discovery as fast as he could.

But -- and his wife wrote an affidavit where she said:  Yes, I love my son -- my husband, but my sons come first.  She is not going to risk her being placed in jail or being separated from her sons for any period of time.

And so if Your Honor would release him, I could have -- my investigator is in the back of the courtroom.  He could be suited up with GPS, no computer except -- or no Internet except to review the discovery, and then communicate with me or pretrial.  That way, as we're -- as I am reviewing discovery, I can call him up and say:  What does this mean?  How can I find this?

And we can just get ready for this really fast-approaching trial.  He's not a danger --

THE COURT:  And the 13,000 pages of additional discovery are specifically this defendant's communications?

MS. RHEE:  I believe so.  Yes, Your Honor.

THE COURT:  Well, I am going to want to hear from the government.

What happened?

MS. NASEEF:  Your Honor, the 13,000 --

THE COURT:  Did the government fail to turn over 13,000 --

THE INTERPRETER:  Excuse me, Your Honor.  I think the battery has died.

(Whereupon, the proceeding pauses.)

THE INTERPRETER:  We're set, Your Honor.

MS. NASEEF:  Your Honor --

THE COURT:  And when I didn't -- when this statement was made in the defendant's papers about the 13,000 missing pages, even though it was in the defendant's reply -- that she said it, I really expected the government to explain that really promptly, as opposed to having me puzzling and worrying over it, and thinking quite seriously about a release under 3142(i)(4).  Because 13,000 new pages involving communications of this defendant, why shouldn't he be released under 3142(i)(4) if the government didn't give that to her?

I am presuming that must be right since the government has sat silent since I got the reply.

MS. NASEEF:  Your Honor, that is not correct.

THE COURT:  What's not correct, that you sat silent?

MS. NASEEF:  It is correct that we did not --

THE COURT:  Don't do that with me.

MS. NASEEF:  -- file a reply -- it is correct that we did not --

THE COURT:  You see something like that that needs

correction, you better get on your typewriter and file something promptly.

MS. NASEEF:  Yes, Your Honor.  We will file --

THE COURT:  Because otherwise, gosh, I am making my decisions before I come out on the bench.

MS. NASEEF:  I understand, Your Honor.

THE COURT:  You should understand.

MS. NASEEF:  We will be sure to file a reply in the future --

THE COURT:  What's going on with the 13,000 pages?

MS. NASEEF:  Yes, Your Honor.

There were -- as you know, counsel changed in this case.  Those 13,000 pages were provided to previous counsel and to the defendant on a hard drive that he had access to at Lewisburg last summer, I think even actually before last summer.

When counsel changed, instead of asking -- instead of having Ms. Gomez [sic] turn over all of the discovery to Ms. Rhee, since Ms. Gomez was in trial --

THE COURT:  You mean Ms. Hernandez?

MS. NASEEF:  Sorry, Ms. Hernandez.

Instead of having Ms. Hernandez turn over all of the discovery to Ms. Rhee, since Ms. Hernandez was in trial, the government created a new hard drive and put all of the discovery that had previously been provided to Ms. Hernandez

on it.

We also sent a discovery letter that listed the Bates range and each type of information, and it includes those 13,000 pages. When the transfer is being made, our paralegal did inadvertently leave off that one folder of the emails on the new hard drive. It's information that previous counsel had that the defendant had access to on a hard drive at Lewisburg, and it's information that was detailed in the list of Bates numbers.

As soon as Ms. Rhee brought it to our attention that that was missing from the hard drive, we got her another copy of it.

THE COURT: Well, whether inadvertent or not, why shouldn't I release this defendant to help Ms. Rhee get through these 13,000 pages that was inadvertently left off of the hard drive?

MS. NASEEF: Your Honor, Ms. Rhee --

THE COURT: Because we are getting close to trial.

MS. NASEEF: Yes, Your Honor. I understand that we're getting close to trial. However, Ms. Rhee knew the volume of discovery when she asked to be substituted onto this case. She knew the defendant wanted a trial and that the trial date was set in July, and she felt that she would be able to be ready for trial in -- in July despite that.

I think these 13,000 pages, unfortunately, are a

small amount of the overall discovery because it is, in fact, vast. It's not as though she had 10 pages of discovery and 13,000 were missing. She has had a lot of information to review, which I believe she has diligently started reviewing, and she will need to review these documents as well.

The defendant has available -- Your Honor had previously asked the government to make even the protected material available for the defendant's personal review without counsel present at Lewisburg. The government did that, provided hard drives to -- to Lewisburg. And, at Lewisburg, the defendant was able to access all of the discovery in this -- in this case, both the protected discovery and the not protected discovery.

Obviously, the government doesn't control where the defendant is housed pretrial. If Ms. Rhee feels that it would be better for him to be housed at Lewisburg where he can access that discovery freely and do video meetings with her, I -- you know, I would defer to the Court and to Ms. Rhee if she thinks that is a better way for him to prepare for trial. I don't know --

THE COURT: Well, I had him moved from Lewisburg to D.C. jail at Ms. Rhee's request, I think. I asked for that to happen.

MS. RHEE: No, Your Honor. I was not involved in

this case when Mr. Algredo was moved from Lewisburg to D.C.

THE COURT:  Okay.  Maybe it was another one of the cases I have with you, Ms. Rhee.

MS. RHEE:  Yes, Your Honor.

MS. NASEEF:  I think he was only moved here due to the pending trial and hearing schedule.

THE COURT:  Okay.

MS. NASEEF:  And I don't honestly know why he remains here, other than for this hearing today, of course, but I don't know why.

THE COURT:  Well, Ms. Rhee, do you want him sent -- do you want me to ask the marshals to see what they can do about moving him back to Lewisburg?

MS. RHEE:  No, Your Honor.

THE COURT:  Okay.  All right.

MS. RHEE:  So, Your Honor, other than --

THE COURT:  And I think that the defendant has access to the discovery also at D.C. jail.

MS. NASEEF:  I don't know, Your Honor, but...

THE COURT:  Yes.

MS. RHEE:  I have not been able to leave -- I have not ever left a single piece of paper with Mr. Algredo.  I don't know how I can leave any documents.  I think I have to make special arrangements for him to be pulled out.  And so a complicated process where I email the jail and -- my email

gets passed around to several different layers of authority. And then, I think that they make -- made arrangements for him to have a special room to review the discovery.

THE COURT:  Yes.  I mean, defendants detained at D.C. jail have access to discovery tools to look at electronic discovery and other kinds of discovery.  So the fact that he is at D.C. jail doesn't mean he's cut off from looking at discovery if all of the appropriate steps are taken.

MS. RHEE:  Your Honor, as government counsel stated, there is a great deal of discovery in addition to the 13,000 new pages that I have to review.  Much of that, though, is -- a lot of it is in Spanish; much of that is also in English.

And as I stated, he is not a lawyer.  He doesn't -- a lot of the things he pulls out, it's not at all relevant to the defense; it's something that I need to discuss with him.  I need to review the discovery with him; and that's what I have been doing every time I have gone to the jail.

At Lewisburg we get one-hour video calls and, after that hour, you have to just schedule another one.

I have been stay -- when I go to the jail, I am usually there for quite a number of hours.  And that's another reason that I get yelled at because I -- they keep

warning me:  He needs to be out of here by 2:30.  I mean, they will warn me from -- when I was there at 10:30, they said:  We know you, make sure he is out of here by 2:30. And I get the eye, I get the looking at you and --

THE COURT:  You are a defense lawyer; you are tough.  You can withstand that.  They are just D.C. jail guards.

All right.  Let me go back to the government.

MS. NASEEF:  Yes, Your Honor.

Would you like me to continue to address access to the discovery or the weight of the evidence?

THE COURT:  I think you need to address all of it.

MS. NASEEF:  Okay.

THE COURT:  Because I am very concerned about the discovery and this trial date and this defense counsel being prepared.

MS. NASEEF:  Yes, Your Honor.

As I mentioned, the defendant himself has had access to all of this discovery.  Ms. Rhee actually said at the beginning that he has helped her find those phone calls that she has cited.

THE COURT:  Well, what can you do with D.C. jail to make sure that this defendant gets access to it?  I mean, the marshals are part of the Department of Justice.  The marshals have to make sure that defendants get access to

discovery; they have to put them in places they can get access to discovery.  You have a invested interested in making sure that this defendant doesn't get released under 3142(i), if that is your position.

MS. NASEEF:  Yes, Your Honor.

THE COURT:  Is that your position?

MS. NASEEF:  Yes, Your Honor.

THE COURT:  Well, then what are you going to do to help Ms. Rhee make sure this defendant gets access to his discovery, that she gets as much time as she needs at D.C. jail?

MS. NASEEF:  Yes, Your Honor.  I'm happy to --

THE COURT:  You have a responsibility to do this, too --

MS. NASEEF:  Yes, Your Honor.  I am happy to ask if this --

THE COURT:  -- through the marshals, which is part of the Department of Justice.

And the D.C. jail gets a ton of money -- a ton of money from the Department of Justice --

MS. NASEEF:  Yes, I understand.

THE COURT:  -- to house defendants from this court; so you have all the leverage in the world.

MS. NASEEF:  Your Honor, the government is happy to discuss with the marshals and D.C. jail --

THE COURT:  Yes, you do.

MS. NASEEF:  -- moving him to a place where he has access --

THE COURT:  And then you can report to me -- you can report to me what you have done --

MS. NASEEF:  Yes.

THE COURT:  -- and what the D.C. jail is telling you they're doing before I start directing D.C. jail to do things, which they also don't like.

MS. NASEEF:  Yes, Your Honor.

THE COURT:  All right.  Let's now -- but we're not completed, not finished here.

MS. NASEEF:  Okay.

THE COURT:  Is there any other way that you can help -- given the inadvertent lack of production of 13,000 pages of discovery to Ms. Rhee, is there any other assistance you can give her in sorting through these 13,000 pages?

For example, why can't you give her the hot docs from those 13,000 that you think would be -- focus her attention on that the government may be planning to use at trial, or whatever digest you have for that information to spare Ms. Rhee from having to do her own digest of 13,000 pages while she is also trying to prepare for trial in other ways.

MS. NASEEF:  Yes, Your Honor.  And, actually, we have already done so.

The government had an analysis done of all of the email account.  That analysis itself, as well as the attached Excel spreadsheets that are essentially a list of hot docs, was provided to previous counsel and to Ms. Rhee. I can give Ms. Rhee the Bates range again today.  But that is a focused review of all of the emails.  It's sorted by emails relating to chemical purchases, emails related to financial transactions, and emails that include personally identifiable information.

THE COURT:  And these are all emails from this defendant, Mr. Algredo Vazquez --

MS. NASEEF:  Yes, Your Honor.

THE COURT:  -- running his chemical import/export business?

MS. NASEEF:  Yes, Your Honor.

THE COURT:  And shipping chemicals from various chemical companies around the world to Mexico?

MS. NASEEF:  Yes, Your Honor.  And --

THE COURT:  With his name all over them and making -- arranging all of the shipments, invoicing, and so on?

MS. NASEEF:  Yes.  And --

THE COURT:  And are these chemicals -- my

understanding is that these chemicals were precursor chemicals used in the manufacture of methamphetamine.

MS. NASEEF:  Yes, Your Honor.

So as this analysis shows -- just from the email, from 2018 to 2021, which is the time period of the email search warrant -- the defendant was involved in the shipment of approximately 7800 tons of different chemicals, 32 different chemicals, worth approximately $13 million.

There's 32 different chemicals.  And I can't speak to every one of the 32 chemicals today but, for example, there are 2 chemicals addressed in the emails, methylamine hydrochloride and propionyl chloride.

Methylamine hydrochloride is a direct -- and propionyl chloride are primary or immediate precursor chemicals.  And what that means is they are one chemical reaction away from the finished drug.  Methylamine hydrochloride is a primary precursor for methamphetamine, and propionyl chloride is a primary precursor for fentanyl.

And then among some of the other chemicals, for example, there are chemicals that are -- what are known as reagents, and they -- that means that they're used to increase the potency or the yield of the finished methamphetamine or fentanyl.

And methyl thioglycolate and tartaric acid are two examples of --

THE COURT:  And you are going to have to give my court reporter the spelling of those --

MS. NASEEF:  Yes.  I am going to do that before I leave today because I believe she had to email me about it before.

Those two chemicals are examples of reagents that the defendant was involved in purchasing.

THE COURT:  What am I supposed to make of the word "reagent"?

MS. NASEEF:  That's the chemicals that are used to increase the potency --

THE COURT:  Oh, okay.

MS. NASEEF:  -- or yield once the meth and the fentanyl is produced.  And that -- as the government will present in evidence at trial, that decreases the weight of what needs to be transported to the United States.  Obviously, transport costs are a big cost of doing business as a drug cartel.  And by increasing the potency, removing any waste, that decreases the weight --

THE COURT:  Okay.  I know the defendant's charged with the methamphetamine, but is there any reference in the charges against him regarding fentanyl?

MS. NASEEF:  There is no reference in the charges against him.  There will be a filing in our motions in limine about 404(b) and related case law on the fentanyl

based on that.

THE COURT:  Got it.  All right.

MS. NASEEF:  And these are not small quantities.

As we have mentioned before, but from the -- specifically from this email analysis, it was 156 tons of methylamine hydrochloride in those 3 years, which is the direct precursor for methamphetamine, and about 3 tons of the precursor -- the direct precursor for fentanyl.

So getting back to the weight of the evidence, I would actually say that the weight of the evidence has gotten stronger since we were before Your Honor previously on a detention hearing.  We did not have the analysis of all of those emails at that time.

We had the seizures and those sorts of things, but this is a much full picture of the defendant's business, chemical business, and his constant, nearly daily communication with his brother, Carlos.  So I would say that the --

THE COURT:  The Carlos, in the transcript, who said:  My brother had nothing to do with chemicals?

MS. NASEEF:  The Carlos in the transcript who said:  My brother had nothing to do with chemicals.  The Carlos Algredo who is charged in this District with, I believe, the same offenses -- perhaps slightly different offenses, but similar.

So the government's evidence has actually gotten stronger since the last time it was here on the detention hearing.

One thing I did want to go back and address about the alleged recantation, to clarify the record --

THE COURT:  Yes.  What is going on here?

MS. NASEEF:  Yes.  I want to clarify the record for the defendant, for Ms. Rhee, for the Court -- for everybody.

It is confusing with the number of witnesses whose names we are trying not to use for their safety.

THE COURT:  Well, we have got the 3/31 witness.

MS. NASEEF:  Yes.

THE COURT:  We all know who that is.

MS. NASEEF:  Yes.

THE COURT:  We have got the 4/7 letter reference to CS1.

MS. NASEEF:  Yes.

THE COURT:  Ms. Rhee doesn't know who that is.

MS. NASEEF:  So the 4/7 letter and CS1 are not actually related.

THE COURT:  Okay.

MS. NASEEF:  So let's -- let's start at the beginning with the criminal complaint and all of the search warrants that are related to this case.  Those documents all

refer to a "CW1" and a "CS1," which Ms. Hernandez told Ms. Rhee are the government's two main civilian cooperating witnesses against the defendant.

Those two individuals identified the defendant in a photo lineup affirmatively; they have never recanted. They were -- we'll put them aside for now.  And, you know, there is no issue with their credibility or any change in their expected testimony from the complaint from the search warrant, all of that.

The March 31st witness -- in 2021, that individual, the March 31st witness was shown a photograph of the defendant, and he did not identify him.  When he was asked if he knew an individual named Javier Algredo he said no.  When he was asked if he knew an individual who went by the nickname "Men," he said that he knew someone named "Men," and then he told the government that he had -- the March 31st witness had worked at a methamphetamine lab at a ranch owned by someone named "Men," and additional details about that.

After telling that story, the individual was again shown the defendant's photo, and the March 31st witness again said the defendant was not the "Men" he was talking about.  That interview wraps up.  At the time, the government had no reason to believe that the "Men" the March 31st witness was talking about was the same as the

defendant.

Multiple people could have the nickname "Men." Also, there were multiple -- that March 31st witness himself had actually told us about multiple ranches with multiple methamphetamine labs.  So, again, no reason to believe he was talking about the same person.

THE COURT:  Say that again.

The 3/31 witness in debriefings had told the government about multiple individuals with the nickname "Men" --

MS. NASEEF:  No.  I'm sorry, Your Honor.

He had told the government about multiple different methamphetamine labs located at different ranches.

THE COURT:  Okay.

MS. NASEEF:  So --

THE COURT:  All in the same area in Mexico?

MS. NASEEF:  All in the same state of Mexico, or -- there are a couple of states, but yes.

As the government began to prepare witnesses for trial, including CW1 and CS1, as well as other witnesses, the government got additional details about those witnesses's testimony.  And based on those details and their descriptions of the methamphetamine lab that they worked at with the defendant, then it became clear to the government that there was enough overlap between the descriptions of

the two labs that the March 31st witnesses' statements should be disclosed to the defense.  I don't know if they are talking about the same ranch, but there was enough that we felt it should be disclosed.

THE COURT:  And how many witnesses have identified this defendant as running a meth lab in Mexico?

MS. NASEEF:  At least two, I believe three.

THE COURT:  And in their descriptions of the meth lab this defendant allegedly ran in Mexico, do they say -- describe it as being underground?

MS. NASEEF:  There's -- there's discussion about attempting to build an underground portion that we are aware of now.  Yeah.

THE COURT:  Because the thing that's distinctive about what the 3/31 witness says -- at least to my ears, because I don't know much about meth labs in Mexico and whether they are generally underground or generally above ground, or what -- but the 3/31 witness's testimony that he knew a guy with a nickname "Men" who ran an underground meth lab.

MS. NASEEF:  Your Honor, there are -- that is a descriptor, but there are other underground labs.  What actually alerted the government was an additional detail provided by one of the cooperating witnesses we plan to call at trial about a person who was injured during that -- the

production of methamphetamine at that lab, and that was the detail that we felt could potentially be alerting or created enough overlap.

THE COURT:  I see.  Because the 3/31 witness had a family member injured in a meth lab?  That's what clued you to think we need to talk to this guy again about what overlap he may have for this defendant?

MS. NASEEF:  Yes, Your Honor.  Yes.

And when we went to talk to him again, and we showed him the photo of the defendant, that was the first time he ever identified the photo.  He said he identified it because the defendant was housed with him at Lewisburg.

And I again asked:  Did you ever meet this individual in Mexico?  He said no.

So he didn't -- even this individual, who was never -- the March 31st witness was never going to be a government's witness for obvious reasons.  That March 31st witness hasn't changed his story either; his story is the same.  Whether or not it contradicts the testimony of other witnesses at trial is something that we will find out in trial --

THE COURT:  But, from the government's perspective, there has been no recantation by any witness --

MS. NASEEF:  No.

THE COURT:  -- interviewed in connection with this

case?

MS. NASEEF:  No.  No one has recanted.  No recantations.

THE COURT:  Okay.  Now let's get to the 4/7 letter.

MS. NASEEF:  I'm sorry.  To the what?

THE COURT:  The 4/7 -- the April 7 letter.

MS. NASEEF:  Yes.  I am not sure I -- so we were attempting to answer questions presented to the government by Ms. Rhee, and one was if there were any -- I don't remember exactly how she worded it, but about identification procedures.  And so we explained that there were photo arrays shown to -- it was not described this way, but CW1 and CS1.

Obviously, the government has interviewed other people.  One of those people is the March 31st witness.  But the government has interviewed other people, some of whom have not identified the defendant, and some of whom have.  So we were trying to describe that without saying the names of people or how many people ID'd him, how many people didn't ID him.  But at this point CW1, CS1 positively identified the defendant in photo arrays.

There is another individual who may be a witness at trial who did not identify the defendant in the photo array, but he didn't say that isn't the defendant either.

He just said he -- he couldn't tell one way or the other. He couldn't remember what he looked like well enough to say if that was or wasn't him.

THE COURT:  And that witness you just described is the witness you described as one witness who the government intends to call at trial did not recognize any of the individuals in the photo lineup, but did indicate that he met an individual who went by the nickname "Men"?

MS. NASEEF:  Yes.

THE COURT:  That's the second witness you are referring to --

MS. NASEEF:  Yes.  The -- yes.

THE COURT:  -- in that paragraph in the April 7 letter?  Okay.

MS. NASEEF:  Yes, Your Honor.

THE COURT:  All right.  Ms. Rhee, do you want to respond?

THE INTERPRETER:  Your Honor, the interpreter would request a break.

THE COURT:  Okay.  I have people waiting for my next hearing, too.

Okay.  How long of a break do you need, Teresa?

THE INTERPRETER:  At least 15 minutes, Your Honor.

THE COURT:  Fifteen minutes?

THE INTERPRETER:  Yeah.  There was no indication

that you would need more than a standby interpreter when you requested me, which is why I don't have a team.

THE COURT:  Okay.  That's all right.

What I am going to do is I am going to take a break for -- in this case, then, for -- sorry about this guys -- for a half an hour so I can turn to my next -- the Bailey case.

(Whereupon, the Court and staff confer.)

THE COURT:  Okay.  So I am missing my defense attorney in my next case.  We're going to take a break for -- until 1:30 so that, hopefully, I can get my next matter out of the way.  That will give my court interpreter time to regroup.  1:30.

(Whereupon, the proceeding recesses from 12:36 to 2:15 p.m.)

THE COURT:  All right.  To pick up where we left off, was the government in the middle of its talking or --

MS. NASEEF:  Your Honor, we were not in the middle.  I just wanted to clarify one thing that occurred to me during the break.

It was the government's understanding that Mr. Algredo would be returned to Lewisburg, so all of this discovery remains at Lewisburg.  We will keep that there just in case he is, for some reason, returned to Lewisburg. But we will make another copy of the discovery, and we will

work with the D.C. jail to make that available here at the D.C. jail.

THE COURT:  Okay.  Well, let me just hold off because I think he has been transferred to D.C. jail and is going to be -- and perhaps the deputy marshal knows this.

I hate to put you on the spot.  But since he is coming up on trial in a couple of months, is he now permanently staying at D.C. jail, if you know?

DEPUTY MARSHAL:  I do not, Your Honor, but if you give me about five minutes I can ask.

THE COURT:  Okay.  Well, we're going to be another five minutes.  If you could ask, that would be helpful.

DEPUTY MARSHAL:  Yes, ma'am.

THE COURT:  Perhaps -- Ms. Rhee, do you have an understanding of where he has been permanently -- has he been permanently transferred to D.C. jail?

MS. RHEE:  I don't know, Your Honor.

My understanding was that he was transferred here in the winter.  I was not involved in the case when he was transferred.  It was only after he was transferred that I became involved in the case.  I had assumed that he was transferred here because of a jury trial starting in March.

THE COURT:  March.

MS. RHEE:  And I was appointed to this case on February the 17th, so I had no involvement in why he was

moved here.  But now that he is here, I would prefer -- for my benefit, prefer him here versus being at Lewisburg.

THE COURT:  I would think so.

MS. RHEE:  Yes.

THE COURT:  Usually when people are in Lewisburg and lawyers want to see them, they're asking me to get them out of Lewisburg and into D.C. jail.  So --

MS. NASEEF:  Yes, Your Honor.  So we'll make another copy of discovery.

THE COURT:  But you have discovered that the discovery did not follow Mr. Algredo Vazquez from Lewisburg to here --

MS. NASEEF:  Yes.

THE COURT:  -- it just stayed in Lewisburg where it's just sitting there doing nobody any good?

MS. NASEEF:  Yes, Your Honor.

I will make another copy, as opposed to waiting to figure out what is going on --

THE COURT:  Yes.  Do not wait on that.

MS. NASEEF:  I will make another copy of the discovery.  And I will work with the D.C. jail to get another hard drive to be made available for Mr. Algredo at the D.C. jail.  And if Ms. Rhee has any other specific requests, I will include those in our request to the marshals and the D.C. jail.

THE COURT:  Thank you.

Ms. Rhee, so having had the government clarify that the hot docs and the 13,000 documents inadvertently not given to you -- have already been identified for you.  I know that doesn't mean you have to rely on the government's analysis, obviously.  But it is certainly a help if what the government thinks is a hot doc -- for you to go through that.  And with the government's assistance in getting discovery to Mr. Algredo Vazquez -- aren't those specific, concrete steps that will help make sure you are prepared for trial?

MS. RHEE:  That's the goal, Your Honor, yes.  Thank you.

I did speak with the government, and we're going to try to see --

THE COURT:  Could you just move the microphone closer to you.

MS. RHEE:  Oh, I'm sorry.

I did speak with the government during the break and we're going to see if we can try to coordinate something where Mr. Algredo can have access to the discovery.

THE COURT:  And if you all -- and if the government would submit to me by midweek next week what your communications are with D.C. jail, what steps the D.C. jail has taken to make sure Mr. Algredo Vazquez has access to the

discovery; and given the volume of discovery, what steps they're taking to ensure that they are civil, polite to Ms. Rhee, and are accommodating the length of time she needs to be meeting with her client while he is residing at D.C. jail.  I think you may need to have a conversation, as a member of a significant department at the Department of Justice, a main contract partner with the D.C. jail -- you might have to talk to the warden because I am sure the warden doesn't want to hear from me.

MS. RHEE:  That's the last resort --

THE COURT:  And you can explain to me all of the conversations you have had to make sure this defendant is prepared for trial.

Yes, Deputy.

DEPUTY MARSHAL:  Took me less than five minutes, Your Honor.

THE COURT:  Excellent.

DEPUTY MARSHAL:  I was just told with about a 98 percent certainty he will stay at D.C. jail.  So...

THE COURT:  Okay.  Good.  That's where we want him.  That's where we're going to have him set up.

Okay.  Ms. Rhee, is there anything else that you want to say?

MS. RHEE:  No, Your Honor.

THE COURT:  Does the government have anything else

it wants to say?

MS. NASEEF:  Nothing further, Your Honor.

THE COURT:  And I'm sorry that my schedule has gotten out of control today.  Things just took far longer than I had planned or anticipated, but sometimes it can't be helped.

Okay.  I am prepared to rule on the defendant's renewed motion for pretrial release docketed at ECF 56.

The Bail Reform Act -- just to set out the legal standard that I am applying here -- is that release of a defendant prior to trial should be given unless a judicial officer determines, after a hearing, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, under 18 U.S.C. Section 3142(e)(1).

The government bears to establish, as it has done in the past, by a preponderance of evidence that the defendant poses a serious risk of flight or a serious risk of obstruction or attempt to obstruct justice or to intimidate or threaten a prospective witness and/or show, by clear and convincing evidence, that no conditions of release will assure the safety of any other person or the community.

And there are four factors set out in 18 U.S.C. Section 3142(g) that the Court is supposed to consider in

determining whether there are any conditions of release to reasonably assure the person as required:  The nature and circumstances of the offense charged; the weight of the evidence against the person; the history and characteristics of the person; the nature and seriousness of the danger to any person or the community that would posed by the person's release.

And when as here -- as here, there is probable cause to show that the defendant committed an offense under the Controlled Substances Import and Export Act that carries a maximum term of imprisonment of at least ten years.  There is a rebuttable presumption that there is no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community.

I have already determined at a hearing on September 29, 2021, and my subsequent written order docketed at ECF 18, that this defendant has failed to present sufficient evidence to rebut the presumption of detention that applies here, and that there is no condition or combination of conditions for release that would reasonably assure his appearance as required.

Of course, under 18 U.S.C. Section 3142(f), a detention hearing may be reopened before or after such a determination by a judicial officer and at any time before

trial, and the judicial officer can change that determination made at the original detention hearing upon finding that the information exists that was not known to the movant at the time of the hearing, has material bearing on the issue on whether there are conditions of release that will reasonably assure the appearance of such a person as required.

New and material information consists of something other than the defendant's own evaluation of his character or the strength of the case against him; instead, it must consist of truly changed circumstances, something unexpected, or a significant event.

Here, the thrust, mainly, of the defendant's request for pretrial release is -- goes to the second factor of 3142(g) and the analysis that looks to the weight of the evidence against the defendant.  And the defendant here has made the argument that the government's evidence is weakened because of the developments set out in the government's letter of March 31, 2023, in which the government reveals that the witness discussed in that letter indicated this defendant is not the individual that witness, who we're calling the March 31 witness, knew as "Men" was running an underground methamphetamine lab at a ranch in Mexico.

The defendant has also noted a December 3, 2021, phone call -- two of them, actually -- between alleged

coconspirators Carlos Algredo, this defendant's brother, and a man named Francisco Pulido, where Pulido asked Algredo who Javier Algredo was, and speculating that the individual could be someone named Daniel, who is yet another brother of this defendant.

In his reply, the defendant also supplements these arguments by pointing to another call between Pulido and an unidentified male, which Pulido appears to be confused by a text he received from individual claiming to be a DEA agent. And that reply also notes an April 7 letter from the government noting another witness claimed to have met an individual named "Men," but did not recognize the defendant's photo in a lineup.

According to the defendant, this evidence regarding the recorded phone calls places into doubt that the government has charged the right individual because his purportedly coconspirators would not have been speculating as to who Javier Algredo Vazquez was if he really was their coconspirator.

These are certainly matters that the government is going to grapple with at trial, but they do not move the needle sufficiently for this Court to change my determination as to the defendant's pretrial detention.

The weight of the evidence against the defendant remains strong.  And given the government's analysis of the

13,000-some-odd emails of this particular defendant engaging in his import/export business involving chemicals, 7800 tons of which, of which there is -- some portion of those tonnages are precursor chemicals for making fentanyl and methamphetamine being shipped to Mexico with communications with Carlos, his brother, who is a fugitive on an indictment charged in a similar drug conspiracy -- I have to agree with the government that the evidence against this defendant, instead of getting weakened, appears to be getting stronger with complete documented evidence about this defendant's role in not only transporting precursor chemicals as part -- knowing that they were going to be made into methamphetamine and fentanyl; but the government has also reported that neither one of the witnesses who had direct communications with this defendant over a period of years would talk to him about making a meth lab at a ranch in Mexico have recanted it all and are clearly standing by their story.

The March 31 witness is not the individual referred to in the complaint, in the search warrant affidavits as either CS1 or CW1, and that is not a person who was even going to be called to testify at trial.

And just looking at the transcripts of the two phone calls that the defendant has put forward, it is clear to me, from statements made in those two transcripts, that these were defendants -- that these were individuals

speaking with the full understanding that they might be wiretapped; and they used that opportunity to actually relay as much exculpatory information as possible about this defendant.

Of course, I am not the fact finder here; that will ultimately be for a jury to evaluate those transcripts. But with my recognition of who Carlos Algredo is and Pulido, both of whom are actually fugitives right now and under indictments that have been recently unsealed, I think they are probably pretty savvy individuals, and those transcripts have to be understood in that way.

It just strains credulity that this defendant's brother, in December of 2021, was unaware that Algredo Vazquez had been arrested in September, several months earlier, even though he denied that he was in jail in the course of this phone call; I think that shows the lie to what that conversation was.

But, of course, Ms. Rhee, you will be free to argue a different interpretation of that and all of the appropriate context in front of the true factfinders, which is going to be the jury.

As to temporary release, the defendant seeks temporary release under 18 U.S.C. Section 3142(i)(4) because he feels unsafe in the D.C. central detention facility and you have had difficulty meeting with him to review discovery

in the case, plus the 13,000 email communications with this defendant that had been inadvertently left off the hard drive delivered to you.

Although, this defendant had received those emails and discovery produced to him for him to look at in jail, it certainly had been produced to prior counsel in the case; that doesn't excuse the inadvertent omission of what is critical evidence in this case involving this defendant's own communications.  But I think that the government has taken concrete and constructive steps, with their recognition of hot docs and analysis that they have shared with defense counsel, and are going to take steps to ensure that Mr. Algredo Vazquez is given all the tools he needs to review discovery.  That this is not going to -- that that -- the temporary release -- given all of the other risks of flight here, the financial backing that this defendant has if all of the allegations in this complaint prove to be correct, in addition to the fact that he was, for a series of years, responsible for the movement of millions of dollars' worth of chemicals in an international brokerage scheme or business, as Ms. Rhee calls it a brokerage business for chemicals -- he has the resources and the connections so that he poses a real flight risk.

For those reasons, I am not going to alter the detention order that is currently in place.  But I am glad

you brought this all to my attention, Ms. Rhee, so that we could take concrete steps to move forward with the currently scheduled trial.

MS. RHEE:  Thank you, Your Honor.

THE COURT:  Is there anything further from the government today?

MS. NASEEF:  Nothing further, Your Honor.

THE COURT:  Ms. Rhee, anything further from you?

MS. RHEE:  No.

THE COURT:  All right.  I am sorry this has taken all day, that wasn't my plan either.

With that, you are all excused.  Thank you.

MS. RHEE:  Thank you.

THE COURT:  Thank you, Deputy, for making those fast calls.

DEPUTY MARSHAL:  No problem.

(Whereupon, the proceeding concludes, 2:33 p.m.)

* * * * *

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 9th day of May, 2023.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter