IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      ) CRIMINAL ACTION NO.:
                               ) 21-0597-BAH
          Plaintiff,           )
     vs.                       )
                               )
JAVIER ALGREDO VAZQUEZ         ) Washington, D.C.
                               ) July 19th, 2023
          Defendant.           ) 12:15 p.m.
_____  )


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE BERYL A. HOWELL
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      Kate M. Naseef, Esquire
                         Katlin Sahni, Esquire
                         Nhan Nguyen, Esquire
                         Department of Justice
                         Narcotic and Dangerous Drug Section
                         45 N Street, NE
                         Washington, D.C. 20530

For the Defendant:       Sandi S. Rhee, Esquire
                         228 S. Washington Street
                         Alexandria, VA 22314

Also Present:            Kasey Ridings, U.S. DOJ, Paralegal
                         Special Agent Kevin Novick, DEA
                         Victoria Dopazo, Interpreter
                         Shelley Blumberg-Lorenzana, Interpreter
                         Susana Martin, Interpreter

Reported by:             Christine T. Asif, RPR, FCRR
                         Official Court Reporter
                         United States District Court
                         for the District of Columbia
                         333 Contitution Avenue, NW
                         Washington, D.C., 20001
                         (202) 354-3247

Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription


Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

INDEX

| Witness Name | Page |
|---|---|
| Jesus Contreras Arceo | |
|    Cross-examination By Ms. Rhee.............................. | 5 |
|    Redirect Examination By Ms. Sahni........................ | 33 |
| Jose Misaul Bello Madrigal | |
|    Direct Examination By Ms. Naseef......................... | 43 |
|    Cross-examination By Ms. Rhee............................. | 51 |
| Salvador Dominguez Perez | |
|    Direct Examination By Mr. Nguyen......................... | 55 |
|    Cross-examination By Ms. Rhee............................. | 62 |
| Special Agent Kevin Novick | |
|    Direct Examination By Ms. Naseef......................... | 68 |

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

P R O C E E D I N G S

THE COURT:  Let's call the case.

THE CLERK:  The matter before the Court, criminal case No. 21-597, United States of America versus Javier Algredo Vazquez.

Counsel, please come forward and state your names for the record, starting with the government.

MS. NASEEF:  Good afternoon, Your Honor.  Kate Naseef for the United States, with co-counsel, Nhan Nguyen and Kaitlin Sahni.  And at counsel table, paralegal Kasey Ridings and case agent Kevin Novick.

THE COURT:  Good afternoon.

MS. RHEE:  Good morning, Your Honor.  Sandi Rhee for Mr. Javier Algredo.

THE COURT:  Yes.  Good afternoon to both of you.

MS. RHEE:  Sorry, good afternoon.

THE COURT:  All right.  Yes, Ms. Naseef.

MS. NASEEF:  It came to our attention this morning that 28 U.S.C. 1827 requires consecutive translation of witness testimony, and yesterday we were using simultaneous translation, which we apologize to the interpreters.  That may have been part of what was making it very hard for them.

We've conferred.  We have no issue with -- the defense and the government are both okay with moving forward with consecutive translation, but we have no concerns about

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

the use of the simultaneous translation yesterday.

THE COURT:  All right.  And you do not want to proceed with simultaneous translation?

MS. NASEEF:  No, Your Honor.  We want to move to consecutive translation.

THE COURT:  Okay.  All right.  That's what we'll do.

THE INTERPRETER:  Theresa Salazar, federally certified Spanish interpreter.  That would be consecutive translation of only witness testimony.  Simultaneous will be used for all colloquy in the courtroom.

THE COURT:  All right.  Thank you for the clarification.

We're just waiting for one more juror to get here.  Do you want to check?

(Pause in the proceedings.)

(The jury entered the courtroom.)

THE COURT:   All right.  Welcome back to the courthouse, ladies and gentlemen of the jury.  Thank you all for being so conscientious and flexible as we accommodate try and everybody's necessary schedules.

We're going to resume Ms. Rhee's cross-examination of Mr. Contreras.

Mr. Contreras, you remain under oath.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JESUS CONTRERAS ARCEO,

called as a witness, being first duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MS. RHEE:

**Q.** Good afternoon, Mr. Contreras.

**A.** Good afternoon.

**Q.** I wanted to ask you, do you have access to newspapers or magazines in Spanish?

**A.** No.

**Q.** Do you have access to Spanish language news broadcasts while you're in prison?

**A.** No.

**Q.** So you haven't heard any news or anything about this case while you've been in prison?

**A.** Yes, I heard the news. I -- it was -- I had recess every -- for two hours. And at the time I was on recess from 2:00 to 4:00 in the afternoon, there was no -- no news in Spanish.

**Q.** I'm sorry, perhaps I misunderstood. Did you say you heard about this case while you were in prison?

**A.** No. I did not hear about this case.

**Q.** Okay.

**A.** Okay.

**Q.** And so yesterday, we established that you were a senior

member of the Cartel Jalisco Nueva Generacion; correct?

A.   That's correct.

Q.   Nemesio Ruben Oseguera Cervantes, also known as El Mencho, is the absolute head of that organization; correct?

A.   That's correct.

Q.   And he's very powerful in Mexico; correct?

A.   That's correct.

Q.   And he's dangerous?

A.   Very dangerous.

Q.   And he kills people personally; correct?

A.   People who don't obey his orders, he kills them himself.

Q.   So when he gives an order, people move pretty quickly to obey his orders; correct?

A.   That's correct.

Q.   And just his name in Mexico or your affiliation with the organization and Mencho instills fear; correct?

A.   Correct.

Q.   And you testified yesterday that you ran between eight to ten meth labs simultaneously; correct?

A.   That's correct.

Q.   But on other occasions, you told the government that you mostly ran one laboratory at a time; correct?

A.   The one that I had personally and then I took care of the rest of them.

Q.   So you operated one personally and then you managed the

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

rest?

**A.** With my workers.

**Q.** So talking about Sosa and Picoso, those are the nicknames that you call some of the chemicals that you use to produce meth; correct?

**A.** That's correct.  Of all the chemicals, those are one of the main ones.

**Q.** You told the government, on June 11th, 2020, that these chemicals were produced in Mexico; is that correct?

**A.** That's correct.

**Q.** But perfume comes from China; correct?

**A.** That's correct.  And monomethylamine also.

**Q.** But you have no idea the true names of these chemicals are; correct?

**A.** I don't have them because it wasn't my job.  I was only in charge of managing the labs.

**Q.** You testified yesterday that you met Carlos because Carlos approached you for getting chemicals that were seized at the Port of Manzanillo; correct?

THE INTERPRETER:  Interpreter requests a minute to confer.

"And they were seized."  Interpreter corrects.  "The chemicals that were seized."

**Q.** (BY MS. RHEE)  And that is because you testified that you and the CJNG cartel controlled that Port of Manzanillo;

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

correct?

A.   Mencho controls the Port of Manzanillo.

Q.   But you said yesterday that you were paying off many of the people working at the port; correct?

A.   That's correct, because Mencho authorized me.  Without Mencho's permission, you can't do anything.

Q.   And Mencho was your direct boss; correct?

A.   Correct.

Q.   And you testified that Carlos approached you with chemicals headed for the Sinaloa Cartel because he needed a sponsor; correct?

A.   That's correct, to free those two containers that were in Manzanilla.

Q.   But you testified the DEA had already seized those chemicals so you couldn't help him; correct?

A.   That's correct.

Q.   And the DEA had seized those chemicals in the Port of Manzanillo; correct?

A.   That's correct.

Q.   Do you remember the approximate date when the DEA seized those chemicals from the Port of Manzanillo?

A.   I don't remember.  It was in 2011.

Q.   Do you remember the first time you discussed Javier Algredo with the government?

A.   Yes, correct.

**Q.** So it was April the 29th, 2021; correct?

**A.** I don't remember, but if she knows it, it's okay.

**Q.** Okay. So you told the government that the reason that Mencho allowed Javier Algredo to twice share in finished meth was because Javier had helped Mencho recover previously seized chemicals from the ports. Do you remember that?

THE INTERPRETER: I'm sorry, interpreter requests repetition of the question.

**Q.** (BY MS. RHEE) That you told the government that the reason that Mencho allowed Javier Algredo to twice share in finished meth was because Javier Algredo had helped Mencho recover previously seized chemicals from the ports?

**A.** No. From the moment we freed those containers, he was going to start working for our cartel.

**Q.** So you didn't tell the government that Javier had helped Mencho and that's why Mencho was allowing Javier to cook meth. Is that correct, you don't remember that?

**A.** I don't remember.

**Q.** So just want to be sure that you remember being shown a photo of Carlos Algredo on February the 3rd, 2021. You remember that; correct?

**A.** Yes, that's correct.

**Q.** And you told him that you -- you told the government that you recognized him; correct?

**A.** Yes, that's correct.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   But what you don't remember is that one week before, on January the 27th, that you were unable to pick out Carlos Algredo from a group of six photos; correct?

A.   I remember that I always identified Francisco Pulido and Carlos.  That's perhaps where the confusion is.

Q.   Because they look alike?

A.   No, they don't look alike at all.

Q.   So you don't remember not being able to identify Carlos. That's just -- I just want to be sure that you don't remember not being able to identify Carlos; correct?

A.   I remember that I did identify him.  But if the lady attorney says that I didn't, well, that's where the confusion is.

Q.   And you also don't remember telling the government that you had no dealings with Carlos Algredo Vazquez; correct?

A.   That Javier was a partner of Carlos in the exportation of chemicals from China to Mexico.

Q.   My question is:  You don't remember telling the government that you had no dealings with Carlos; is that correct?

A.   I always commented to them that Carlos is the one who always exported the chemicals from China to Mexico.

Q.   Do you remember on April the 29th, 2021, and I know that you don't remember the dates, but do you remember the first time that you spoke about Javier Algredo Vazquez?

A.   I can't remember the date.

Q.   Okay.  Do you remember when the government started the meeting, they told you we want to talk about Javier Algredo Vazquez, also known as Men, before they started -- I'm sorry.

A.   Yes, that's correct.

Q.   Because that's how they generally started their meetings, right, they set the agenda?

A.   That's when I told them Javier was Carlos's brother.

Q.   So at the beginning of each meeting the government, they told you who they wanted you to talk about; correct?

A.   No, because we would organize that with my attorney regarding the meetings.

Q.   So you and your attorney decided to -- decided the topics that you wanted to talk about?

A.   My attorney, male attorney.  It wasn't a female attorney.

Q.   So when you were asked about Javier Algredo, also known as Men, you answered that you were unsure of his nickname, but that you had heard someone referring to Mr. Algredo as Men; correct?

A.   Yes, that's correct, in the communication that he would put that.

Q.   What communications are you talking about?

A.   The Blackberry.

Q.   So you had Blackberry communications with Javier Algredo?

A.   Never.  No, it was always through Francisco Pulido's Blackberry with him.

Q.   Okay.  And when you made this comment to the prosecutors, that was more than two years ago; correct?

A.   That's correct.

Q.   And just a month after that, you started telling the prosecutors a lot of information about Javier Algredo; correct?

A.   That's correct.

Q.   And you told the government that Javier would frequently visit Mexico, didn't you?

A.   Yes, that's correct, but I had only met with him in person three times.

Q.   Then how would you know how many times Javier Algredo visited Mexico?

A.   Through Francisco Pulido and through Carlos's brother.

Q.   So how -- when you say through Francisco Pulido and Carlos Algredo (sic), how did you learn that Javier Algredo was a frequent visitor to Mexico?

A.   Because Francisco Pulido would have to report everything to me so that they wouldn't be sending chemical products to other -- another port -- other people in Mexico.

Q.   Okay.  But that's not answering the question.  Did Francisco Pulido report to you each time Javier Algredo visited Mexico?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.    Francisco Pulido would report to me, but I'm not sure if he was faking it or he was giving me the right information.

Q.    You told the government that you sent Martin Partida, your worker, to meet with Javier; is that correct?

A.    Yes, that's correct.

Q.    And then Martin reported back to you that he had met with Javier; correct?

A.    That's correct.

Q.    And yesterday you testified about meeting Carlos in Francisco's warehouse; correct?

A.    That's correct.  Correct.

Q.    And you listened to some audiotapes or audio recordings that the government played for you yesterday; correct?

A.    Yes, of Carlos and Francisco Pulido.

Q.    And that was only for the purpose of voice recognition; correct?

A.    That might be the case, but I did know Carlos and Francisco Pulido.

Q.    Okay.  And the government had to play some of the recordings for you more than once; correct?

A.    There were four or five recordings that they had us -- me listen to.

Q.    And you told the jury under oath here in court yesterday that you had trouble with Carlos's voice because when you met with Carlos in Francisco's warehouse, you were all kind of

standing apart at the meeting; correct?

A.   Yes, that's correct.  Francisco Pulido's office is large.

Q.   When was the first time you met at Pulido's office?

A.   I can't remember, but many times.

Q.   I apologize, I mean -- the question that I wanted to ask is when was the first time that you met with Javier Algredo, Carlos Algredo, and Francisco Pulido at Francisco's warehouse?

A.   I think it was the meeting of 2013, as far as I can remember.  2011, 2013, I can't remember very well.

Q.   When you all met, Carlos Algredo, Javier Algredo, Francisco Pulido, and you, at Francisco's warehouse, you were there for a business meeting; correct?

A.   Yes, I mentioned that yesterday.  It was regarding the transporting of chemicals from China to Manzanillo, or can you not remember?

Q.   I remember.  I just wanted to clarify with you.

     But it was illegal business that you were meeting about; correct?

A.   That's correct.

Q.   Were you yelling across the room at each other?

A.   No, no, we were not shouting at each other, because we're human.

Q.   And it wasn't -- that wasn't the first time you heard

those audio recordings from yesterday, were they?

A.   I heard them yesterday for the first time.

Q.   So the government never played them for you during your meetings with them?

A.   Never.

Q.   So when you met with Carlos Algredo and Javier Algredo, you spoke of chemicals, you must have used their nicknames; correct, the chemicals' nicknames?

A.   Well, I would always arrive to negotiate the prices with Francisco Pulido, and Francisco Pulido had his team which was Carlos and Javier.

Q.   Okay.  So it was Francisco Pulido who communicated what you needed to Javier Algredo and Carlos Algredo; is that correct?  Is that what you're saying?

A.   Yes, because they were the team of the new generation of us to bring the chemicals to the Port of Manzanillo, Francisco, Carlos, and Javier.

Q.   Okay.

        MS. RHEE:  Your Honor, the parties have agreed that the documents that I've marked as exhibit -- Defense Exhibit 2, 3, 11, and 13 are admissible in evidence.  And I move them into evidence at this point.

        THE COURT:  And it's Defense Exhibits 2, 3, 11, and 13?

        MS. RHEE:  Yes, Your Honor.  I -- yes, Your Honor,

it's 2, 3, 11, and 13.

THE COURT:  Okay.  And the government has agreed that Defense Exhibits 2, 3, 11, and 13 may be admitted?

MS. SAHNI:  Yes, Your Honor, no objection.

THE COURT:  Okay.  2, 3, 11, and 13.  Okay.

MS. RHEE:  I understand -- I want to show --

THE COURT:  Are you going to say what they are?

MS. RHEE:  It's the first --

THE COURT:  Usually we understand what they are -- ladies and gentlemen, usually when an exhibit is admitted, the witness identifies it, we know what it is, so we all have a general idea of what we're doing.

I have zero idea what 2, 3, 11, and 13 are.  What are they?

MS. RHEE:  Defense Exhibit 2 is the plea agreement of Mr. Jesus Contreras Arceo, also known as Canasta.  The second defense -- excuse me, the defense exhibit --

THE COURT:  Do you want to use the witness at all for this?

MS. RHEE:  Yes, I do.

THE COURT:  Okay.  So why don't you --

MS. RHEE:  Do you want me to go ahead and list what they are first and then --

THE COURT:  Well, if you're going to use the witness to do that, and we'll be able to identify what the exhibits

Cross-examination - Contreras Arceo

are --

            MS. RHEE:  Okay.

            THE COURT:  -- through the witness, that's preferable than you doing that.

            MS. RHEE:  Okay.  Yes.

            THE COURT:  So -- but I just wanted to make sure somebody was going to say what these were.

            MS. RHEE:  Your Honor, I was going to say it.

            THE COURT:  Okay.

            MS. RHEE:  I was going to tell them that it's been marked as exhibit -- excuse me.  I'm going to start with, excuse me, Exhibit 3.

**Q.**   (BY MS. RHEE)  I want to show you what's been marked as exhibit -- Defense Exhibit 3.  It is the statement of facts in your criminal case in the Eastern District of Virginia.

**A.**   (Speaking Spanish.)

            THE COURT:  Can I just explain one thing before you -- yesterday you heard what's called simultaneous translation, which is we don't hear the interpretation going back and forth, it's all in the earphones.  We're changing it up today to have what we call consecutive interpretation, so we can hear both the Spanish being translated and so on. Just, I know you all notice the difference, but I think it's a little bit less cumbersome than having those earphones running out of juice all the time.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Now, Ms. --

THE INTERPRETER:  Now I will explain to him.  I didn't want to speak over you.

THE WITNESS:  So I want to know what you're saying.

THE INTERPRETER:  And the interpreter apologizes that we didn't interpret that.  Could you repeat, please?

MS. RHEE:  Sure, of course.

Q.  (BY MS. RHEE)  I'll just say, do you recall that when you pled guilty in the Eastern District of Virginia, that your plea -- excuse me, your plea agreement is in three parts?

A.  Two sections, wasn't it?

Q.  Well, there's a plea agreement, that's been marked as Exhibit 2.  There is the statement of facts, and that's been marked as Exhibit 3.  And then yesterday we talked about the sealed addendum to the plea agreement, and that's just like a cooperation agreement that you have with the government that's a secret.

A.  That is correct.

Q.  So just want to draw your attention to the statement of facts.  And I understand that this document is in English, but do you recognize the signature on the last page of this document?

MS. RHEE:  May I publish this on the ELMO?

THE COURT:  Yes, you may.

A.  Yes, that's correct, it's mine.

THE COURT:  Ladies and gentlemen, you should be able the see that on your screens.  And if you can't see something on your screens, please raise your hand so that we can make sure your screen is working correctly.  Okay.

Q.  (BY MS. RHEE)  And when you pled guilty in this case, Mr. Contreras, the judge reviewed with you these documents, didn't he?

A.  Through my lawyer.

Q.  You were in court when the judge asked you about these three documents; correct?

A.  I remember having signed them, but as far as the one regarding the protected information, I'm a little confused.

Q.  Okay.  My --

A.  And my lawyer is not here with me to be able to explain what you're indicating.

Q.  Okay.  My question is very simple.  After signing these documents, you went to court, and there was a judge, Judge Ellis, and there was an interpreter interpreting everything that was going on for you that day; correct?

A.  That is correct.

Q.  And during that hearing, the judge asked you about these documents that you had signed; correct?

A.  That's correct.

Q.  And on that day, you swore under oath that what you had signed was correct, these -- what you had signed was

correct?

A.   That's correct.

Q.   And you agreed that they -- the facts in the statement in these documents were true, didn't you?

A.   That's correct.

Q.   And in the statement of facts that you just indicated that you signed, you agreed that you laundered over $200 million in drug money; is that correct?

A.   From the beginning of the cartel to date.

Q.   And isn't it true that in this statement of facts, you stated that you employed sicarios, or assassins, that, at your direction, carried out numerous acts of violence, including murders, kidnappings, tortures, and the forceful collection of drug debts; correct?

A.   That's correct.

Q.   So you also directed others to commit acts of violence on your behalf; correct?

A.   Under Mencho's orders.

Q.   And you testified yesterday that you personally committed an act -- that you personally killed someone over a drug debt; correct?

A.   That's correct.

Q.   And you told the government that the man that you killed was someone with a nickname Handicap; correct?

A.   No.

**Q.** Okay.  I think the word "handicap" --

**A.** Yes, he had had an accident and his back was messed up.

**Q.** And so he was used -- he used a wheelchair to get around; correct?

**A.** And he drove like that.

**Q.** And you took him to a warehouse?

**A.** Not exactly.  He was invited to a -- we made an appointment with him to go to a restaurant in Guadalajara, and then he was taken to a warehouse in --

THE WITNESS:  Ciudad Guzman.

**A.** -- Ciudad Guzman.

THE INTERPRETER:  Thank you.

**A.** Jalisco.

**Q.** (BY MS. RHEE)  And you knew this was a warehouse where other murders occurred; correct?

**A.** Yes, that was where most of the people were invited to go when Mencho had them picked up.  There were very few who left there alive.

**Q.** And did you tell the government on that day that there were about 20 to 30 people present at the warehouse?

**A.** That's correct, among sicarios, assassins.

**Q.** But it was you who shot the handicapped man in the head with your .38 caliber handgun, wasn't it?

**A.** Yes, that's correct.  Mencho asked why he had hidden himself.  He said no, no, I'm going to pay you.  Then he lied

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

to us and Mencho said kill him, shoot him, do it.

Q.  And after you shot him, the handicapped man was thrown into acid so that his body would be dissolved; correct?

A.  That's right, it's correct.  Everyone who went into that warehouse would be disappeared in acid.  That's what we did.

Q.  By the way, do you have a license to carry that .38 caliber Super handgun?

A.  I've never had a permit.  I always carried it illegally.

Q.  And it wasn't just a .38, it was a Super handgun; correct?

A.  It was a Super .38, which we use a lot in Mexico.

Q.  And the difference between a Super .38 caliber and a regular .38 caliber is that the Super is magazine fed; correct?

A.  That's correct.

Q.  And isn't it true, then, in your statement of facts, that you also carried an M21 rifle?

A.  Yes.  When I would go to a lab, I would carry an M21.

Q.  And you also had a AK-47; is that correct?

A.  Yes.  "Goat horns," we call it.  That's true.

Q.  Okay.  So now I just want to ask you about your plea agreement.  And again, this document is in English.  But on the very last page, is this your signature on that?

A.  Yes, that's correct.

Q.  And it looks like you signed actually every single page of

the document; is that correct?

A.    That's correct.

THE COURT:   And for the record, what you were just talking about was Defense Exhibit 2?

MS. RHEE:   Yes, Your Honor.

Q.   (BY MS. RHEE)   And in this plea agreement, you pled guilty to conspiracy to manufacture 500 grams or more of a mixture and substance containing methamphetamine, knowing and intending that the substance would be imported into the United States.   And Count 2, you pled guilty to conspiracy to commit money laundering, with the intent to promote the carrying on of specified unlawful activity, the manufacture and distribution of methamphetamine; correct?

A.    That's correct.

Q.    And your advisory sentencing guidelines was life; correct?

A.    That's correct.

Q.    And that's just for Count 1.

And for Count 2, it was the same, life; correct?

A.    For the same.

Q.    And so you pled guilty -- but you were cooperating prior to pleading guilty; correct?

A.    That's correct.

Q.    So even though your guideline range was life, you received 35 years; correct?

A.   That's correct.

Q.   Okay.  And now I'm going to show you what's been marked as Defense Exhibit 11.  It's the consent order of forfeiture. And I'm going to show you the very last page with your signature.  Is that your signature?

A.   That's correct.  That's correct.

THE COURT:  And let me just interrupt one second, Ms. Rhee.

These items that have been admitted into evidence will be supplied to you for you to look at more closely during your deliberations.  So even if it's just appearing momentarily on the screen and you feel like you haven't had time to read it, have no worries.  If it's admitted into evidence, you will be able to examine it more closely during your deliberations.  So I just want you to understand that.

Q.   (BY MS. RHEE)  Isn't it true that you agreed to -- the consent order of forfeiture in the amount of $50 million?

A.   That, I don't remember.

Q.   Well, what you signed says that you agree to pay back money that you made as a drug trafficker.

A.   That, I don't remember.

Q.   And the final document is what's been marked as Defense Exhibit 13.  It is the judgment in a criminal case.  And you did not sign this document, but it shows that the judge in your case imposed a sentence of 480 months, but -- I'm sorry,

it's 420 months.

A.   It's 35 years.

Q.   So now I want to ask you about Victor Mora's -- or I think you refer to him as Men -- his ranch in Mexico.

A.   Yes.

Q.   So yesterday you testified that you actually had a worker nicknamed Men; correct?

A.   That's correct.

Q.   And this Men worked with you, Peteto, and Martin Purtida; correct?

          THE INTERPRETER:  Please repeat the last name.

          MS. RHEE:  Martin Purtida.

A.   That's correct.

Q.   (BY MS. RHEE)  And so his real name is Victor Mora, but you're calling him Vico, or Men; correct?

A.   That's correct.

Q.   Isn't it true that the first time that you ever told the government that Victor Mora was Men was about two weeks ago?

A.   That's correct.

Q.   And before that, you never said anything about there being another Men, did you?

A.   No, it's correct.

Q.   And Victor, he's the one who owned the ranch?

A.   That's correct.

Q.   That's where the meth lab was?

**A.** That's correct. That's where we improved the method, so the processing for methamphetamine.

**Q.** And Victor lived there with his family?

**A.** His mother and his father.

**Q.** He didn't -- his wife and children didn't live there?

**A.** He had them close by in a little town, but he lived mainly at the ranch.

**Q.** What did Victor do for you as a worker?

**A.** When we started with him in Metrican, we started processing pseudoephedrine.

**Q.** So he was a pseudo -- what -- he was a cook for you then?

**A.** That's correct.

**Q.** Did he do anything else?

**A.** No. When we came from Guadalajara to Jalisco, about a year and a half later I brought him to Jalisco -- to Jalisco, yes.

**Q.** So yesterday you testified that the drugs sent to Javier were delivered by Peteto; correct?

**A.** That's correct.

**Q.** And Peteto confirmed that the drugs were delivered; correct?

**A.** That's correct.

**Q.** And I just -- one last time, I just want to confirm that Francisco Pulido's daughter was your girlfriend; correct?

A.   That's correct.

Q.   You also testified that Javier Algredo told you that he could cook meth in a way that produced a higher yield; correct?

A.   That's correct.  That is what permission was given to Javier.

Q.   Okay.  But Javier told you -- you said that Javier told you that he could produce ten to 12 more kilos than what your people could do; correct?

A.   That's correct, per barrel.

         MS. RHEE:  I'm sorry, the last?

         THE INTERPRETER:  "Per barrel."  The interpreter repeats.

         MS. RHEE:  Thank you.

Q.   (BY MS. RHEE)  And that's a lot more meth, isn't it?

A.   That's correct.

Q.   And since you were a big meth producer, running eight to ten labs all at once, you would want to learn this new way, wouldn't you?

A.   That's correct.

Q.   Did Javier show you how to cook meth this new way?

A.   His people got the same yield that we had.

Q.   So Javier didn't get more meth per barrel than, you, your people did?

A.   No.  That's why Martin told me Raul and Paco were there to

learn, but they obtained the same yield.  When Mencho asked me what percentage it had yielded, I said it's the same.

Q.  So when Javier told you that he could produce a higher yield per barrel than you could, did you ask him how he could do that?

A.  He brought his workers to get that job done, but it didn't yield the same.  Because everything is proven with facts, not with words.

Q.  Okay.  So the answer is you didn't ask him how he could get more yield per barrel; is that correct?

A.  That's always in the process, because it's a rustic, basic process and one knows what the recipe is.

Q.  So he wasn't talking about a new recipe; correct?

A.  He was talking about getting a higher percentage of kilograms, but he didn't get that.

Q.  And can you tell us what he told you about how to get a higher yield of kilograms of meth?  What did he tell you?

A.  That it was in the process and the process of resting that more methamphetamine could be obtained.  That's why Martin, Tony, Raul, and Paco got in, in order to learn, but it didn't work, it was the same.

Q.  So let's talk about the Casa de Cambio you were talking about yesterday.

A.  Okay.

Q.  You testified that you took between a million to

$2 million to deposit into Francisco's account; correct?

**A.**   Not to Francisco's account.   Francisco was given the 1, $2 million in cash, and he deposited that in the exchange agency for the transfer to be made.

**Q.**   Okay.   So he made the transfers to China; correct?

**A.**   The exchange house or agency did.

**Q.**   And do you know what specific chemicals you were getting for the 1 million to $2 million that you paid Francisco in cash?

**A.**   All that -- everything that was exported -- or imported --

        THE INTERPRETER:   Interpreter correction.

**A.**   -- from China, perfume, monomethylamine, nitro- --

        THE INTERPRETER:   The interpreter requests repetition.

**A.**   Nitroethane, dulce, and iron, hierro.   And at the end we were also including the alcohol, benzyl alcohol.

**Q.**   So if Javier needed to be paid, it was Francisco who paid Javier; correct?

**A.**   That's correct.   Francisco Pulido was always the one receiving the money so he would be in charge of having the products in the warehouse.   So that's why I delivered that to Francisco Pulido, so that he would report everything to me.

**Q.**   But you never sent money to Javier directly; correct?

**A.**   Francisco Pulido reported to me that he was the one in charge of paying Javier and Carlos, because I had to report to

Mencho.

Q. Did Francisco ever tell you in what account they deposited the money -- that he deposited the money?

A. He did all the transfers done at the exchange agencies to the businesses in China. Where Carlos and Javier ordered.

Q. So yesterday you testified that while you were working with Carlos, he was living in Mexico City; is that correct?

A. That's correct.

Q. In preparation for trial, you met with the government on March the 15th, 2023, about four months ago; correct?

A. I don't remember the date.

Q. Okay. But at that meeting, the government told you they wanted to discuss Carlos and Javier Algredo. Do you remember that?

A. About Javier.

Q. Okay. You told them that during -- on that -- during that meeting, you told the government that during the time of the meetings between -- the three meetings that you had with Javier Algredo and Carlos Algredo and Francisco Pulido, that both Carlos and Javier lived in the United States. Do you remember that?

A. Just Javier. Carlos lived in Mexico City.

Q. So the question is: You don't remember saying that to the government; correct?

A. About Javier living in the United States, yes. Carlos,

no.

Q. Okay. So I want to ask you about your testimony yesterday. You said that one time you wanted to meet with Javier about some chemicals, and you had to tell Francisco, who had to tell Carlos, who had to contact Javier. And then Carlos had to contact Francisco to tell you; is that correct?

A. That's correct.

Q. So you never had contact directly with Javier Algredo; correct?

A. Never.

Q. You didn't have his phone number?

A. I did not have his phone number because I did not use a phone. I used only Blackberry. And they were Francisco Pulido's team, Javier and Carlos.

Q. You didn't have Javier's Blackberry information; correct?

A. When I talked to him, I talk over Francisco Pulido's Blackberry.

Q. But nothing directly with Javier; correct?

A. That's correct.

Q. And nothing directly with Carlos; correct?

A. That's correct. Everything was through Francisco Pulido.

Q. Okay. So when you wanted to arrange meetings with Javier

and Carlos, you had to contact Francisco Pulido; correct?

**A.** That's correct, because they were on Francisco Pulido's team. Francisco Pulido reported to me so that I would report to Mencho.

**Q.** Mr. Contreras, isn't it true that the first time you've ever seen Javier Algredo was yesterday in the courthouse?

**A.** No. I saw him in Mexico three times.

MS. RHEE: Your Honor, if I can have just a minute, I just want to talk to my client.

I have nothing further, Your Honor.

THE COURT: Do we have a fairly long redirect, meaning should we take a break now and then come back for redirect?

MS. SAHNI: Yes, Your Honor, I think now will be a good time for a break.

THE COURT: Okay. So we'll take a ten-minute break now so we don't have to interrupt the redirect examination.

(A recess was taken.)

THE COURT: Could I just clarify one thing, Ms. Rhee. Is the sealed part of the plea agreement not part of Exhibits 2 or 3?

MS. RHEE: It is, Your Honor. What I wanted to do, and I can't -- we're going to redact everything, but the relevant portions on the second page. And so if I can --

THE COURT: And then it will just be part of

Exhibit 2?

MS. RHEE:  I think it's Exhibit 1, Your Honor.

MS. SAHNI:  It is Defense Exhibit 1, Ms. Rhee.

THE COURT:  Oh, is the sealed part of the plea agreement?

MS. SAHNI:  Yes, Your Honor.

THE COURT:  Okay.  Got it.

(Jury entered the courtroom.)

THE COURT:  All right.  Ms. Sahni, are you ready for your redirect?

MS. SAHNI:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. SAHNI:

Q.  Mr. Contreras, you previously testified that Carlos asked you to help retrieve some chemicals that were originally intended to go to the Sinaloa Cartel; is that correct?

A.  Yes, that's correct.  Javier had brought them through the cartel Sinaloa Cartel.

Q.  When Carlos asked for your help, how was the relationship between the CJNG and the Sinaloa Cartel?

A.  There was no problem.  Through business, we could work on everything.  And Mencho would give them permission charging them the percentage for them to arrive at the Manzanillo port. And the Sinaloa Cartel would give us permission to transport the methamphetamine through -- to Tijuana through their area.

But it was just required to have respect to report everything and then everything could be done.

Q. Was that an agreement that the CJNG and the Sinaloa Cartel had with each other at the time?

A. That's correct.

Q. Did that agreement eventually break down?

A. After Chapo Guzman was caught, Chapo's children began to give us a lot of trouble. Mencho was always in good condition with Mayo.

Q. Could you explain who Mayo is?

A. Mayo was an associate of Chapo Guzman. Mayo Zambada has been detained.

Q. Who is Chapo Guzman?

A. Chapo Guzman was extradited to the United States, and he's serving a life sentence right now. He was the leader of the Sinaloa Cartel.

Q. Mr. Contreras, if you could please remember to speak slowly so the Court interpreters don't get mad at us.

A. Yes.

Q. Do you recall approximately when Chapo Guzman was arrested?

A. No, I don't remember.

Q. How was the relationship between the two cartels after the arrest of Chapo Guzman?

A. When Chapo Guzman was detained, Mencho continued to send

someone from the offices.  He would meet with Mayo Zambada. And the agreement was whenever methamphetamine or cocaine was going to be moved, they would mutually respect each other, not do it behind each other's backs and always pay the proper percentage.

Q.  Was that the agreement before Chapo Guzman's arrest or after?

A.  Always and after Chapo Guzman's arrest.  When the kids, Chapo Guzman's children, began to give Mayo a lot of trouble, Mayo sent a message to Mencho and said that he couldn't deal with them anymore because they were doing a lot of unjust things.  He wanted to continue to have the relationship with Mencho that he had had until that time, each one respecting their territory.

If Mencho wanted to go to Tijuana, he would just always have to pay the percentage and pay the federal off -- the feds.  And also in the ports, Mayo would report to Mencho when he was going and also showing respect and paying percentage. Because Mencho would send a letter saying, you know, we have to pay the government a lot.  And Mencho told him don't forget to bring me some every time you do a trip.

This agreement continued up until the day when I was brought here, because there was also someone who was with me who was extradited.  And he said he had the same relationship with Mayo.

Q. So under this arrangement, what would happen to someone who tried to bring precursor chemicals through a port that the CJNG controlled without the CJNG's permission?

A. Mencho would have them killed or would kill them. And he would send a message to Mayo saying that they had not reported in. And Mayo would say that that was the right thing to do. No one reported to Catro, who was the one we had on our side, about Navo, but things should be done as they were supposed to be done without losing respect for each other.

Q. In cross-examination, some of the chemicals you mentioned were perfume, nitroethane, and benzyl alcohol; is that correct?

A. That's correct.

Q. Were those primary chemicals for manufacturing methamphetamine?

A. Yes, that's correct. They're the ones exported from China.

Q. To manufacture a batch of methamphetamine, would you use only one of those primary chemicals at a time?

A. All the chemicals have to be used at the same time.

Q. So you would -- is it correct that you would mix the perfume, nitroethane, and benzyl alcohol?

A. No, no, no. Perfume is a main product. Nitroethane is another main product. And benzyl alcohol is a main product for all three --

THE INTERPRETER:  Interpreter requests repetition.

A.  So perfume, nitroethane, and also benzyl alcohol are each one different and used as a main product.  Monomethylamine is one of the three that always has to be a part of it.

Q.  (BY MS. SAHNI)  Were perfume, nitroethane, and benzyl alcohol essentially three different ways of manufacturing methamphetamine?

A.  That is correct.

Q.  Did each of those three ways of making methamphetamine require some different chemicals?

A.  With monomethylamine.

Q.  Is that the chemical that was the same for all three?

A.  So for the three chemicals, monomethylamine is important for the three.

THE INTERPRETER:  One moment.  The witness repeated the three, three times.

Q.  (BY MS. SAHNI)  Over time, did the primary chemical that you used to manufacture methamphetamine change?

A.  That's correct.  At first we used perfume, then later nitroethane and then later benzyl alcohol.

Q.  Why did the method that you used change over time?

A.  Because the DEA began to restrict.  I don't know if they were restricting the Chinese companies or the Mexican importers, but first it was restricting perfume and then restricting nitroethane, and also benzyl alcohol and

monomethylamine.

Q.   Did those enforcement actions make it more difficult for you to get those particular chemicals?

A.   That is correct.

Q.   You previously mentioned on cross-examination a ranch that was used to experiment.  Do you remember that?

A.   That's right.

Q.   Why were you experimenting?

A.   For the same reason that perfume could no longer be brought out of China to Mexico.  That's when we began to bring nitroethane, and then benzyl alcohol.

Q.   Did each one of those chemicals require a different recipe for manufacturing methamphetamine?

A.   For nitroethane, we needed dulce and hierro.  It was the difference.  Sosa, acetone, and others are the same.

Q.   Was it someone's job in the cartel to experiment with new methods or recipes for making methamphetamine?

A.   Oh, that's right, at Men's ranch, we had the ability to experiment with different recipes.

Q.   Were you the one who was personally experimenting?

A.   I just would go there.  We had people, Cacho and Danny, who were there, and Vico.

Q.   Can you remind us what Men's real name is?

A.   Victor Mora.

Q.   What did Men look like?

A.   He's tall and light-skinned.  He has red hair.

Q.   Does he look like Javier, in your opinion?

A.   No.

Q.   Did the government ever ask you about Victor Mora prior to your meeting with them about two weeks ago?

A.   Yes.

Q.   Do you recall when the government asked you?

A.   Two weeks ago.

Q.   Okay.  So was that the first time the government asked you about Victor Mora?

A.   That is correct.  That was the first time I was asked about Victor Mora.

Q.   In your prior meetings with the government, did we play some audio recordings for you?

A.   No, none.

Q.   We never played clips of phone calls for you?

A.   No, none.

Q.   You don't remember that?

A.   I don't remember.

Q.   You spoke on cross-examination about exchange houses; is that correct?

A.   That's right.

Q.   Do you know the bank account numbers used to send the money from the exchange houses?

A.   I don't know, because that was why the exchange houses

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Redirect Examination - Contreras Arceo

would charge a percentage for making the transfers.

Q. Was it the people who operated the exchange house who were responsible for knowing that information?

A. That's right. The person who works at the exchange house is the one who is concerned with or has that information.

Q. Is the person who operates the exchange house also the person whose job it is to know the account number of the recipient of the transaction?

A. That's correct.

Q. Mr. Contreras, I'd like to show you what has been marked and previously admitted as Defense Exhibit 1. Is this the addendum to your plea agreement?

A. Yes, correct.

MS. SAHNI: And I'll just please ask the interpreter to read this first line here in Spanish to the witness, that says "Sealed Addendum to the Plea Agreement."

A. I'm sorry, I did not understand.

THE INTERPRETER: Interpreter will repeat.

A. Yes, that's correct.

Q. (BY MS. SAHNI) And here at the bottom, is that your signature?

A. That's correct.

Q. And in this document, when it references a defendant, is that you?

A. That's correct.

Q.  I'm going to show page 3, paragraph 2.  This agreement says that nothing in this agreement prevents the government in any way from prosecuting the defendant should the defendant knowingly provide false, untruthful, or purjurious information or testimony.  Is that your understanding?

A.  Could you repeat, please?  I did not understand that word.

Q.  Yes.  This agreement says that nothing in this agreement prevents the government in any way from prosecuting the defendant should the defendant knowingly provide false, untruthful, or purjurious information or testimony.  Is that your understanding?

A.  Yes, that's correct.

Q.  And then paragraph 4, it also says in this agreement that this plea agreement is not conditioned upon any outcome in any pending investigation.  Is that your understanding?

A.  Yes, that's correct.

Q.  And this agreement also says that the plea agreement is not conditioned upon any results in any future prosecution which may occur?

        THE INTERPRETER:  Please, can you leave it on the screen for the interpreter?  Thank you.

A.  That's correct.

Q.  (BY MS. SAHNI)  If I may finish the sentence on page 4.  Because of the defendant's cooperation.  Is that your

understanding?

A.  Yes, that's correct.

Q.  Mr. Contreras, what is the most important thing you have to do as part of your cooperation?

A.  To say the truth.

MS. SAHNI:  Thank you.

THE COURT:  Are you done with redirect?

MS. SAHNI:  Yes, Your Honor.

THE COURT:  All right.  Mr. Contreras, you're excused.

And could the government call its next witness.

MS. NASEEF:  Yes, Your Honor, the government calls Jose Bello Madrigal.

THE COURT:  Is Mr. Madrigal coming from the witness room?

MS. NASEEF:  Yes, Your Honor.

THE COURT:  Okay.

MS. NASEEF:  He is here in the courthouse.  I don't know if he stepped out of the witness room.

THE COURT:  Do you want to check?

MS. NASEEF:  Someone went to get him, Your Honor.

THE COURT:  Okay.  The witness room is down the hall, so sometimes it takes a couple minutes.

MS. NASEEF:  Your Honor, the witness asked if he can please use the restroom before he takes the stand.

THE COURT:  All right.  Is he doing that right now?

MS. NASEEF:  Yes.

THE COURT:  Ladies and gentlemen, why don't we stand up, if you want, stretch, refresh yourself a little bit before we start with the next witness.  We spend a lot of time sitting.  Take advantage of these moments to stretch a little bit.

Please step forward to the witness stand, which is right up here.

MS. NASEEF:  Your Honor, we need translation for this witness, please.

JOSE MISAUL BELLO MADRIGAL, called as a witness, being first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you, sir.  You may be seated.

THE WITNESS:  Thank you.

THE COURT:  Please proceed, Ms. Naseef.

DIRECT EXAMINATION

BY MS. NASEEF:

Q.  Good afternoon.  Can you please state your name for the record?

A.  Good afternoon.  I am Jose Misaul Bello Madrigal.

Q.  And where are you employed, Mr. Bello?

A.  I work at a technical control task group in the general

electorate of the special agency of the prosecution of the division of organized crime in the Republic of Mexico.  The acronym is FEMDO.

Q.   That's a long name.  Is there an acronym that you use to refer to your specific agency that you work for?

A.   Yes, it's CTC.

Q.   And what does CTC do?

A.   CTC is in charge of interception of communications and geolocation, extraction of information of electronic devices.

Q.   And is CTC part of the government of Mexico?

A.   Yes.

Q.   How long have you worked for CTC?

A.   12 years.

Q.   And what is your current position with CTC?

A.   At the moment, I'm the chief operations officer at CTC.

Q.   How long have you had that job?

A.   Five years.

Q.   Can you please describe for the jury what your primary responsibilities are as the director of operations?

A.   My activity consists of coordinating and supervising the interception of voice -- voice calls authorized by wiretap, wiretaps authorized by the magistrate judges.

Q.   Have you testified before in proceedings, legal proceedings in Mexico?

Direct Examination - Bello Madrigal

A.   Yes.

Q.   Approximately how many times?

A.   Approximately on 50 occasions.

Q.   Who authorizes CTC to intercept communications?

A.   All the wiretaps are authorized by the magistrate judges who indicate that the wiretaps are to be conducted by CTC.

Q.   And who transmits the orders from the judges to CTC?

A.   The prosecutor of the federation.

Q.   And by the federation, do you mean the government of Mexico?

A.   Yes.

Q.   What do you do once you receive an authorization from the Mexican prosecutor's office that has been signed by the judge?

A.   Once an order for wiretap is received with the authorization to intercept and review the calls, we make sure that we comply with what the law in Mexico requires for such activity.  And once it has been reviewed, then it is communicated to the telephone company that there is a judge's order so that the company would cooperate with the authorities.

Q.   How does the telephone company transmit the phone calls to CTC?

A.   The IT department of the telephone company sends the information to our administrative platform for communications

at CTC.

Q.   And does CTC's platform accurately record the calls that the phone company sends?

MS. RHEE:  Your Honor, is this --

(Bench conference on the record.)

MS. RHEE:  Your Honor, the objection is the basis of his knowledge.  How would he know if it's accurately -- all he does is reviews the form and sends it to the phone company. So I don't think there's a basis that's been laid for his knowledge.

THE COURT:  Of how the phone company operates in complying with the Court order?

MS. RHEE:  She asked if the phone -- they were accurately recorded.  How would he know that?

MS. NASEEF:  I can ask another question if you prefer.  He's the director of operations.  I think he described what his responsibility was in that world, but I can ask him --

THE COURT:  Well, you can -- you can ask him -- he's made the statement, how does he know that.  Okay.

(The following proceedings were had in open court.)

THE COURT:  Please proceed.

MS. SAHNI:  Your Honor, I don't believe he answered that question, so --

THE COURT:  Well, why don't you repeat the

question.

Q.   (BY MS. NASEEF)   Does CTC's platform accurately record the calls that the phone company sends?

A.   Yes.

Q.   How do you know that?

A.   Because it's impossible to alter any of the information that the company, the telephone company sends to our platform because it's simultaneous communication.

Q.   Can you explain what you mean by simultaneous communication?

A.   So by simultaneous communication, I'm saying that at the same time that the communication of the line that is being intercepted is taking place, it is recorded on the platform of the CTC.

Q.   Who maintains and updates the CTC platform?

A.   Could you repeat the question?  I couldn't hear clearly.

Q.   Who maintains and updates the CTC platform?

A.   In the CTC, we have an area that is called platform administration.

Q.   And is that area the area that maintains and updates the platform?

A.   Yes.  That is the area that is in charge of always keeping the platform up to date.

Q.   How often is the platform updated?

A.   Approximately every 30 days.

Q.   And is this platform connected to the internet?

A.   No.

Q.   When CTC is authorized to intercept phone calls, is CTC able to intercept voice calls that are made on applications like WhatsApp?

A.   No.

Q.   Can you explain why not?

A.   Because interception of communications in Mexico is limited to those companies that are based in Mexico.  The judge does not have the authority to authorize an interception outside of Mexico.  Our interception platform only allows us to intercept voice calls.

Q.   So are there -- if I understand correctly, there are two different reasons why you -- CTC is unable to intercept WhatsApp calls; is that right?

A.   That's correct.

Q.   The Mexican government is not authorized to compel WhatsApp, as far as you understand?

A.   Could you repeat the question, please?

Q.   The Mexican government does not have the legal authority to compel WhatsApp.  Is that your understanding?

A.   Yes, they don't have the authority to request WhatsApp to allow an interception.

Q.   And I believe you also said even if you could compel WhatsApp, your equipment would not technically be able to

collect that data?

**A.** Yes, that's correct. Our platform does not allow for the interception of that type of communications.

**Q.** Who has access to the CTC platform where the calls are stored?

**A.** Well, the person who has access to the platform is the administer -- the one who administers the platform, the supervisor who makes sure that the platform is working correctly. And the analyst staff who are in charge of listening to the communications and who I supervise as the boss, we are in charge of listening to these communications.

**Q.** Does the platform create a record of every user that accesses a recorded call?

**A.** Well, the operating staff has a key folder, a unique access key so there is a record of every time they access the information.

**Q.** Does CTC provide the intercepted calls to the Mexican prosecutor's office?

**A.** Yes.

**Q.** How often?

**A.** The prosecutor, when he refers to an intercepted communications, it's the prosecutor who decides how often they want to be informed or provided that information. This could occur every seven or every 15 days.

**Q.** How does CTC provide the recorded calls to the

Direct Examination - Bello Madrigal

prosecutor's office?

A.   So the calls are within the period that the prosecutor has decided for them to be recorded, are stored on a CD with the original CD and a copy.  And then they are provided to the office of the prosecutor with the documentation that establishes the chain of custody.

Q.   How long are the calls stored on the CTC platform?

A.   So the records are stored up to 15 days after the turn that has been authorized for the interception has concluded. Authorized by the judge.

Q.   One moment.  Are the calls -- what do you do during those 15 days between when the authorization period ends and when the calls are removed from the CTC platform?

A.   The final reports are developed and a final document indicating that this authorization period has ended has -- is also drawn up.

Q.   Does CTC also confirm that all of the recorded calls have been sent to the prosecutor's office during that time period?

A.   Yes.  All the communications that were recorded on the platform are sent to the prosecutor's office.

Q.   And after the calls are removed from the platform, is the only copy of the intercepted calls the CDs that are maintained by the prosecutor's office?

A.   Yes.  The platform no longer keeps information.

Q.   Turning to the interceptions in this case, did you or someone you supervise send authorizations to a Mexican telecommunications company known as Telcel for two periods of authorized interception on the phone numbers ending in 1226 and 1338?

A.   Yes.

Q.   And were the procedures you just described followed in this case?

A.   Yes.

Q.   Are the audio files on the CDs maintained by the prosecutor's office in the same or substantially the same condition as they were when CTC intercepted them?

A.   Yes.

Q.   Was the CTC platform used in this investigation in working order from August 2020 to February of 2022?

A.   Yes.

        MS. NASEEF:  No further questions, Your Honor.

        THE COURT:  Any cross?

        MS. RHEE:  Very briefly.

                    CROSS-EXAMINATION

BY MS. RHEE:

Q.   Just wanted to confirm, Mr. Bello, the wiretap was up from August 2020 through February 2022; is that correct?

A.   Yes.

Q.   And why did it stop in February 2022?

**A.**   Because the period authorized by the judge came to an end.

**Q.**   So in Mexican wiretaps, how long are the periods for each wiretap -- interceptions?

**A.**   It's up to 180 days for each unique authorized interception.

**Q.**   Are there any restrictions on the Mexican wiretaps?

**A.**   The restriction that applies is that it is not lawful to intercept communications between an accused person and their attorney.

**Q.**   So is that the only restriction?

**A.**   It's one of the main ones.  And we can only intercept the communications of those countries that are based in Mexico.

**Q.**   So I guess my question is:  Can you -- once you have a wiretap authorized on a certain telephone, other than phone calls between a defendant and their attorney, are there -- can you listen to all the phone calls that you're intercepting?

**A.**   Yes.  All the calls that are made through the phone number that is intercepted, yes.

**Q.**   Okay.  So just to be clear, your office intercepted two phones, one that ends in the phone number 1226, and the other 1338; correct?

**A.**   Yes.

**Q.**   So just so that I understand, or that we all understand, you said it's recorded simultaneously as the phone calls are

being made; correct?

**A.** Yes.

**Q.** Is there someone listening to it in your office?

**A.** Yes.

**Q.** Okay. And that's what the -- you said you prepare a final report to submit to the prosecutors. That's what the report's about?

**A.** So once the period allowed or authorized for doing the interception is complete, then the final report is prepared to present to the prosecutors and they in turn report to the judge.

**Q.** Okay. But my question is about the substance of the report that you submit to the prosecutors. The question is: Do you -- you listen to the phone calls, you analyze the phone calls, and you interpret the phone calls, and then you put that in your report to the prosecutors; correct?

**A.** We just listen to the calls and send them to the prosecutor. We don't interpret them.

**Q.** So you transcribe the phone calls and send them to the prosecutors?

**A.** We send the audio to the prosecutor.

**Q.** Okay. So your office's position is just to record, download it onto a disk, and then just send it to the prosecutors; correct?

**A.** Yes.

**Q.** Then why are you listening to them?

**A.** Because it's authorized by the magistrate judge.

**Q.** Are you -- okay. In your reports, if you end your -- listening to your phone calls, if you hear about, perhaps, people talking about a meth lab, which is illegal in Mexico, do you need to take some action on that?

**A.** Report it to the prosecutor.

**Q.** And if there's nothing particularly criminal being discussed, do you report that to the prosecutor also?

**A.** All the calls, all the calls that are made by the person on that number that's been authorized for the interception are recorded and sent.

**Q.** Okay. Thank you very much.

          MS. RHEE: I have nothing further, Your Honor.

          THE COURT: Any redirect, Ms. Naseef?

          MS. NASEEF: No, Your Honor.

          THE COURT: You are excused.

          THE WITNESS: Thank you.

          THE COURT: And who's the government's next witness?

          MR. NGUYEN: The government calls Salvador Dominguez Perez.

          THE COURT: All right. Mr. Dominguez Perez, please step forward.

                    SALVADOR DOMINGUEZ PEREZ,

called as a witness, being first duly sworn, was examined and

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

testified as follows:

THE WITNESS:  Yes.

THE CLERK:  You may be seated.

THE COURT:  Okay.  You can proceed.

MR. NGUYEN:  Thank you, Judge.

DIRECT EXAMINATION

BY MR. NGUYEN:

Q.  Would you state your name for the record, please?

A.  Okay.  Good afternoon to everybody.  My name is Salvador Dominguez Perez.

Q.  And, Mr. Perez, I know you speak very quickly.  If you wouldn't mind speaking slowly so the interpreters can do a good job interpreting?

A.  Of course.

Q.  What do you do?

A.  I'm a federal prosecutor.

Q.  Where are you a federal prosecutor?

A.  In Mexico City.

Q.  Did you travel from Mexico City to Washington, D.C. to testify today?

A.  That's right.

Q.  How long have you been a federal prosecutor?

A.  Approximately four years.

Q.  And before serving as a federal prosecutor, what did you do?

A.   I was an assistant of a federal prosecutor.

Q.   And what does the assistant to the federal prosecutor do?

A.   We support federal prosecutors in all of their functions directly.  And we also have the job of supporting all activities in criminal cases.

Q.   What unit are you currently assigned to?

A.   Currently, I'm working at the specialized unit investigating crimes against health of the prosecutor's office that is specialized in matters of organized crime.

Q.   What types of crimes does the crimes against public health prosecute?

A.   We investigate the crime of organized crime; in other words, criminal organizations that commit crimes against health, usually known as drug cartels.

Q.   Does your unit also prosecute chemical suppliers to those drug cartels?

A.   Yes.

Q.   In your capacity as a federal prosecutor, are you familiar with a person by the name of Javier Algredo Vazquez?

A.   Yes.

Q.   In your capacity as a federal prosecutor, are you familiar by a person by the name of Carlos Algredo Vazquez?

A.   Yes.

Q.   And in your capacity as a federal prosecutor in Mexico,

are you familiar with a person by the name of Francisco Pulido?

A.   Yes.

Q.   Are you the federal prosecutor assigned to the parallel investigation in Mexico regarding these individuals?

A.   That's correct.

Q.   As part of the investigations, was there a judicially authorized wiretap for the phone numbers of Carlos Algredo Vazquez and for Francisco Pulido?

A.   Yes.

Q.   Were those numbers ending in 1226 and 1338?

A.   Yes.

Q.   And when I say wiretap, is your understanding the same as intercepting telephone calls?

A.   That's right.

Q.   Are there approvals to get wiretaps for telephone numbers in Mexico?

A.   Yes.

Q.   Would you tell the jury how you go about getting those approvals?

A.   Of course.  In Mexico, we have in our constitution of the Mexican United States, we have a protection of the inviolatability of communications.  In this sense, we must obtain the authorization of a judge in order to intercept the communications of a person.  Okay.  So the name of the judge

of whom we requested an authorization and obtained it is the specialized judge in the investigation techniques intervening in telecommunications --

THE INTERPRETER:  The interpreter needs to request an explanation of (Spanish.)

**A.**  We present to this judge, a written request in which we must cover certain requisites.  Once we cover these requirements, he prepares a decision in writing in which we're authorized to intervene or intercept the communications.

**Q.**  (BY MR. NGUYEN)  Would you tell the jury what the requirements are?

**A.**  Yes.  The requirements are that the request must be based and motivated.  There must be a need and an objective.  This means that there must be evidence of the following requirement:  We must indicate the person who we are investigating, the phone line, which phone company they belong to, the length of time for the interception, the place where the wiretap will take place, the people who will be in charge of this, and in this case, it's the general directorate of the technical force of control.  These are the requirements which we must cover so that the judge will authorize for us the wiretap.

**Q.**  Did the judge find that you met all these requirements for the wiretaps of Carlos Algredo Vazquez and Francisco Pulido?

**A.**  Yes.

**Q.** After the wiretap has concluded, what happens to the recordings from the wiretap?

**A.** From the moment we start the interception, people in charge records those telephone calls. And at our request, at the request of the prosecution, either monthly or biweekly sends those recordings in compact discs to us. And in this compact discs, all -- each of the calls intercepted are stored. Once we have these discs, they are sent to our offices so that they will be safeguarded there.

**Q.** Where are they stored?

**A.** They are stored in the evidence locker.

**Q.** Is the evidence locker secure?

**A.** Yes.

**Q.** And if someone needed to get the CDs out of the evidence locker, what paperwork do they have to fill out?

**A.** In order to be able to have access to that evidence, the person must have the authorization, in this case, my authorization. And once the person gets to the locker, the evidence locker, he or she must sign the registry for chain of custody.

**Q.** Are you, as a federal prosecutor, responsible for the CDs for the Carlos Algredo Vazquez and Francisco Pulido wiretap?

**A.** Yes.

MR. NGUYEN: Your Honor, may I approach the witness?

THE COURT: Have you shown Ms. Rhee?

MR. NGUYEN:  I showed her already before this examination, but I can do it again.

THE COURT:  What is it?

MR. NGUYEN:  It's Government's Exhibit 31, Your Honor.

THE COURT:  Okay.  And you may approach the witness.

MR. NGUYEN:  Thank you.

**Q.**  (BY MR. NGUYEN)  I've handed you what's been previously marked for identification as Government's Exhibit No. 31 and ask if you recognize it?

**A.**  Yes.

**Q.**  What do you recognize it to be?

**A.**  It's a compact disc.  It's a compact disc that contains the recordings of the calls that were intercepted of the conversations of Francisco Pulido and Carlos Algredo.

**Q.**  Have you reviewed the file names contained on Government's Exhibit No. 31?

**A.**  Yes.

**Q.**  Did you compare those file names with the file names that are secured in your care and custody in Mexico City from the Mexico wiretap?

**A.**  Yes.

**Q.**  Were they the same file names?

**A.**  That's correct.

**Q.**  Have you reviewed the calls contained in Government's

Exhibit 31?

A.  Yes.

Q.  Did you compare the calls in Government's Exhibit No. 31 with the calls that you have secured in your care and custody in Mexico for the Mexican wiretap?

THE INTERPRETER:  For the Mexican -- please repeat the last part.

MR. NGUYEN:  Wiretap.

THE INTERPRETER:  Wiretap, thank you.

A.  Yes.

Q.  (BY MR. NGUYEN)  Are they the same calls?

A.  Yes, completely.

Q.  Does Government's Exhibit No. 31 contain fair and accurate copies of the files that you have in your care and custody in Mexico City from the Mexican wiretap?

A.  Yes.

MR. NGUYEN:  Government moves to admit Government's Exhibit No. 31 into evidence.

THE COURT:  Any objection?

MS. RHEE:  No, Your Honor.

THE COURT:  Hearing no objection, Government Exhibit 31 will be admitted.

MR. NGUYEN:  Thank you, Your Honor.

The government also moves to admit Government's Exhibit 41 through 60, which are the calls contained in

Government's Exhibit 31.

MS. RHEE:  No objection, Your Honor.

THE COURT:  Hearing no objection, the calls at 41 -- you did say 41; correct?

MR. NGUYEN:  Yes, Your Honor, 41 through 60.

THE COURT:  41 through 60 will be admitted.

MR. NGUYEN:  I have no other questions for this witness.

THE COURT:  Any cross?

MS. RHEE:  Just briefly again, Your Honor.

CROSS-EXAMINATION

BY MS. RHEE:

Q.  So you testified that you are the federal prosecutor involved in this case; correct?

A.  Yes.

Q.  Can you tell the Court how the Mexican government started this parallel investigation?

A.  Yes.  We received similar investigations in Mexico with regards to different people, like, for example, Carlos Algredo and Francisco Pulido, in which Javier Algredo is also involved.

Q.  Okay.  So the investigation started because the American embassy contacted the prosecutor's office in Mexico about Mr. Carlos Algredo and Francisco Pulido; correct?

A.  The investigation started because a formal communication

with information from the government of the United States was received.

Q.   Okay.  And so when you say you investigate the importation of precursor chemicals, the chemicals that Mr. Carlos Algredo imported into Mexico, they were not all -- they are not on some prohibited list in Mexico, are they?

A.   They are dual-use substances.  That is to say that they can have both licit and illicit use.

Q.   And as part of your investigation as the prosecutor, the federal prosecutor in this case, when a chemical arrives in Mexico, because you don't know what that particular chemical is going to be used for, you have the company hold the chemical at the port; correct?

A.   The function of reviewing all that situation is complex to explain.  In this case, the customs agency in Mexico intervenes.

Q.   Okay.  So when they intervene, they check the documents; isn't that correct?

A.   The authorities in charge of that check those documents.

Q.   And so when documents show the legitimate purchasers in Mexico, the customs agency would investigate that; correct?

        THE INTERPRETER:  Request clarification.  The legitimate, you said the legitimate what?

Q.   (BY MS. RHEE)  In the documents that is provided to the customs agency and the government investigating these

chemicals, if a legitimate purchaser is demonstrated by the importer, that chemical would not be detained; correct?

A. In some cases, they are detained in case there is a -- in cases where there is an investigation open against these people. Because in the investigation, we have indication with probable cause that it could be related -- it could be related to crimes against health.

Q. But in this case, when chemicals that Carlos Algredo imported into Mexico were detained, there were many times when he provided the documents of the purchasers in Mexico, legitimate purchasers in Mexico; isn't that correct?

A. Yes, but when there is an investigation, some of the importations from -- by Carlos Algredo had to be reviewed, or resecured.

Q. So can you tell us which chemicals of Carlos Algredo's was detained and not returned to him?

A. As I remember, glacial acid. That's the one I remember at this moment.

Q. And I just have one more question about obtaining a wiretap. You said that there's some requisites in order to obtain a wiretap. And you --

A. Yes.

Q. And you indicated that it was based on need and objective; correct?

A. Yes.

Q.  And evidence; correct?

A.  Yes.

Q.  So in the case of this wiretap, what evidence did you put in the request for the wiretap of Carlos and Francisco Pulido's telephones?

A.  Okay.  The request that was done with regards to these lines includes evidence information.  That's the productive standard that is known in Mexican legislation in the initial stage.  And in this case, what was used was the information that was given by the United States.  It was corroborated by elements of the federal police.

In this case, they corroborated that the telephone lines belonged to Carlos Algredo and Francisco Pulido.  And once it was corroborated that those lines belonged to them, one of the needs that is presented to the judge is that once there is the probability that these people commit illicit activity, it is necessary to have access to their communications.

In Mexico, this interception is an investigative tool which allows us to collect data, information, and evidence against the people being investigated.

Q.  So when you say you corroborated the elements provided or the information provided to you by the American government, you said that you corroborated -- as far as the telephone numbers, you made sure that the telephone number belonged to Carlos Algredo and the telephone number belonged to Francisco

Pulido.  That's what your office did; correct?  That's the corroboration?

A.  Yes, initially.  Yes.

Q.  And then after -- my understanding is that the period of a wiretap is 180 days; is that correct?

A.  Yes, that's the maximum.  Period.

Q.  Okay.  So 180 days is six months; correct?

A.  Yes.

Q.  And then so in order to continue the wiretap, you need to have some basis to ask for another 60 -- or 180 days; is that correct?

A.  One wiretap can last from one day to 180 days.  If we request another authorization for a wiretap, it has to be asked of the judge fulfilling the requirements that I already mentioned.

Q.  How long was this wiretap for, do you know?

A.  These telephone lines were intercepted on two occasions. The first one lasted six months and the second as well.

Q.  And so while you're conducting these wiretaps, do you also conduct surveillance or other investigations stemming from the information that you receive on the wiretaps?

A.  Yes, the police is in charge of that.

Q.  So but you've listened to all the phone calls; correct?

A.  Yes.

Q.  And in any of the phone calls, was anyone talking about

meth labs or the production of meth?

**A.** No.

**Q.** Thank you.

MS. RHEE:  I have nothing further, Your Honor.

THE COURT:  Redirect?

MR. NGUYEN:  No, Your Honor.  Thank you.

THE COURT:  You're excused.

THE WITNESS:  Thank you.

THE COURT:  All right.  We're going to take a short break, ten minutes.

And how many more witnesses do you have available today for the government?

MR. NGUYEN:  We have one more, Your Honor.

THE COURT:  Okay.

(A recess was taken.)

THE COURT:  All right.  Let's bring the defendant in and your next witness.  Can you put the witness on the stand?

MS. NASEEF:  Yes, Your Honor.  The government calls Kevin Novick, Special Agent Kevin Novick to the stand.  This testimony is going to take about three hours probably, so it won't be finished today.

THE COURT:  Okay.  You're not calling this research specialist, Diana Wu?

MS. NASEEF:  We're not calling Diana Wu.  Ms. Rhee stipulated to the chain of custody for the WhatsApp calls.  We

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

were going to call Judy O'Brien, whose testimony will only take only about 30 minutes, but she is about ten minutes delayed, and we didn't want to unnecessarily delay the proceedings.

THE COURT:  Good.

(Jury entered the courtroom.)

THE COURT:  And Ms. Naseef, your next witness.

MS. NASEEF:  Yes, Your Honor, the government calls Special Agent Kevin Novick.

SPECIAL AGENT KEVIN NOVICK,

called as a witness, being first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you, sir.  Please be seated.

DIRECT EXAMINATION

BY MS. NASEEF:

Q.  Please state your name for the record.

A.  My name is Kevin Novick, N-O-V-I-C-K.

Q.  Where are you currently employed?

A.  I'm currently employed as a special agent with the Drug Enforcement Administration.

Q.  And which office of DEA are you employed with?

A.  I'm currently assigned to the Los Angeles Field Division. And within the Los Angeles Field Division, I'm assigned to the financial investigations group.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

**Q.** How long have you been a DEA agent?

**A.** I've been a DEA special agent for just a little over six years. I graduated Quantico at the end of March 2017.

**Q.** What did you do before you became a DEA agent?

**A.** Prior to being a DEA special agent, I was a commissioned officer in the United States Coast Guard.

**Q.** What did your duties in the Coast Guard entail?

**A.** As a commissioned officer in the United States Coast Guard, I was involved in various operations, including search and rescue operations, operations supporting national defense and homeland security, as well as maritime law enforcement.

**Q.** Mr. Novick, if you could just speak slowly for the court reporter.

**A.** I'm sorry.

**Q.** Did you receive any specialized training upon joining the DEA?

**A.** I did, yes.

**Q.** What was that?

**A.** I attended a 20-week basic agent training course held at Quantico, Virginia.

**Q.** What did you cover in that course?

THE COURT: Excuse me one second. How long were you in the Coast Guard?

THE WITNESS: I went to the academy from college, so four years there. And then just over six years active duty,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

from 2000 -- May of 2010 to January 1st, 2017, around there.

THE COURT:  Sometimes it's hard to tell how old people are.  Okay.  Thank you.

Q.  (BY MS. NASEEF)  Agent Novick, what did you cover in your training at the DEA academy?

A.  Basic agent training in Quantico, Virginia, we cover a wide variety of topics, all to help our careers; namely, physical and electronic surveillance, how to conduct narcotics investigations, defensive tactics, how to debrief and handle confidential sources or informants, things like that.

Q.  Have you received any other training in drug investigation since you left the academy?

A.  Yes, I have.  I've received formal training like in a formal classroom training as well as on-the-job training.

Q.  And have you received any training related to money laundering?

A.  I have, yes.

Q.  And could you just explain briefly what your training in money laundering covered?

A.  I've attended courses on how money laundering operates and functions as well as how to conduct money laundering operations as an undercover agent or undercover special agent.

Q.  Do you speak any languages other than English?

A.  I speak Spanish.  I wouldn't say I'm fluent but more

conversational.  I feel comfortable having a conversation with an individual, conducting interviews, debriefs, things like that.

Q.   And I know this question's a little obvious, but as a DEA agent what types of crimes do you investigate?

A.   We investigate violations of the Controlled Substances Act.

Q.   And in laymen terms, what is that?

A.   Drug-related crimes, so individuals who are trafficking or involved in trafficking, things like heroin, fentanyl, methamphetamine, things like that.

Q.   Approximately how many investigations regarding the manufacture and distribution of drugs have you been involved with?

A.   Dozens.  At least over 20.

Q.   And Agent Novick, you can move the microphone closer to you so you don't have to move to get closer to it.

In your current assignment, have you specialized in certain types of drug cases?

A.   Yes, I have.

Q.   And what have you specialized in?

A.   Primarily I've specialized in investigations related to the CJNG, or Cartel de Jalisco Nueve Generacion.

Q.   How long have you been investigating the CJNG?

A.   I've been investigating CJNG since I was assigned to Los

Angeles, so just over six years, or a little over six years.

**Q.** Can you explain briefly to the jury what CJNG is?

**A.** CJNG is one of, if not the most prolific drug trafficking cartels based in Mexico. They're extremely violent. They traffic in large quantities, ton quantities of methamphetamine, fentanyl, cocaine. Typically the methamphetamine and fentanyl is manufactured in Mexico and distributed to the United States and elsewhere. Cocaine is transported from South America to Mexico, United States, and elsewhere.

**Q.** And where is the CJNG based within Mexico?

**A.** CJNG has a large presence throughout the entire country of Mexico. They have a presence in almost every Mexican state. But identifying like a headquarters or home base for them would be the state of Jalisco in Mexico, as it's in their name as well.

**Q.** Who is the leader of the CJNG?

**A.** The undisputed leader of CJNG is Nemesio Oseguera Cervantes, also known as El Mencho.

**Q.** Based on your training and experience, can you explain generally what methamphetamine and fentanyl are?

**A.** Methamphetamine and fentanyl are synthetic drugs, in that a combination of various chemicals are mixed in order to create the drug. And that is in contrast to something like cocaine, where the base that creates the end product of

cocaine is the coca leaf, which is a plant that grows on a tree. So meth and fentanyl pretty much all chemicals; whereas, cocaine you would use like a leaf, add chemicals and other ingredients, mix it and then manufacture it into cocaine.

Q. And what types of facilities are methamphetamine and fentanyl manufactured in?

A. Typically, they're -- or typically, methamphetamine is manufactured in clandestine labs. Those can be varying in size from somebody's garage or a house, to large-scale labs, you know, the size of warehouses or in the middle of the jungle or, you know, mountainous regions. As far as fentanyl, a similar-type clandestine lab, but can also be produced in a pharmaceutical-type lab as well.

Q. Where is most of the methamphetamine that is sold in the United States manufactured?

A. Mexico.

Q. And you mentioned the pharmaceutical use for fentanyl. Where -- is there a legal use for fentanyl?

A. Yes, there is.

Q. Where is most of the fentanyl that is sold on the black market in the United States manufactured?

A. Mexico.

Q. Are you familiar with the price of methamphetamine in the United States?

**A.** I am, yes.

**Q.** And does that price vary depending on where you are in the country?

**A.** Yes, it does.

**Q.** Where does methamphetamine tend to cost the least?

**A.** Typically, methamphetamine costs the least near the southwest border or states that are -- states or locations that are close to the border with Mexico.

**Q.** Why is that?

**A.** Due to its -- due to the proximity of those areas to the area that most methamphetamine is manufactured in Mexico.

**Q.** And approximately how much does a pound of methamphetamine cost near the southwest border?

**A.** Near the southwest border, in Los Angeles, for example, for a pound of methamphetamine is about $1,000, maybe just a little bit underneath.

**Q.** And how much does a pound of methamphetamine cost in Washington, D.C.?

**A.** In Washington, D.C., a pound of methamphetamine would cost anywhere typically between $3,000 and $6,000.

**Q.** As part of your responsibilities as a DEA agent, are you familiar with the laws that regulate chemicals that are used to manufacture methamphetamine and other drugs?

**A.** Yes, I am.

**Q.** And can you explain to the jury what a List I chemical

is?

**A.** A List I chemical is a chemical that, while it may have some legitimate uses, is also a primary ingredient or an important ingredient needed in the manufacture of controlled substances. So, for example, methylamine is a List I chemical because it is a key ingredient in the manufacture of methamphetamine.

**Q.** Were you involved in the investigation of the defendant, Javier Algredo Vazquez?

**A.** Yes.

**Q.** And what was your role in that investigation?

**A.** I am one of the case agents assigned.

**Q.** And in the investigation into Javier Algredo Vazquez, what types of investigative techniques were used?

**A.** In the course of our investigation, we used a variety of different techniques, to include the debriefing of cooperating witnesses and confidential sources, seizures, subpoenas for bank accounts, search warrants, as well as coordinating with counterparts, law enforcement counterparts in other countries, so, for example, Mexico.

**Q.** As part of your investigation into the defendant, did DEA subpoena the New York state Department of State for business records?

**A.** Yes, we did.

**Q.** You have a binder of Government Exhibits in front of you.

Could you please look at what has been marked for identification as Government Exhibits 35 and 36.  What are these exhibits?

A.   35 is the Certificate of Incorporation of Pro Chemie in New York from the State of New York.  And 36 is a Certificate of Change for Pro Chemie in New York.

Q.   And were these exhibits accompanied by a Certificate of Authenticity from the State of New York?

A.   Yes, they were.

MS. NASEEF:  Your Honor, at this time the government moves Government Exhibits 35 and 36 into evidence.

MS. RHEE:  No objection, Your Honor.

THE COURT:  Hearing no objection, 35 and 36 are admitted.

MS. SAHNI:  Your Honor, may we have permission to publish to the jury on the screens.

THE COURT:  Yes.  You may publish.

MS. SAHNI:  Publishing Government Exhibit 35.

Q.   (BY MS. NASEEF)  Looking at the sixth paragraph on Government Exhibit 35, who is the registered agent for Pro Chemie, New York?

A.   Carlos Algredo.

Q.   And what address is listed for Carlos Algredo on this document?

A.   4215 Ketcham Street, Elmhurst, New York.

MS. NASEEF:  And Your Honor, may I publish Government Exhibit 36.

THE COURT:  Yes, you may.

MS. NASEEF:  If we could move to page 2, please, Ms. Riding.

**Q.**  (BY MS. NASEEF)  Agent Novick, what is the purpose of this document?

**A.**  The purpose of the Certificate of Change is to make a change within the company or structure.

**Q.**  And what is the change that's documented in this exhibit?

**A.**  The change of registered agent.

**Q.**  And who is the new registered agent?

**A.**  It states Javier Algredo.

**Q.**  (BY MS. NASEEF)  And Ms. Riding, if you could turn to page 3 of the exhibit, please.

Who signed this document?

**A.**  Carlos Algredo.

**Q.**  And what is Carlos's role in Pro Chemie according to the document?

**A.**  President.

**Q.**  And what is the date on the document?

**A.**  January 12th, 2015.

MS. NASEEF:  Ms. Riding, could you please turn back to page 2.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Direct Examination - Novick

Q.   (BY MS. NASEEF)  Does this document say when Pro Chemie was incorporated in New York?

A.   It states June 27th, 2014.

MS. NASEEF:  You can take it down.

Q.   (BY MS. NASEEF)  As part of your investigation into the defendant and his brother, did the DEA also review Carlos Algredo's immigration records?

A.   Yes, we did.

Q.   In your binder, could you please look at Government's Exhibits 37 and 37A.  Do you recognize these exhibits?

A.   Yes, I do.

Q.   And what are they?

A.   37 is the Visa application for Carlos Algredo, or the U.S. Visa application for Carlos Algredo.

Q.   And is 37A a translation of that Visa translation prepared by a certified court interpreter?

A.   Yes, it is.

MS. NASEEF:  Your Honor, at this time the government moves Exhibit 37 into evidence, and we'll use Exhibit 37A pending admission by the Court interpreter.

MS. RHEE:  We have no objection, Your Honor.

THE COURT:  Hearing no objection, 37 will be admitted.

MS. NASEEF:  Your Honor, permission to publish Exhibit 37A.

THE COURT:  Yes.  And don't you want to admit 37A?

MS. NASEEF:  Your Honor, I believe -- can I speak to you over the intercom?

THE COURT:  Yes.

(Bench conference on the record.)

THE COURT:  If you're introducing an exhibit that's in Spanish, I'm sure you want the translation version to be sent back for the jury to look at because, otherwise, they're just going to be looking at Spanish as gibberish.  So are you hesitant to introduce 37A, the actual translation that they can read?

MS. NASEEF:  No, Your Honor, but Ms. Rhee didn't stipulate to the accuracy of the interpretations.

THE COURT:  Oh, I see.

MS. NASEEF:  So we need the -- Judy O'Brien is the interpreter who certified all of the interpretations, and so she needs to certify them on the stand and then they will be admitted.  That's why I asked to use them provisionally until she takes the stand.

THE COURT:  Okay.  Unless Ms. Rhee has changed her mind.

MS. RHEE:  I have changed my mind, Your Honor, and so we'll stipulate.  So there's no issue.  In fact, Ms. O'Brien does not even have to testify tomorrow.

THE COURT:  Okay.  Well, that's excellent news.  So

you can now move the introduction of 37A so we can all understand what's going on.  Okay.  Thank you.

(The following proceedings were had in open court.)

MS. NASEEF:  Thank you, Your Honor.  Your Honor, at this time I move Government Exhibit 37A into evidence.

THE COURT:  And no objection, I understand, Ms. Rhee?

MS. RHEE:  No objection, Your Honor.

THE COURT:  Okay.  It will be admitted.

MS. NASEEF:  Permission to publish Exhibit 37A.

THE COURT:  And you may publish.

MS. NASEEF:  Can we please turn to the second page, Ms. Riding.

Q.  (BY MS. NASEEF)  Who is the individual pictured on this page, Agent Novick?

A.  Carlos Algredo Vazquez.

MS. NASEEF:  And turning to page 8 please, Ms. Riding.

Q.  (BY MS. NASEEF)  When was this application received?

A.  Receipt date May 23rd, 2017.

MS. NASEEF:  And then turning to page 9.

Q.  (BY MS. NASEEF)  Who does Carlos Algredo list as his employer?

A.  MB Barter & Trading Mexico.

Q.  And in what city does Carlos Algredo live?

A.   There's a city, Coyoacan State Distrito Federal, which would be Mexico City.

Q.   Is Coyoacan a neighborhood within Mexico City?

A.   Coyoacan is a neighborhood within Mexico City, as far as I remember, yes.

Q.   And under the telephone numbers on page 9, how many numbers does Carlos Algredo list?

A.   Three.

Q.   What is the third number that he lists?

A.   5529711226.

Q.   Turning to page 12, does Carlos Algredo say what his role is at MB Barter?

A.   It says partner.

Q.   Finally, turning to page 14 of this exhibit.  Does Car- --

          THE COURT:  Are you waiting for something?

          MS. NASEEF:  Yes, Your Honor, I'm waiting for the page to turn.

Q.   (BY MS. NASEEF)  On page 14, if you look in your binder, Agent Novick, does Carlos Algredo identify any immediate relatives that he has in the United States?  It's on the screen now.

A.   Okay.  Yes, he does.

Q.   And who is that?

A.   It lists David Algredo as a sibling as well as Javier Algredo, sibling.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   And as part of your investigation, did you also request records from the government of Mexico?

A.   Yes, we did.

Q.   And could you please look in your binder at Government's Exhibits 38, 38A, 39, and 39A.

A.   Okay.

Q.   And do you recognize these exhibits?

A.   Yes, I do.

Q.   Looking first at Exhibit 38, what is this exhibit?

A.   It is the Articles of Incorporation submitted to the government of Mexico by MB Barter & Trading Mexico.

Q.   And is Exhibit 38A a translation of Exhibit 38?

A.   Yes, it is.

Q.   And what Exhibit 39?

A.   39 is a letter or signed statement from Carlos Algredo Vazquez to FGR, or the federal prosecutor's office in Mexico.

Q.   Is Exhibit 39A a translation of Exhibit 39?

A.   Yes, it is.

Q.   Were these documents provided by the government of Mexico and accompanied by a Certificate of Authenticity?

A.   Yes.

        MS. NASEEF:  At this time, Your Honor, I move to admit into evidence Government's Exhibits 38, 38A, 39, and 39A.

MS. RHEE:  No objection, Your Honor.

THE COURT:  Hearing no objection, 38 and 39 and the translations to both may be admitted.

MS. NASEEF:  Permission to publish Government Exhibit 38A.

THE COURT:  You may publish.

MS. NASEEF:  Ms. Riding, can we please turn to page 4 of Exhibit 38A.

Q.   (BY MS. NASEEF)  How many shares -- Agent Novick, could you just remind the jury what Exhibit 38A is?

A.   Sure.  38A is the Articles of Incorporation, submitted to the government of Mexico for MB Barter & Trading Mexico.

Q.   And on page 4, on your screen, how many shares of MB Barter does Carlos Algredo own according to this document?

A.   40, four zero.

Q.   And how many shares are there total?

A.   50.

Q.   And on the next page, page 5 of the exhibit, what is Carlos Algredo's role in this company?

A.   Sole administrator.

MS. NASEEF:  Permission to public Government Exhibit 39A.

THE COURT:  Yes, you may.

Q.   (BY MS. NASEEF)  At the top of the -- what is this exhibit?

A.   39A, that is a translation to English of the letter or signed statement by Carlos Algredo Vazquez to FGR, or the Mexican federal prosecutor's office.

Q.   And at the top of the -- top left of that first page, what is the date on this exhibit?

A.   May 7th, 2021.

Q.   How does Carlos describe his position in this statement?

A.   Sole administrator.

Q.   Of what company?

A.   MB Barter & Trading Mexico.

Q.   And what is Carlos Algredo requesting in Exhibit 39A?

A.   He's requesting that the government of Mexico release shipments that were detained back to him.

Q.   Agent Novick, I didn't catch the end of your answer there. Could you please repeat that?

A.   Oh, they're requesting that containers that had chemicals that were detained be released from custody.

Q.   Was the government of Mexico conducting a wiretap investigation targeting Carlos Algredo Vazquez and Francisco Pulido Coracero between August 2020 and February 2021 and then again between July 2021 and February 2022?

A.   Yes.

Q.   And as part of the investigation, did the United States Government request the records from that wiretap from the government of Mexico?

**A.** Yes, we did.

**Q.** And what types of communications did the government of Mexico intercept in this wiretap?

**A.** Phone calls between Carlos Algredo talking to other individuals.

**Q.** And what phone numbers was the government of Mexico intercepting during the two interception periods?

**A.** A phone number ending in 1226 and a phone number ending in 1338.

**Q.** In the course of your investigation, were you able to determine who the user of the phone number ending in 1226 was?

**A.** Yes.

**Q.** And who was that?

**A.** Carlos Algredo.

**Q.** And how were you able to identify Carlos Algredo as the user of that number?

**A.** We were able to identify it was Carlos Algredo because he made self-identifying statements in conversations that were intercepted. And that same phone number was listed on his Visa -- U.S. Visa application.

**Q.** Is that the Visa application that we just looked at in Exhibit 37A?

**A.** Yes, it is.

**Q.** And did Carlos Algredo list any other phone numbers on

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

that Visa application?

A.   Yes, he did.

Q.   Did the Mexican authorities obtain wiretaps for those phone numbers?

A.   I don't believe so.

Q.   Were you able to determine who the user of the phone number ending in 1338 was?

A.   Yes.

Q.   And who was that?

A.   Francisco Pulido Coracero.

Q.   And how were you able to identify Francisco Pulido Coracero as the user of the 1338 number?

A.   That phone number was listed on his U.S. Visa application as well.

Q.   In what language were these intercepted communications primarily?

A.   Spanish.

Q.   And were some of those communications translated into English by a certified court interpreter?

A.   Yes, they were.

Q.   There should be a binder containing transcripts and translations of select wiretap calls.

     Agent Novick, could you review what's in the binder quickly?

     Agent Novick, does the binder contain Government Exhibits

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

41A through Government Exhibit 60A?

**A.** Yes, I see 41A and ending in 60A.

MS. NASEEF: Your Honor, at this time the government moves into evidence Government Exhibits 41A through 60A, which are translations of Government Exhibits audio files 41 to 60.

THE COURT: Any objection?

MS. RHEE: No objection, Your Honor.

THE COURT: Hearing no objection, 41A through 60A will be admitted.

MS. NASEEF: Your Honor, at this time may we publish binders containing the transcripts and translations to the jury so we can move more quickly through this part?

THE COURT: Any objections?

MS. RHEE: No, Your Honor.

THE COURT: Okay. That's a lot of binders.

MS. NASEEF: Yes, Your Honor.

Okay. Sorry, Your Honor, we're going to go without the binders for the time being.

THE COURT: Did you not bring the binders today?

MS. NASEEF: No, we did, but they're just downstairs.

THE COURT: Oh, I see. Okay. Well, maybe we're all a little -- it's been a long day, so maybe we'll start with that tomorrow morning. Are there other things that you can

cover --

MS. NASEEF:  Yes, Your Honor.

THE COURT:  -- before you turn to those starting perhaps tomorrow morning?

MS. NASEEF:  Yes, Your Honor.

THE COURT:  Okay.

Q.  (BY MS. NASEEF)  Did the DEA conduct a search of the defendant's cell phone subsequent to his arrest pursuant to a Court-ordered search warrant?

A.  Yes.

Q.  And was DEA able to extract WhatsApp messages from his phone?

A.  Yes.

Q.  In the exhibit binder, not the transcript binder, can you please look at what has been marked for identification as Government Exhibits 133 to 156.

A.  To 146?

Q.  156, please.

What are these exhibits?

A.  They are translations as well as the transcription of WhatsApp conversations between the defendant and others.

Q.  And were these communications voice or text?

A.  Text.

Q.  And what language were these messages in originally?

A.  Spanish.

MS. NASEEF:  At this time government moves Government Exhibits 131 to 156 into evidence.

MS. RHEE:  No objection.

THE COURT:  Hearing no objection, they'll be admitted.

MS. NASEEF:  Your Honor, can I have permission to publish all of these one by one as we talk through them.

THE COURT:  Yes, of course.  We'll just keep the publish on.

MS. NASEEF:  Yes, Government Exhibit 156 to start Ms. Riding, please.

Q.  (BY MS. NASEEF)  What is this?

A.  It is a WhatsApp conversation between Carlos and the defendant that starts on September 20th, 2021.

Q.  And how were you able to identify the other individual in these messages as Carlos?

A.  The name Carlos cell was saved in the defendant's phone. At the bottom of the -- line 7 there, he references Javier's little brother.  And also the cell phone number that was associated with the same name as Carlos cell is the number ending in 1226.

Q.  Starting on line 1, can you read the messages sent by Javier, and I will read the messages sent by Carlos?

MS. NASEEF:  And Ms. Riding, when we get to the bottom of the page, can you please flip to the next page.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.  (BY MS. NASEEF)  "Hi, good morning, how are you?  Please let me know when you have arrived in Washington.  If you can, call me before you go into the immigration meeting."

A.  "Hi, good morning, of course.  I arrive in about another hour.  I arrive in Washington."

Q.  "Be really careful, thanks very much."  Media omitted.

"We have 22 tons of oxalic acid notified as seized, destination Vera Cruz, Mexico.  22 tons of oxalic acid for Vera Cruz, in under review.  22 tons of oxalic acid from Manzanillo under review, origin, India.  Industrial use for polishing floors, manufacturing grinding discs.  Two containers of 25 tons each, equaling 50 tons of citric acid, destination Vera Cruz, origin, China, food use in soft drinks, candy.  Little brother, everything okay?"

What happened on September 20th, 2021?

A.  The defendant was arrested in Washington, D.C.

Q.  Did Carlos and Javier exchange other WhatsApp messages before September 20th, 2021, discussing their business together?

A.  Yes, they did.

Q.  Publishing Government Exhibit 133.  What is this?

A.  It is a -- a translation of the Spanish conversation, a WhatsApp conversation between Carlos and Javier that starts on September 25th, 2017.

Q.  I will continue reading Carlos if you can continue reading

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Javier.

**A.** Uh-huh.

**Q.** "Hi, good afternoon, how are you?  After a 16.5-hour flight, I arrived safely in China.  I've had problems with the wifi connection."

**A.** "That's great that you are well and I wish you luck.  I'm going to stay in touch with Daniel in case there's anything I can help you with from here."

**Q.** Based on your knowledge of this investigation, what is the significance of Carlos being in China?

**A.** China is one of the countries that supplies precursor chemicals that the defendant and Carlos purchased.

**Q.** Publishing Government Exhibit 134.  What is this?

**A.** It's a WhatsApp conversation between Carlos and Javier that starts on December 14th, 2017.

**Q.** And again, I'll continue reading Carlos if you will please read Javier.

"Hi, good afternoon, how are you?"

**A.** "Hi, very well, and how are you getting along?"

**Q.** "Please transfer USD 30,800 to Haihang as payment in full on invoice HHAX 17052.  Better I am in MTY visiting customers."

**A.** "That's great.  I'll do it and send you the confirmation."

**Q.** "That's why I didn't send you the instructions by email, and that amount was due December 8th.  Thanks a lot."

A.  "Yes, that's fine.  As soon as I get home, I'll do it."

Q.  In line 3, what is Haihang?

A.  Haihang is a chemical company.

Q.  And what does USD refer to?

A.  U.S. dollars.

Q.  And what is the abbreviation in line 4, MTY?

A.  MTY stands for Monterrey.

Q.  And where is Monterrey?

A.  Monterrey is a large city in Mexico located in the state of Nuevo Leon.

Q.  Did Carlos and Javier exchange additional WhatsApp messages where they discussed Javier transferring money to chemical companies?

A.  Yes, they did.

Q.  Turning to Government Exhibit 137, what is this?

A.  A WhatsApp conversation between Carlos and Javier that starts on December 27th, 2018.

Q.  Can you please read the messages from Javier and I will read Carlos.

A.  "Hi, just to confirm, there are two transfers for Rizhao Hanze, one for $11,607 and $27,083, or just one for $27,083."

Q.  "Hi, we already sent Hanze 11,607.  Just transfer 27,083."

     What is Rizhao Hanze in line 1 of this message?

A.  It's a chemical supply company.

Q.  Turn to Government Exhibit 141.  What is this?

A.   A WhatsApp conversation between Carlos and Javier that starts on July 3rd, 2019.

Q.   Starting at line 1, can you read the messages sent by Javier and I will read the messages sent by Carlos?

A.   "Hi, do you have the information for the Pro Chemie transfer?"

Q.   "Hi.  Yes, give me a few minutes."

A.   "Of course."

Q.   "It's 48,600 to Yantai Taroke.  Payment in full on the last invoice, an installment on purchase order PCN-044-2019."

A.   "Hi, we're boarding the airplane.  It looks like it's leaving on time.  Rest and I'll let you know when we arrive."

Q.   "Safe travels."

     In line 5, what is Yantai Taroke?

A.   A chemical supply company.

Q.   Turning to Government Exhibit 145.  What is this?

A.   A WhatsApp conversation between Carlos and Javier that starts on December 19th, 2019.

Q.   And if you could please continue reading Javier and I'll read Carlos.

A.   Uh-huh.

Q.   "Hi, how are you?  Please transfer 14,600 to Jinan.  I sent you a copy of the invoice."

A.   "Hi, good.  I just made the one to Taroke."

Q.   "Yes, I received the confirmation.  Thanks."

A. "This last one is to the bank that shows on the invoice. The one from yesterday went to another bank. That's fine, the penultimate transfer went to this bank."

Q. "Yes, because they are different products, they go to different banks."

A. "I sent you the confirmation."

Q. And in line 2, what is Jinan a reference to?

A. A chemical supply company.

Q. And turning to Government Exhibit 154, the last WhatsApp chat we'll discuss today. What is this?

A. This is a WhatsApp conversation between Carlos and Javier that starts on June 7th, 2021.

Q. Starting at line 1, can you please read Carlos -- or sorry, can you please read Javier and I will read Carlos.

"Hi, good morning, how are you? Standard Charter Bank has not received a 53,400? I checked in the account. It hasn't been returned either. Please, can you check on it with Bank of America?"

A. "Hi, good morning. We're fine. Thanks. I'll check and let you know."

"Hi, if we have the correct information of Jining Jianbang Chemical Company Limited," or LTD, "the last transfer was made on 11/11/2020, with the same information, for $19,800."

Q. "Perfect. Pro Chemie buys from Jining and then Pro Chemie

invoices Blane.  I already let the Chinese guy know.  He will confirm tomorrow."

A.   "That's fine.  I hope the money from the transfer that was rejected is there by tomorrow"

Q.   "Right.  The refund."

What is Jining Jianbang Chemical Co. Limited in line 5?

A.   It's a chemical supply company.

Q.   In addition to discussing the transfers to the chemical companies, did the defendant and his brother have other conversation on WhatsApp about the finances of Pro Chemie New York itself?

A.   Yes, they did.

Q.   Turning to Government Exhibit 138.  What is this?

A.   It is a WhatsApp conversation between Carlos and Javier that starts on February 27th, 2019.

Q.   And if you could continue reading Javier, I'll read Carlos.

"Hi, is it still cold?"

A.   "Yes, today was really cold, like four below zero, but with the wind it felt colder.  But tomorrow is going to be better."

Q.   "That's good.  After looking at the income and the two new orders, I'm going to need you to please transfer/deposit to Pro Chemie 17,000 of the commissions that the Chinese paid me in 2017.  In addition to that amount, a transfer from China is

going to arrive next week for 26,200."

A.   "Of course, I'll deposit it tomorrow.  What account are they going to deposit to?"

Q.   "To Pro Chemie directly."

A.   "That's fine."

Q.   Turning to Government Exhibit 139.  What is this?

A.   A WhatsApp conversation between Carlos and Javier that starts on March 1st, 2019.

Q.   I'll continue reading Carlos if you can please read Javier.

   "Hi, good morning, how are you?  You'll have seen that this funds from China have not arrived, and we have to make a payment.  Please, if you can, deposit the 17,000 today."

A.   "Hi, good morning.  Lorena already deposited the check to Pro Chemie."

Q.   "Thanks very much."

   Who is Lorena?

A.   The defendant's wife.

Q.   Turning to Government's Exhibit 140.  What is this?

A.   This is a WhatsApp conversation between Carlos and Javier that begins on June 4th, 2019.

Q.   And can you please read Javier starting on line 1 and I'll read Carlos?

A.   "Hi, I had to go to the bank to deposit $100 in cash so that they would be credited immediately.  Then I will withdraw

them when there's enough money available.  Regards."

**Q.**  "Hi, thanks very much.  As of today, I'll consider the minimum in the account."

**A.**  "Don't worry, I can deposit cash here and then withdraw it, although it's not recommended for large amounts but in emergency, it can be done."

**Q.**  Based on your training and experience, why would depositing large amounts of cash not be recommended?

**A.**  Typically with banking at U.S. financial institutions, there's -- if you deposit large amounts of cash, a second -- you need to either show ID or have a -- be able to provide where the money was coming from that is being deposited.

**Q.**  And turning to Government Exhibit 148.  What is this?

**A.**  This is a WhatsApp conversation between Carlos and Javier that starts on June 2nd, 2020.

**Q.**  Please continue reading Javier and I'll read Carlos.

"Hi, how are you?  How are Lorena and the boys?"

**A.**  "Hi, we're fine, thanks."

**Q.**  "Could you please check the account balance?  I am in GDL. I don't want to sign into the bank account from the hotel internet."

**A.**  "There is only $2,603.02.  There was no deposit today."

**Q.**  "Today a customer transferred 43,000.  Let's hope it credits tomorrow.  Thanks a lot."

**A.**  "As soon as it shows up tomorrow, I will confirm.  Are you

on a work matter?"

**Q.** "Tomorrow I am donating platelets, and I will see our most important customer.  I arrived at noon for the tests.  All good."

**A.** "That's great.  Take care of yourself and rest."

**Q.** In line 3, what does GDL stand for?

**A.** GDL stands for Guadalajara, a Mexican city, a large Mexican city located in the Mexican state of Jalisco.

**Q.** Is Guadalajara, in fact, the largest city in Jalisco?

**A.** I believe so, yes.

**Q.** Turning to Government Exhibit 149.  What is this?

**A.** It is a WhatsApp conversation between Carlos and Javier that starts on June 22nd, 2020.

**Q.** Can you please continue reading Javier and I will read Carlos.

"Hi, good afternoon, how are you?"

**A.** "Hi, how are you?  We're fine, thanks."

**Q.** "It looks like they have released the shipment detained in L.A.  It would fly to Mexico City today.  I'm well, thank God."

**A.** "Very good news."

**Q.** "I hope to have confirmation of the arrival this afternoon."

**A.** "You don't have any issues with them delivering it to you in Mexico?"

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Direct Examination - Novick

Q.   "No issue exactly.  It might have to be inspected and be, quote, detained, end quote, for five to seven days while they await the results of the analysis."

A.   "That must be what they did in Los Angeles."

Q.   During the course of your investigation, were you able to identify email addresses used by the defendant?

A.   Yes.

Q.   And what were those email addresses?

A.   There was javijavi43@yahoo.com and prochemieny@yahoo.com.

Q.   How did you identify the email address javijavi43@yahoo.com as belonging to the defendant?

A.   We initially had a search warrant for the Pro Chemie Yahoo account, and listed in that search order -- in the return of that search warrant was subscriber information that listed the javijavi43 account as a recovered email.

    Additionally, we also -- that javijavi43 account was listed as an email address through Bank of America information that was provided to us.

Q.   Agent Novick, if you could just stay closer to the microphone as you finish what you're saying?

A.   Oh, sorry.

Q.   Did you take any investigative steps related to the javijavi43 email address?

A.   Yes, we did.

Q.  And what did you do?

A.  We conducted a search warrant for that email address.

MS. NASEEF:  At this time, Your Honor, the government is going to move into evidence Government Exhibit 61, which is a CD containing the results of the search warrant of the defendant's email address, javijavi43@yahoo.com, accompanied by the Certificate of Authenticity from Oath Holdings pursuant to Federal Rule of Evidence 902(13).  And Your Honor, if you could bear with me, but the CD contains Government Exhibits 62, 63A and C, 64A and C, 65A --

THE COURT:  64 and then 65A and did you say 65C?

MS. NASEEF:  So, Your Honor, other than Exhibit 62, for every other number I'm going to read it will be 63A and 63C, 64A and 64C, if that's a little faster.  I apologize.  I just am not sure how else to make the record clean on this.

THE COURT:  It's okay.  It's just that if you said 65C, that's not on your list, so I just have to write it in.  Did you have a 65C?

MS. NASEEF:  Yes, we have 65A and 65C.

THE COURT:  Okay.  Well, it's missing from your list, that's all.

MS. NASEEF:  It is, Your Honor, the exhibit list?

THE COURT:  Yes.  I'm looking at the exhibit list.  It says 65A, 65B and no 65C.

MS. NASEEF:  I apologize, Your Honor.

THE COURT:  And I paused to ask you.

MS. NASEEF:  Yes, Your Honor.  I apologize.

THE COURT:  Okay.

MS. NASEEF:  66A and 66C, 67A, 67C, 81A, 81C.

THE COURT:  I'm sorry, what was the next?

MS. NASEEF:  67, 81A, 81C.

THE COURT:  Is that it?

MS. NASEEF:  No.  82A, 82C.  118A and 118C.  180A and 180C.  181A and 181C.  226A and 226C.  227A and 227C. 228A and 228C.  229A and 229C.  230A and 230C.  231A and 231C. 232A and 232C.  233A and 233C.  234A and 234C.  235A and 235C. And 236A and 236C.

THE COURT:  All right.  Just let me add 236 to this. All right.  So you're moving the admission of all those numbers just listed?

MS. NASEEF:  Yes, Your Honor.

THE COURT:  And Ms. Rhee?

MS. RHEE:  There's no objection, Your Honor.

THE COURT:  Okay.  So all those documents will be admitted --

MS. NASEEF:  And Your Honor --

THE COURT:  -- with no objection.

MS. NASEEF:  Apologize.  But since -- if I could just have one moment, Your Honor.

Permission to publish Government Exhibit 62, please.

THE COURT:  Yes, you may.

Q.  (BY MS. NASEEF)  Do you recognize this?

A.  Yes, I do.

Q.  And what is this?

A.  It is a flight itinerary for Javier Algredo.

Q.  And who was this email sent from?

A.  It's a little blurry at the top, but I believe --

MS. NASEEF:  Ms. Riding, could you please zoom in on the top of the email since it's a little small?

A.  It's from Interjet.

Q.  (BY MS. NASEEF)  And who is the email sent to?

A.  Javijavi43@yahoo.Com.

Q.  And what is the subject line?

A.  "Interjet itinerary."

MS. NASEEF:  If you could zoom back out, please, Ms. Riding.

Q.  (BY MS. NASEEF)  What is the body of the email about?

A.  It's a flight itinerary that departs JFK in New York and arrives in Mexico City and then returns from Mexico City to JFK New York.

Q.  And if you could look in your binder at Government's Exhibit 63A to 63C, in your binder, please, Agent Novick. What are these exhibits?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

**A.**   63A is an email from Carlos Algredo to javijavi, the javijavi43 email address, with a date of Wednesday, September 2nd, 2020, B is the translation, and C is the attachments.

MS. NASEEF:  Your Honor, permission to admit into evidence Government Exhibit 63B, the translation of the Government Exhibit 63A.

THE COURT:  Any objection?

MS. RHEE:  No, Your Honor.

THE COURT:  Hearing no objection, 63B may be admitted.

MS. NASEEF:  Permission to publish.

THE COURT:  And you may publish.

MS. NASEEF:  Ms. Riding, if you could zoom in on the exhibit a little.

**Q.**   (BY MS. NASEEF)  What email address is Carlos Algredo using?

**A.**   It states mgmexico@prodigy.net.mx.

**Q.**   How can you tell that Carlos is the sender of the email?

**A.**   In the from line, under the contact -- or next to the email address, it says Carlos Algredo.  Then at the bottom it's signed Carlos.

**Q.**   And did Carlos send other emails to the defendant from the mgmexico@prodigy.net.mx email address?

**A.**   Yes.

**Q.**   And did Carlos Algredo use any other email addresses to

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

contact the defendant?

**A.**  Yes, he did.

**Q.**  Can you please look in the binder at what has been marked for identification as Government's Exhibit 64.  Do you recognize this?

**A.**  Yes, I do.

**Q.**  And what is this?

**A.**  It is a spreadsheet that summarizes the emails sent by the defendant to Carlos and then from Carlos to the defendant.

**Q.**  And is this a fair and accurate summary of the emails that were obtained from the Yahoo search warrant?

**A.**  Yes.

        MS. NASEEF:  The government moves to admit Government's Exhibit 64 into evidence.

        MS. RHEE:  No objection, Your Honor.

        THE COURT:  Hearing no objection -- what number was that?

        MS. NASEEF:  64.

        THE COURT:  64, yes, it may be admitted.

        MS. NASEEF:  Permission to publish.

        THE COURT:  Yes, you may publish.

        MS. NASEEF:  Ms. Riding, if you could zoom in on the content, please, since the type is a bit small.

**Q.**  (BY MS. NASEEF)  Can you explain what this chart demonstrates to the jury?

**A.**   Yes.  So in the upper spreadsheet, those are emails, a summation of emails from Javier to Carlos.  In this case, the sender is the Javijavi43 email for all three columns in that top portion, and in the receiver are the three different email addresses in the column next to it, used by Carlos.  And then it's broken down by the number of emails per year.

And in the bottom portion, the second spreadsheet at the bottom are emails from Carlos to Javier, the sender being the same emails that were listed in the receiver at the top, because they're from Carlos, and then the receiver would be the Javijavi43 email, broken down by year as well.

**Q.**   And how often were the defendant and his brother emailing back and forth every year?

**A.**   In 2018, it was just over -- just around three times per year.  2019, it was just over three -- or sorry, three times per week, not per year.  In 2018, it was around three times per week.  2019, just a little bit more, just over three times per week.  2020, it went up to around six times per week.  And then in 2021, it only covers through July, but that averages out to about a little over three times per week as well.

**Q.**   Was there a pattern to these emails?

**A.**   Yes, there was.

**Q.**   And what was that pattern?

**A.**   Carlos would send invoices to Javier and then Javier would reply back with confirmation of payment of said invoices.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Direct Examination - Novick

**Q.** And did these emails have attachments?

**A.** Yes, they did.

**Q.** And what were they generally?

**A.** Generally, it was the invoice being charged, and then a confirmation of the payment being sent to Carlos.

MS. NASEEF:  Your Honor, I can continue, but this would be a good stopping point for the day, if you would like to stop.

THE COURT:  All right.  I will excuse you all until 9:00 a.m. tomorrow morning.  Have a very good evening.  Do not talk about the case among yourselves or with anybody else. See you in the morning.

(Jury left the courtroom.)

THE COURT:  All right.  Everybody have a good evening.

(The proceedings were concluded.)


I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_____/s/_____
Christine T. Asif
Official Court Reporter

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

< Dates >.
11/11/2020 93:23.
13 may 15:3.
August 2020 50:15, 50:23, 83:20.
December 14th, 2017 90:15.
December 19th, 2019 92:18.
December 27th, 2018 91:17.
December 8th 90:25.
February 2021 83:20.
February 2022 50:23, 50:25, 83:21.
February 27th, 2019 94:15.
January 1st 69:1.
July 19th, 2023 1:11.
July 2021 83:21.
July 3rd, 2019 92:2.
June 22nd, 2020 97:13.
June 27th, 2014 77:3.
June 2nd, 2020 96:15.
June 4th, 2019 95:21.
June 7th, 2021 93:12.
March 1st, 2019 95:8.
March 2017 68:3.
May 23rd, 2017 79:20.
May 7th, 2021 83:6.
September 25th, 2017 89:24.

September 2nd 102:2.
$1,000 73:15.
$100 95:24.
$11,607 91:21.
$19,800 93:24.
$2 28:1, 28:3, 28:8.
$2,603.02 96:22.
$200 19:7.
$27,083 91:21.
$3,000 73:20.
$50 23:17.
$6,000 73:20.
.38 20:23, 21:6, 21:9, 21:11, 21:12, 21:13.
.
.
< 1 >.
1 22:18, 28:2, 28:8, 32:2, 32:3, 39:11, 88:22, 91:23, 92:3, 93:13, 95:22.
11 14:21, 14:23, 15:1, 15:3, 15:5, 23:3.
11,607 91:22.
118A 100:9.
118C 100:9.
11th 6:8.
12 26:8, 43:14, 80:11.
1226 50:4, 51:21, 56:11, 84:8, 84:11, 88:21.
12:15 p.m. 1:12.
12th 76:23.
13 14:21,

14:24, 15:1, 15:5, 15:13, 23:23.
131 88:2.
133 87:16, 89:21.
1338 50:5, 51:22, 56:11, 84:9, 85:7, 85:12.
134 90:13.
137 91:15.
138 94:13.
139 95:6.
14 80:14, 80:18.
14,600 92:22.
140 95:19.
141 91:25.
145 92:16.
146 87:17.
148 96:13.
149 97:11.
15 48:24, 49:8, 49:12.
154 93:9.
156 87:16, 87:18, 88:2, 88:10.
15th 29:10.
16.5-hour 90:3.
17,000 94:24, 95:13.
17052 90:21.
180 51:5, 65:5, 65:7, 65:10, 65:12.
180A 100:9.
180C 100:10.
181A 100:10.
181C 100:10.
1827 2:19.
.
.
< 2 >.
2 14:21, 14:23, 15:1, 15:3, 15:5, 15:13, 15:15, 17:13,

22:4, 22:10, 22:19, 31:21, 32:1, 40:1, 76:4, 76:25, 93:7.
20 20:20, 70:15.
20-week 68:19.
2000 69:1.
20001 1:46.
2010 69:1.
2011 7:22, 13:11.
2013 13:10, 13:11.
2015 76:23.
2017 69:1, 94:25.
2018 104:14, 104:16.
2019 104:15, 104:17.
202 1:47.
2020 6:8, 102:3, 104:18.
2021 8:1, 8:20, 9:22, 88:14, 89:15, 89:18, 104:19.
2022 50:15.
2023 29:10.
20530 1:29.
20th 88:14, 89:15, 89:18.
21-0597-BAH 1:6.
21-597 2:4.
22 89:7, 89:8, 89:9.
22314 1:33.
226A 100:10.
226C 100:10.
227A 100:10.
227C 100:10.
228 1:32.
228A 100:11.
228C 100:11.

229A 100:11.
229C 100:11.
230A 100:11.
230C 100:11.
231A 100:11.
231C 100:11.
232A 100:12.
232C 100:12.
233A 100:12.
233C 100:12.
234A 100:12.
234C 100:12.
235A 100:12.
235C 100:12.
236 100:14.
236A 100:13.
236C 100:13.
25 89:12.
26,200 95:1.
27,083 91:22.
27th 9:2.
28 2:19.
29th 8:1,
   9:22.
2:00 4:18.
.
.
< 3 >.
3 14:21, 14:23,
   15:1, 15:3,
   15:5, 15:13,
   16:12, 16:14,
   17:14, 31:21,
   40:1, 76:16,
   91:2, 97:6.
30 20:20,
   46:25,
   67:2.
30,800 90:20.
31 59:4, 59:9,
   59:17, 60:1,
   60:3, 60:13,
   60:18, 60:22,
   61:1.
333 1:45.
35 22:25, 24:2,
   75:2, 75:4,
   75:11, 75:13,
   75:18,
   75:20.

354-3247
   1:47.
36 75:2, 75:5,
   75:11, 75:13,
   76:2.
37 77:10,
   77:13, 77:19,
   77:22.
37A 77:10,
   77:15, 77:19,
   77:25, 78:1,
   78:10, 79:1,
   79:5, 79:10,
   84:23.
38 81:5, 81:9,
   81:12, 81:24,
   82:2.
38A 81:5,
   81:12, 81:24,
   82:5, 82:8,
   82:10,
   82:11.
39 81:5, 81:14,
   81:15, 81:18,
   81:24,
   82:2.
39A 81:5,
   81:18, 81:25,
   82:22, 83:1,
   83:11.
3rd 8:20.
.
.
< 4 >.
4 40:14, 40:24,
   82:8, 82:13,
   91:6.
40 82:15.
41 60:25, 61:3,
   61:4, 61:5,
   61:6, 86:5.
41A 86:1, 86:2,
   86:4, 86:9.
420 24:1.
4215 75:25.
43,000 96:23.
45 1:28.
48,600 92:9.
480 23:25.
4:00 4:18.

.
.
< 5 >.
5 82:18, 92:14,
   94:6.
50 44:3, 82:17,
   89:12.
500 22:7.
53,400 93:16.
5529711226
   80:10.
.
.
< 6 >.
60 60:25, 61:5,
   61:6, 65:10,
   86:6.
60A 86:1, 86:2,
   86:4, 86:9.
61 99:5.
62 99:10,
   99:13,
   101:1.
63A 99:10,
   99:14,
   101:24,
   102:1,
   102:6.
63B 102:5,
   102:9.
63C 99:15,
   101:24.
64 99:12,
   103:4,
   103:14,
   103:18,
   103:19.
64A 99:10,
   99:15.
64C 99:15.
65A 99:11,
   99:12, 99:20,
   99:25.
65B 99:25.
65C 99:12,
   99:18, 99:19,
   99:20,
   99:25.
66A 100:5.
66C 100:5.

67 100:7.
67A 100:5.
67C 100:5.
.
.
< 7 >.
7 88:18.
.
.
< 8 >.
8 79:17.
81A 100:5,
   100:7.
81C 100:5,
   100:7.
82A 100:9.
82C 100:9.
.
.
< 9 >.
9 79:21,
   80:6.
902(13) 99:9.
9:00 105:10.
_____/s/___
   _____
   105:22.
.
.
< A >.
a.m. 105:10.
abbreviation
   91:6.
ability
   37:18.
able 9:8, 9:10,
   15:25, 18:1,
   18:14, 23:14,
   47:4, 47:25,
   58:16, 84:10,
   84:16, 84:18,
   85:6, 85:11,
   87:11, 88:15,
   96:11,
   98:5.
above-entitled
   105:20.
absolute 5:4.
academy 68:24,
   69:5,

69:12.
access 4:8,
  4:11, 48:4,
  48:6, 48:15,
  58:16,
  64:17.
accesses
  48:13.
accident
  20:2.
accommodate
  3:20.
accompanied
  75:7, 81:21,
  99:7.
according
  76:19,
  82:14.
account 28:1,
  28:2, 29:2,
  38:23, 39:7,
  93:16, 95:2,
  96:19, 96:20,
  98:14, 98:16,
  98:17.
account.
  96:3.
accounts
  74:18.
accuracy
  78:13.
accurate 60:13,
  103:10.
accurately
  45:2, 45:7,
  45:14,
  46:2.
accused 51:9.
acetone
  37:15.
acid 21:3,
  21:5, 63:17,
  89:7, 89:8,
  89:9,
  89:12.
acronym 43:3,
  43:4.
across 13:22.
Act 19:20,
  70:7.

ACTION 1:5,
  53:6.
actions 37:2.
active 68:25.
activities
  55:6.
activity 22:12,
  43:21, 44:18,
  64:16.
acts 19:12,
  19:16.
actual 78:10.
actually 21:25,
  24:6.
add 72:3,
  100:14.
Addendum 17:15,
  39:12,
  39:16.
addition 94:8,
  94:25.
additional
  91:11.
Additionally
  98:17.
address 75:23,
  98:11, 98:18,
  98:24, 99:2,
  99:6, 102:2,
  102:15,
  102:20,
  102:23.
addresses 98:6,
  98:8, 102:25,
  104:5.
administer
  48:7.
administers
  48:7.
Administration
  46:19,
  67:21.
administrative
  44:25.
administrator
  82:20,
  83:8.
admissible
  14:21.
admission

77:20,
  100:15.
admit 60:17,
  60:24, 78:1,
  81:24, 102:4,
  103:13.
admitted 15:3,
  15:10, 23:9,
  23:13, 39:11,
  60:22, 61:6,
  75:14, 77:23,
  78:18, 79:9,
  82:3, 86:10,
  88:5, 100:21,
  102:10,
  103:19.
advantage
  42:6.
advisory
  22:15.
affiliation
  5:15.
afternoon 2:8,
  2:12, 2:15,
  2:16, 4:6,
  4:7, 4:18,
  42:21, 42:23,
  54:9, 90:3,
  90:18,
  97:16.
afternoon.
  97:23.
agencies
  29:4.
agency 28:4,
  28:6, 43:1,
  43:5, 62:15,
  62:21,
  62:25.
agenda 10:6.
Agent 1:36,
  2:11, 66:19,
  67:9, 67:10,
  67:20, 68:1,
  68:2, 68:4,
  68:5, 68:19,
  69:4, 69:6,
  69:22, 69:23,
  70:5, 70:16,
  73:21, 75:20,

76:6, 76:12,
  76:13, 79:15,
  80:19, 82:9,
  83:14, 85:23,
  85:25, 98:20,
  101:24.
agents 74:12.
ago 11:4,
  24:18, 29:10,
  38:5, 38:8.
agree 23:19.
agreed 14:19,
  15:2, 19:3,
  19:7,
  23:16.
agreement
  15:15, 17:10,
  17:12, 17:15,
  17:16, 21:22,
  22:6, 31:20,
  32:5, 33:3,
  33:6, 34:2,
  34:6, 34:22,
  39:12, 40:1,
  40:2, 40:8,
  40:14, 40:15,
  40:18.
Agreement.
  39:16.
ahead 15:22.
airplane
  92:11.
AK-47 21:19.
alcohol 28:16,
  35:11, 35:22,
  35:24, 36:2,
  36:6, 36:20,
  36:25,
  37:11.
Alexandria
  1:33.
alike 9:6,
  9:7.
alive 20:18.
allow 47:23,
  48:2.
allowed 8:4,
  8:10, 52:8.
allowing
  8:16.

allows 47:11, 64:19.

almost 71:13.

already 7:14, 59:1, 65:14, 91:22, 94:1, 95:14.

alter 46:6.

although 96:5.

America 1:5, 2:4, 71:9, 93:18, 98:18.

American 61:22, 64:22.

among 20:21, 105:11.

amount 23:17, 90:25, 94:25.

amounts 96:5, 96:8, 96:10.

analysis. 98:3.

analyst 48:9.

analyze 52:14.

Angeles 67:23, 67:24, 71:1, 73:14.

Angeles. 98:4.

answer 27:9, 83:14.

answered 10:17, 45:23.

answering 11:23.

anybody 105:11.

apart 13:1.

Apologize 2:21, 13:6, 99:15, 100:1, 100:3, 100:24.

apologizes 17:5.

APPEARANCES

1:21.

appearing 23:11.

application 77:13, 77:14, 79:19, 84:21, 84:22, 85:1, 85:13.

applications 47:4.

applies 51:8.

appointment 20:8.

approach 58:24, 59:6.

approached 6:18, 7:9.

approvals 56:16, 56:20.

approximate 7:20.

Approximately 33:20, 44:2, 44:3, 46:25, 54:23, 70:12, 73:12.

April 8:1, 9:22.

Arceo 4:1, 15:16.

area 32:25, 46:18, 46:20, 46:22, 73:11.

areas 73:10.

around 20:3, 69:1, 104:14, 104:16, 104:18.

arrange 30:25.

arrangement 35:1.

arrest 33:24, 34:6, 34:8, 87:8.

arrested 33:21, 89:16.

arrival

97:22.

arrive 14:9, 32:23, 89:4, 89:5, 95:1.

arrive. 92:12.

arrived 89:2, 90:4, 95:12, 97:3.

arrives 62:10, 101:21.

Articles 81:10, 82:11.

Asif 1:41, 105:18, 105:23.

assassins 19:11, 20:21.

assigned 55:7, 56:4, 67:23, 67:24, 70:25, 74:12.

assignment 70:18.

assistant 55:1, 55:2.

associate 33:11.

associated 88:20.

attachments 102:3, 105:1.

attended 68:19, 69:20.

attention 2:18, 17:19.

attorney 9:12, 10:10, 10:12, 10:14, 10:15, 51:10, 51:16.

audio 12:12, 14:1, 38:14, 50:10, 52:21, 86:5.

audiotapes 12:12.

Authenticity

75:8, 81:21, 99:8.

authorities 44:21, 62:19, 85:3.

authority 47:10, 47:20, 47:22.

authorization 44:12, 44:16, 49:12, 49:15, 56:24, 57:1, 58:17, 58:18, 65:13.

authorizations 50:2.

authorize 47:10, 57:21.

Authorized 7:5, 43:22, 43:23, 44:5, 47:3, 47:17, 49:9, 49:10, 50:4, 51:1, 51:5, 51:15, 52:8, 53:2, 53:11, 56:8, 57:9.

authorizes 44:4.

available 66:11, 96:1.

Avenue 1:45.

averages 104:19.

await 98:3.

.

.

< B >.

back 3:18, 12:6, 16:20, 20:2, 23:19, 31:12, 76:24, 78:8, 83:13, 101:17, 104:13, 104:25.

backs 34:4.

balance

96:19.
Bank 38:23,
  74:18, 93:1,
  93:2, 93:15,
  93:18, 95:24,
  96:20,
  98:18.
bank. 93:3.
banking 96:9.
banks. 93:5.
barrel 26:10,
  26:23, 27:4,
  27:10.
barrel.
  26:12.
Barter 79:24,
  80:12, 81:11,
  82:12, 82:14,
  83:10.
base 71:14,
  71:25.
Based 47:9,
  51:13, 57:12,
  63:23, 71:4,
  71:11, 71:20,
  90:9, 96:7.
Basic 27:11,
  68:19,
  69:6.
basis 45:6,
  45:9,
  65:10.
batch 35:18.
bear 99:9.
became 68:4.
began 33:7,
  34:9, 36:22,
  37:10.
beginning 10:8,
  19:9.
begins 95:21.
behalf 19:17.
behind 34:4.
believe 45:23,
  47:24, 78:2,
  85:5, 97:10,
  101:9.
Bello 41:13,
  42:12, 42:23,
  42:24,

50:22.
belong 57:16.
belonged 64:13,
  64:14, 64:24,
  64:25.
belonging
  98:12.
below 94:19.
Bench 45:5,
  78:5.
benzyl 28:16,
  35:11, 35:22,
  35:24, 36:2,
  36:5, 36:20,
  36:25,
  37:11.
BERYL A. HOWELL
  1:18.
Better 90:21.
better.
  94:21.
big 26:17.
binder 74:25,
  77:9, 80:18,
  81:4, 85:21,
  85:23, 85:25,
  87:14,
  101:23,
  101:24,
  103:3.
binders 86:12,
  86:16, 86:19,
  86:20.
bit 16:24,
  42:4, 42:7,
  73:16,
  103:23,
  104:17.
biweekly
  58:5.
black 72:21.
Blackberry
  10:23, 10:24,
  11:2, 30:14,
  30:16,
  30:19.
Blane 94:1.
Blumberg-lorenz
  ana 1:38.
blurry 101:9.

boarding
  92:11.
body 21:3,
  101:19.
border 73:7,
  73:8, 73:13,
  73:14.
boss 7:7,
  48:11.
bottom 39:20,
  88:18, 88:25,
  102:20,
  104:7,
  104:8.
boys 96:17.
break 31:12,
  31:15, 31:16,
  33:6,
  66:10.
briefly 50:19,
  61:10, 69:18,
  71:2.
bring 14:16,
  34:21, 35:2,
  37:10, 66:16,
  86:20.
broadcasts
  4:11.
broken 104:6,
  104:11.
brother 10:7,
  11:16, 77:6,
  88:19, 89:14,
  94:9,
  104:12.
brought 25:16,
  27:6, 32:17,
  34:23,
  37:10.
business 13:14,
  13:19, 32:21,
  74:22,
  89:18.
businesses
  29:5.
buys 93:25.
.
.
< C >.
Cacho 37:21.

caliber 20:23,
  21:7, 21:12,
  21:13.
call 2:2, 6:4,
  16:21, 21:20,
  41:11, 48:13,
  67:1, 89:3.
called 4:2,
  16:18, 42:13,
  46:18, 53:25,
  67:11.
calling 24:15,
  66:22,
  66:24.
Cambio 27:22.
Canasta
  15:16.
candy 89:14.
capacity 55:19,
  55:22,
  55:25.
Car- 80:14.
care 5:23,
  59:20, 60:4,
  60:14,
  97:5.
careers 69:7.
careful 89:6.
carried 19:12,
  21:8,
  21:17.
carry 21:6,
  21:18.
carrying
  22:11.
Cartel 5:1,
  6:25, 7:10,
  8:14, 19:9,
  32:16, 32:18,
  32:20, 32:24,
  33:3, 33:16,
  37:16,
  70:23.
cartels 33:23,
  55:15, 55:17,
  71:4.
Casa 27:22.
case 2:2, 2:4,
  2:11, 4:14,
  4:21, 4:22,

12:17, 16:15, 18:5, 23:23, 23:25, 50:1, 50:8, 57:19, 58:17, 61:14, 62:10, 62:15, 63:3, 63:8, 64:3, 64:9, 64:12, 74:12, 90:7, 104:2, 105:11.

cases 55:6, 63:3, 63:4, 70:19.

cash 28:3, 28:9, 95:24, 96:4, 96:8, 96:10.

catch 83:14.

Catro 35:7.

caught 33:7.

cause 63:6.

CD 49:3, 49:4, 99:5, 99:10.

Cds 49:23, 50:10, 58:14, 58:21.

cell 87:8, 88:17, 88:19, 88:20.

certain 51:15, 57:7, 70:19.

Certificate 75:4, 75:5, 75:7, 76:8, 81:21, 99:7.

certified 3:9, 77:16, 78:16, 85:19.

certify 78:17, 105:18.

Cervantes 5:3, 71:19.

chain 49:6, 58:19, 66:25.

Change 36:18,

36:21, 75:6, 76:8, 76:9, 76:10, 76:12.

changed 78:20, 78:22.

changing 16:20.

Chapo 33:7, 33:11, 33:13, 33:14, 33:20, 33:24, 33:25, 34:6, 34:8, 34:9.

charge 6:16, 28:20, 28:25, 39:1, 43:8, 46:22, 48:9, 48:11, 57:18, 58:4, 62:19, 65:22.

charged 105:4.

charging 32:22.

chart 103:24.

Charter 93:15.

chat 93:10.

check 3:15, 41:20, 62:17, 62:19, 93:17, 93:19, 95:14, 96:19.

checked 93:16.

Chemical 11:21, 36:12, 36:17, 55:16, 62:10, 62:11, 62:13, 63:2, 73:25, 74:2, 74:5, 91:3, 91:13, 91:24, 92:15, 93:8, 93:22, 94:6, 94:7, 94:8.

Chemie 75:4, 75:6, 75:21, 76:19, 77:1,

92:5, 93:25, 94:10, 94:24, 95:4, 98:13.

Chemie. 95:15.

chief 43:16.

children 25:5, 33:7, 34:9.

China 6:11, 9:17, 9:21, 13:16, 28:5, 28:12, 29:5, 35:17, 37:10, 89:13, 90:4, 90:10, 90:11, 94:25, 95:12.

Chinese 36:23, 94:1, 94:24.

Christine 1:41, 105:18, 105:23.

citric 89:12.

City 29:7, 29:22, 54:18, 54:19, 59:20, 60:15, 79:25, 80:1, 80:2, 80:3, 80:4, 91:9, 97:7, 97:8, 97:9, 97:19, 101:21.

Ciudad 20:10, 20:11.

CJNG 6:25, 32:20, 33:3, 35:3, 70:23, 70:24, 70:25, 71:2, 71:3, 71:11, 71:12, 71:17, 71:18.

clandestine 72:9, 72:13.

clarification 3:13,

62:22.

clarify 13:18, 31:19.

classroom 69:14.

clean 99:16.

clear 51:20.

clearly 46:16.

CLERK 67:14.

client 31:9.

clips 38:16.

close 25:6, 73:8.

closely 23:10, 23:14.

closer 70:16, 70:17, 98:20.

co-counsel 2:9.

Co. 94:6.

Coast 68:6, 68:7, 68:8, 68:23.

coca 72:1.

Cocaine 34:2, 71:6, 71:8, 71:25, 72:1, 72:3, 72:5.

cold 94:18, 94:19.

colder 94:20.

collect 48:1, 64:19.

collection 19:13.

college 68:24.

colloquy 3:11.

COLUMBIA 1:2.

Columbia 1:44.

column 104:5.

columns 104:3.

combination 71:23.

comes 6:11.

comfortable 70:1.

coming 41:14, 96:12.

comment 11:3.

commented 9:20.

commissioned 68:5, 68:8.

commissions 94:24.

commit 19:16, 22:10, 55:14, 64:16.

committed 19:19.

communicated 14:12, 44:19.

communication 10:20, 46:8, 46:10, 46:11, 46:12, 61:25.

communications 10:22, 10:24, 43:8, 44:4, 44:25, 47:8, 48:3, 48:10, 48:11, 48:22, 49:20, 51:9, 51:13, 56:23, 56:25, 57:9, 64:17, 84:2, 85:15, 85:18, 87:22.

compact 58:6, 58:7, 59:13.

companies 36:23, 47:9, 91:13, 94:9.

Company 44:19, 44:20, 44:22, 44:24, 45:3, 45:8, 45:11, 46:3, 46:7, 50:3, 57:16, 62:12, 76:9,

82:19, 83:9, 91:3, 91:24, 92:15, 93:8, 93:22, 94:7.

compare 59:19, 60:3.

compel 47:17, 47:21, 47:24.

complete 52:9.

completely 60:12.

complex 62:14.

comply 44:17.

complying 45:12.

computer-aided 1:50.

concerned 39:5.

concerns 2:25.

concluded 49:9, 58:1.

concluded. 105:16.

condition 33:8, 50:12.

conditioned 40:15, 40:19.

conduct 65:20, 69:8, 69:21, 87:7.

conducted 44:6, 99:2.

conducting 65:19, 70:2, 83:18.

confer 6:21.

conference 45:5, 78:5.

conferred 2:23.

confidential 69:10, 74:17.

confirm 25:24, 49:17, 50:22, 91:20, 94:2, 96:25.

confirmation 92:25, 97:22, 104:25, 105:5.

confirmation. 90:23, 93:6.

confirmed 25:21.

confused 18:12.

confusion 9:5, 9:12.

connected 47:1.

connection. 90:5.

conscientious 3:20.

consecutive 2:19, 2:25, 3:5, 3:9, 16:21.

consent 23:3, 23:17.

consider 96:2.

consists 43:21.

conspiracy 22:7, 22:10.

constitution 56:21.

contact 30:5, 30:6, 30:9, 31:1, 102:19, 103:1.

contacted 61:23.

contain 60:13, 85:25.

contained 59:16, 59:25, 60:25.

containers

7:12, 8:13, 83:16, 89:12.

containing 22:8, 85:21, 86:12, 99:5.

contains 59:13, 99:10.

content 103:23.

continue 34:12, 65:9, 89:25, 90:16, 92:19, 94:16, 95:9, 96:16, 97:14, 105:6.

continued 33:25, 34:22.

Contitution 1:45.

contrast 71:24.

Contreras 3:23, 3:24, 4:1, 4:6, 15:16, 18:6, 31:5, 32:14, 33:17, 39:10, 41:3, 41:9.

control 42:25, 57:20.

Controlled 6:25, 35:3, 70:6, 74:4.

controls 7:2.

conversation 70:1, 88:13, 89:22, 89:23, 90:14, 91:16, 92:1, 92:17, 93:11, 94:10, 94:14, 95:7, 95:20, 96:14, 97:12.

conversational 70:1.

conversations 59:15, 84:19,

87:21.
cook 8:16,
  25:11, 26:3,
  26:21.
cooperate
  44:20.
cooperating
  22:21,
  74:16.
cooperation
  17:16, 40:25,
  41:4.
coordinating
  43:21,
  74:18.
copies 60:14.
copy 49:4,
  49:23,
  92:23.
Coracero 83:20,
  85:10,
  85:12.
correction
  28:11.
correctly 18:4,
  47:13,
  48:9.
corrects
  6:22.
corroborated
  64:10, 64:12,
  64:14, 64:21,
  64:23.
corroboration
  65:2.
cost 73:5,
  73:13, 73:17,
  73:19.
costs 73:6.
Counsel 2:6,
  2:10.
Count 22:10,
  22:18,
  22:19.
counterparts
  74:19.
countries
  51:13, 74:19,
  90:11.
country 71:12,

73:3.
couple 41:23.
course 17:7,
  54:14, 56:21,
  68:19, 68:21,
  74:15, 84:10,
  88:8, 89:4,
  95:2, 98:5.
course. 92:8.
courses
  69:20.
Court-ordered
  87:9.
court. 45:21,
  79:3.
courthouse
  3:19, 31:6,
  41:18.
courtroom
  3:11.
courtroom.
  3:17, 32:8,
  67:6,
  105:13.
cover 57:7,
  57:21, 68:21,
  69:4, 69:6,
  87:1.
covered
  69:19.
covers
  104:19.
Coyoacan 80:1,
  80:3, 80:4.
create 48:12,
  71:24.
creates
  71:25.
credited
  95:25.
credits
  96:24.
crime 43:2,
  55:10,
  55:13.
crimes 55:9,
  55:11, 55:14,
  63:7, 70:5,
  70:9.
CRIMINAL 1:5,

2:3, 16:15,
  23:23, 53:8,
  55:6,
  55:14.
cross 50:18,
  61:9.
CROSS-EXAMINATI
  ON 3:22, 4:4,
  35:10, 37:5,
  38:20, 50:20,
  61:11.
Cruz 89:8,
  89:9,
  89:13.
CTC 43:6, 43:7,
  43:8, 43:11,
  43:13, 43:15,
  43:16, 44:4,
  44:6, 44:7,
  44:23, 45:1,
  45:2, 46:2,
  46:14, 46:15,
  46:17, 46:18,
  47:3, 47:14,
  48:4, 48:17,
  48:25, 49:7,
  49:13, 49:17,
  50:12,
  50:14.
cumbersome
  16:24.
current 43:15,
  70:18.
Currently 55:7,
  55:8, 67:19,
  67:20,
  67:23.
custody 49:6,
  58:20, 59:20,
  60:4, 60:14,
  66:25,
  83:17.
customer 96:23,
  97:3.
customers.
  90:22.
customs 62:15,
  62:21,
  62:25.
.

.
< D >.
Dangerous 1:27,
  5:8, 5:9.
Daniel 90:7.
Danny 37:21.
data 48:1,
  64:19.
date 7:20,
  9:25, 19:9,
  29:11, 46:23,
  76:22, 79:20,
  83:5,
  102:2.
dates 9:23.
daughter
  25:25.
David 80:24.
day 18:19,
  18:24, 20:19,
  34:22, 65:12,
  86:24,
  105:7.
days 46:25,
  48:24, 49:8,
  49:12, 51:5,
  65:5, 65:7,
  65:10, 65:12,
  98:2.
de 27:22,
  70:23.
DEA 1:36, 7:14,
  7:17, 7:20,
  36:22, 67:22,
  68:1, 68:2,
  68:4, 68:5,
  68:16, 69:5,
  70:4, 73:21,
  74:21, 77:6,
  87:7,
  87:11.
deal 34:10.
dealings 9:15,
  9:19.
debrief 69:9.
debriefing
  74:16.
debriefs
  70:2.
debt 19:20.

debts 19:14.
decided 10:12,
  49:3.
decides
  48:22.
decision
  57:8.
Defendant 1:12,
  1:31, 39:23,
  40:3, 40:10,
  40:25, 51:16,
  66:16, 74:8,
  74:21, 77:6,
  87:8, 87:21,
  88:14, 88:17,
  89:16, 90:12,
  94:9, 95:18,
  98:6, 98:12,
  99:6, 102:22,
  103:1, 103:9,
  104:12.
Defense 2:24,
  14:20, 14:23,
  15:3, 15:15,
  15:17, 16:14,
  22:4, 23:3,
  23:22, 32:3,
  39:11,
  68:10.
defensive
  69:9.
delay 67:3.
delayed 67:3.
deliberations
  23:11,
  23:15.
delivered
  25:19, 25:21,
  28:21.
delivering
  97:24.
demonstrated
  63:1.
demonstrates
  103:25.
Department
  1:26, 44:24,
  74:22.
departs
  101:20.

depending
  73:2.
deposit 28:1,
  95:2, 95:3,
  95:13, 95:24,
  96:4, 96:10,
  96:22.
deposited 28:3,
  29:2, 29:3,
  95:14,
  96:12.
depositing
  96:8.
describe 43:19,
  83:7.
described
  45:17,
  50:7.
destination
  89:8,
  89:13.
detained 33:12,
  33:25, 63:2,
  63:3, 63:9,
  63:16, 83:13,
  83:17, 97:18,
  98:2.
determine
  84:11,
  85:6.
developed
  49:14.
devices
  43:10.
Diana 66:23,
  66:24.
difference
  16:23, 21:12,
  37:15.
different 36:3,
  36:6, 36:10,
  37:12, 37:19,
  47:14, 61:19,
  74:16, 93:4,
  93:5,
  104:4.
difficult
  37:2.
DIRECT 7:7,
  42:19, 54:6,

  67:15.
directed
  19:16.
direction
  19:12.
directly 28:23,
  30:9, 30:20,
  30:22,
  55:5.
directly.
  95:4.
director 43:20,
  45:16.
directorate
  57:19.
disappeared
  21:5.
disc 59:13.
discs 58:6,
  58:7, 58:8,
  89:11.
discuss 29:13,
  93:10.
discussed 7:23,
  53:9,
  91:12.
discussing
  89:18,
  94:8.
disk 52:23.
dissolved
  21:3.
distributed
  71:8.
distribution
  22:13,
  70:13.
District 1:1,
  1:2, 1:19,
  1:43, 1:44,
  16:15,
  17:9.
Distrito
  80:1.
Division 43:2,
  67:23,
  67:24.
document 17:20,
  17:22, 21:22,
  22:1, 23:22,

  23:24, 39:23,
  49:14, 75:24,
  76:7, 76:17,
  76:20, 76:22,
  77:1,
  82:14.
documentation
  49:5.
documented
  76:10.
documents
  14:20, 18:6,
  18:10, 18:17,
  18:22, 19:4,
  62:17, 62:19,
  62:20, 62:24,
  63:10, 81:20,
  100:20.
doing 15:12,
  16:4, 34:11,
  42:1, 52:8.
DOJ 1:35.
dollars 91:5.
Dominguez
  53:20, 53:22,
  53:24,
  54:10.
donating
  97:2.
done 27:6,
  29:4, 33:2,
  35:8, 35:9,
  41:7, 64:6.
done. 96:6.
Dopazo 1:37.
down 33:6,
  41:22, 77:4,
  104:6,
  104:11.
download
  52:23.
downstairs
  86:22.
Dozens 70:15.
draw 17:19.
drawn 49:16.
drinks 89:13.
drove 20:5.
Drug 1:27,
  19:8, 19:14,

19:20, 23:20, 55:15, 55:17, 67:20, 69:11, 70:19, 71:3, 71:24.
Drug-related 70:9.
drugs 25:18, 25:21, 70:13, 71:22, 73:23.
dual-use 62:7.
Due 73:10, 90:25.
dulce 28:15, 37:14.
duly 4:2, 42:13, 53:25, 67:11.
During 14:3, 18:21, 23:10, 23:14, 29:16, 29:17, 49:11, 49:18, 84:7, 98:5.
duties 68:7.
duty 68:25.
.
.
< E >.
earphones 16:20, 16:24.
Eastern 16:15, 17:9.
eight 5:18, 26:17.
either 58:5, 93:17, 96:11.
El 5:3, 71:19.
electorate 43:1.
electronic 43:9, 69:8.
elements 64:11, 64:21.
Ellis 18:18.

Elmhurst 75:25.
ELMO 17:23.
elsewhere 71:8, 71:10.
email 90:24, 98:6, 98:8, 98:11, 98:16, 98:18, 98:24, 99:2, 99:6, 101:8, 101:11, 101:13, 101:19, 102:1, 102:2, 102:15, 102:18, 102:20, 102:23, 102:25, 104:3, 104:4, 104:11.
emailing 104:12.
emails 102:22, 103:8, 103:10, 104:1, 104:2, 104:6, 104:8, 104:9, 104:21, 105:1.
embassy 61:23.
emergency 96:6.
employed 19:11, 42:24, 67:19, 67:20, 67:22.
employer 79:23.
end 28:15, 51:2, 53:3, 68:3, 71:25, 83:14, 98:2.
ended 49:15.
ending 50:4, 56:11, 84:8,

84:11, 85:7, 86:2, 88:21.
ends 49:12, 51:21.
Enforcement 37:2, 67:21, 68:11, 74:19.
English 17:20, 21:22, 69:24, 83:1, 85:19.
enough 96:1.
entail 68:7.
entered 3:17, 32:8, 67:6.
entire 71:12.
equaling 89:12.
equipment 47:25.
Esquire 1:23, 1:24, 1:25, 1:31.
essentially 36:6.
established 4:25.
establishes 49:6.
evening 105:10, 105:15.
eventually 33:6.
Everybody 3:21, 54:9, 105:14.
Everyone 21:4.
Everything 11:20, 18:18, 27:7, 28:10, 28:22, 30:23, 31:23, 32:22, 33:1, 33:2, 89:14.
Evidence 14:21, 14:22, 23:9, 23:14, 57:14,

58:11, 58:12, 58:14, 58:16, 58:19, 60:18, 64:1, 64:3, 64:7, 64:19, 75:11, 77:19, 79:5, 81:24, 86:4, 88:2, 99:4, 99:9, 102:5, 103:14.
exactly 20:7, 98:1.
EXAMINATION 31:17, 32:12, 42:19, 54:6, 59:2, 67:15.
examine 23:14.
examined 4:2, 42:13, 53:25, 67:11.
example 61:19, 73:14, 74:5, 74:20.
excellent 78:25.
exchange 28:3, 28:6, 29:4, 38:20, 38:24, 38:25, 39:2, 39:4, 39:6, 89:17, 91:11.
Excuse 15:17, 16:11, 16:12, 17:10, 68:22, 105:9.
excused 41:10, 53:17, 66:7.
Exhibits 14:23, 15:3, 15:25, 31:21, 74:25, 75:2, 75:3, 75:7, 75:11, 77:10, 81:5, 81:7, 81:24, 85:25, 86:4,

86:5, 87:16, 87:19, 88:2, 99:10, 101:25.
experience 71:20, 96:7.
experiment 37:6, 37:16, 37:19.
experimenting 37:8, 37:20.
explain 16:17, 17:2, 18:14, 33:10, 46:9, 47:7, 62:15, 69:18, 71:2, 71:20, 73:25, 103:24.
explanation 57:5.
exportation 9:16.
exported 9:21, 28:10, 35:16.
extract 87:11.
extraction 43:9.
extradited 33:14, 34:24.
extremely 71:4.
.
.
< F >.
facilities 72:6.
fact 78:23, 97:9.
facts 16:14, 17:13, 17:20, 19:3, 19:6, 19:10, 21:16, 27:7.
fair 60:13, 103:10.

fairly 31:11.
faking 12:2.
false 40:4, 40:10.
familiar 55:19, 55:22, 56:1, 72:24, 73:22.
family 25:3.
far 13:10, 18:11, 47:18, 64:23, 72:12, 80:4.
faster 99:15.
father 25:4.
FCRR 1:41, 105:18.
fear 5:16.
February 8:20, 50:15.
fed 21:13.
Federal 34:16, 54:16, 54:17, 54:22, 54:24, 55:1, 55:2, 55:4, 55:19, 55:22, 55:25, 56:4, 58:21, 61:13, 62:10, 64:11, 80:1, 81:16, 83:3, 99:8.
federally 3:8.
federation 44:8, 44:9.
feds 34:17.
feel 23:12, 70:1.
felt 94:20.
female 10:14.
FEMDO 43:3.
fentanyl 70:10, 71:6, 71:7, 71:21, 71:22, 72:2, 72:7, 72:12, 72:18, 72:19, 72:21.
few 20:17,

92:7.
FGR 81:16, 83:2.
Field 67:23, 67:24.
file 59:16, 59:19, 59:23.
files 50:10, 60:14, 86:5.
fill 58:15.
final 23:22, 49:14, 52:5, 52:9.
Finally 80:14.
finances 94:10.
financial 67:25, 96:9.
find 57:23.
fine 91:1, 93:2, 93:19, 94:3, 96:18, 97:17.
fine. 95:5.
finish 40:24, 98:21.
finished 8:4, 8:11, 66:21.
first 4:2, 7:23, 9:23, 13:4, 13:7, 13:25, 14:2, 15:8, 15:23, 24:17, 31:5, 36:19, 36:24, 38:9, 38:11, 39:15, 42:13, 53:25, 65:18, 67:11, 81:9, 83:4.
Five 12:21, 43:18, 98:2.
flexible 3:20.

flight 90:4, 101:7, 101:20.
flip 88:25.
floors 89:11.
fluent 69:25.
fly 97:19.
folder 48:14.
followed 50:7.
following 45:21, 57:14, 79:3.
follows 4:3, 42:14, 54:1, 67:12.
food 89:13.
force 57:20.
forceful 19:13.
foregoing 105:19.
forfeiture 23:3, 23:17.
forget 34:20.
form 45:8.
formal 61:25, 69:13, 69:14.
forth 16:20, 104:13.
forward 2:6, 2:24, 42:8, 53:23.
four 12:21, 29:10, 54:23, 68:25, 82:15, 94:19.
free 7:12.
freed 8:13.
frequent 11:19.
frequently 11:10.
front 74:25.
fulfilling 65:14.
full 90:20, 92:9.

function 62:14.
functions 55:4, 69:21.
funds 95:12.
future 40:19.
.
.
< G >.
garage 72:10.
GDL 96:19, 97:6, 97:7.
Generacion 5:1, 70:23.
general 15:12, 42:25, 57:19.
Generally 10:5, 71:21, 105:3, 105:4.
generation 14:15.
gentlemen 3:19, 15:10, 18:1, 42:3.
geolocation 43:9.
gets 58:18.
getting 6:18, 27:14, 28:7, 56:19, 90:19.
gibberish 78:9.
girlfriend 25:25.
give 32:22, 32:24, 33:8, 34:9, 92:7.
given 26:5, 28:2, 64:10.
gives 5:12.
giving 12:2.
glacial 63:17.
Goat 21:20.
God. 97:20.
good. 97:4.
graduated

68:3.
grams 22:7.
great 90:6, 90:23, 97:5.
grinding 89:11.
group 9:3, 42:25, 67:25.
grows 72:1.
Guadalajara 20:8, 25:15, 97:7, 97:9.
Guard 68:6, 68:7, 68:9, 68:23.
guess 51:14.
guideline 22:24.
guidelines 22:15.
guilty 17:9, 18:5, 22:6, 22:10, 22:21, 22:22.
guy 94:1.
Guzman 20:10, 20:11, 33:7, 33:11, 33:13, 33:14, 33:20, 33:24, 33:25, 34:6, 34:8, 34:9.
.
.
< H >.
Haihang 90:20, 91:2, 91:3.
hair 38:1.
half 25:16.
hall 41:23.
hand 18:3.
handed 59:8.
handgun 20:23, 21:7, 21:9.
Handicap 19:24, 20:1.
handicapped 20:22,

21:2.
handle 69:9.
Hanze 91:21, 91:22, 91:23.
happen 35:1.
happened 89:15.
happens 58:1.
hard 2:22, 69:2.
head 5:4, 20:22.
headed 7:10.
headquarters 71:14.
health 55:9, 55:11, 55:15, 63:7.
hear 4:22, 16:19, 16:22, 46:16, 53:4.
heard 4:14, 4:16, 4:20, 10:18, 13:25, 14:2, 16:18.
Hearing 18:21, 60:21, 61:3, 75:13, 77:22, 82:2, 86:9, 88:4, 102:9, 103:16.
held 68:19.
help 7:15, 32:15, 32:19, 69:7, 90:8.
helped 8:5, 8:11, 8:15.
here. 90:8.
hereby 105:18.
heroin 70:10.
hesitant 78:10.
HHAX 90:21.
hidden 20:24.
hierro 28:15, 37:14.

higher 26:3, 27:3, 27:14, 27:17.
hold 62:12.
Holdings 99:8.
home 71:14, 91:1.
homeland 68:11.
HONORABLE 1:18.
hope 94:3, 96:23, 97:22.
horns 21:20.
hotel 96:20.
hour 89:5.
hours 4:17, 66:20.
house 28:6, 39:2, 39:4, 39:6, 72:10.
houses 38:20, 38:24, 38:25.
human 13:24.
.
.
< I >.
ID 96:11.
idea 6:13, 15:12, 15:13.
identification 59:9, 75:2, 87:15, 103:4.
identified 9:4.
identifies 15:11.
identify 9:8, 9:10, 9:11, 15:25, 80:19, 84:16, 84:18, 85:11, 88:15, 98:6, 98:11.

identifying 71:14.
illegal 13:19, 53:5.
illegally 21:8.
illicit 62:8, 64:16.
immediate 80:19.
immediately 95:25.
immigration 77:7, 89:3.
important 36:13, 41:3, 74:4, 97:3.
importation 62:3.
importations 63:13.
imported 22:9, 28:10, 62:5, 63:9.
importer 63:2.
importers 36:24.
imposed 23:25.
impossible 46:6.
improved 25:1.
in. 35:6, 99:18.
include 74:16.
includes 64:7.
including 19:12, 28:16, 68:9.
income 94:22.
incorporated 77:2.
Incorporation 75:4, 81:10, 82:11.
India 89:10.

indicate 44:6, 57:15.
indicated 19:6, 63:23.
indicating 18:15, 49:15.
indication 63:5.
individual 70:2, 79:14, 88:15.
individuals 56:5, 70:9, 84:5.
Industrial 89:10.
informants 69:10.
information 11:7, 12:2, 18:12, 30:16, 39:3, 39:5, 40:4, 40:11, 43:9, 44:25, 46:6, 48:16, 48:23, 49:25, 62:1, 64:7, 64:9, 64:19, 64:22, 65:21, 92:5, 93:21, 93:23, 98:15, 98:18.
informed 48:23.
ingredient 74:3, 74:4, 74:6.
ingredients 72:4.
initial 64:8.
initially 65:3, 98:13.
inspected 98:1.
installment 92:10.
instills 5:16.
institutions

96:9.
instructions 90:24.
intended 32:16.
intending 22:9.
intent 22:11.
intercept 44:4, 44:16, 47:3, 47:4, 47:12, 47:14, 51:9, 51:12, 56:24, 57:9, 84:3.
intercepted 46:13, 48:17, 48:21, 49:23, 50:12, 51:19, 51:20, 58:7, 59:14, 65:17, 84:20, 85:15.
intercepting 51:17, 56:14, 84:7.
interception 43:8, 43:22, 47:8, 47:10, 47:11, 47:23, 48:3, 49:9, 50:4, 51:6, 52:9, 53:11, 57:17, 58:3, 64:18, 84:7.
interceptions 50:1, 51:4.
intercom 78:3.
Interjet 101:12, 101:16.
internet 47:1.
internet. 96:21.
interpret 17:6, 52:15, 52:18.
interpretation

16:19, 16:21.
interpretations 78:13, 78:16.
INTERPRETER 1:37, 1:38, 1:39, 3:8, 3:9, 6:20, 6:22, 8:7, 17:2, 17:5, 18:18, 20:12, 24:11, 26:12, 28:11, 28:13, 36:1, 36:15, 39:14, 39:18, 40:21, 40:22, 57:4, 77:16, 77:20, 78:16, 85:19.
interpreters 2:21, 33:18, 54:12.
interpreting 18:18, 54:13.
interrupt 23:7, 31:17.
intervene 57:9, 62:17.
intervenes 62:16.
intervening 57:2.
interviews 70:2.
introduce 78:10.
introducing 78:6.
introduction 79:1.
investigate 55:13, 62:3, 62:21, 70:5, 70:6.
investigated 64:20.
investigating 55:9, 57:16,

62:25, 70:24, 70:25.
investigation 40:16, 50:14, 56:5, 57:2, 61:17, 61:22, 61:25, 62:9, 63:4, 63:5, 63:12, 69:11, 74:8, 74:11, 74:13, 74:15, 74:21, 77:5, 81:1, 83:19, 83:23, 84:10, 90:9, 98:5.
investigations 56:7, 61:18, 65:20, 67:25, 69:9, 70:12, 70:22.
investigative 64:18, 74:14, 98:23.
inviolatability 56:23.
invited 20:7, 20:16.
invoice 90:21, 92:10, 93:1, 105:4.
invoice. 92:23.
invoices 94:1, 104:24, 104:25.
involved 61:14, 61:21, 68:9, 70:10, 70:13, 74:8.
iron 28:15.
issue 2:23, 78:23, 98:1.
issues 97:24.
it. 91:1.
items 23:9.
itinerary 101:7, 101:20.
itinerary.

101:16.
itself 94:11.
.
.
< J >.
Jalisco 5:1, 20:13, 25:15, 25:16, 70:23, 71:15, 97:8, 97:9.
January 9:2, 76:23.
JAVIER ALGREDO VAZQUEZ 1:10.
javijavi 102:1.
Javijavi43 98:16, 98:17, 98:24, 102:2, 104:3, 104:11.
Javijavi43@yahoo.com 98:9, 98:12, 99:7, 101:14.
Jesus 4:1, 15:16.
JFK 101:20, 101:22.
Jianbang 93:22, 94:6.
Jinan 92:22, 93:7.
Jining 93:21, 93:25, 94:6.
job 6:15, 27:6, 37:16, 39:7, 43:17, 54:13, 55:5.
joining 68:15.
Jose 41:13, 42:12, 42:23.
Judge 1:19, 18:6, 18:9, 18:17, 18:21, 23:24, 44:14,

44:19, 47:10, 49:10, 51:1, 52:11, 53:2, 54:5, 56:24, 56:25, 57:2, 57:6, 57:21, 57:23, 64:15, 65:14.
judges 43:23, 44:5, 44:7.
judgment 23:23.
judicially 56:7.
Judy 67:1, 78:15.
juice 16:25.
July 104:19.
June 6:8.
jungle 72:12.
juror 3:14.
Jury 3:17, 3:19, 12:23, 32:8, 43:19, 56:19, 57:10, 67:6, 71:2, 73:25, 75:16, 78:8, 82:10, 86:13, 103:25, 105:13.
JURY TRIAL 1:17.
Justice 1:26.
.
.
< K >.
Kaitlin 2:10.
Kasey 1:35, 2:10.
Kate 2:8.
Kate M. Naseef 1:23.
Katlin 1:24.
keep 88:8.
keeping 46:22.
keeps 49:25.
Ketcham 75:25.

Kevin 1:36, 2:11, 66:19, 67:9, 67:10, 67:18.
key 48:14, 48:15, 74:6.
kidnappings 19:13.
kids 34:8.
kill 21:1, 35:4.
killed 19:20, 19:23, 35:4.
kills 5:10, 5:11.
kilograms 27:15, 27:17.
kilos 26:8.
kind 12:25.
know. 93:20.
knowing 22:8, 39:3.
knowingly 40:4, 40:10.
knowledge 45:7, 45:10, 90:9.
known 5:3, 10:3, 10:16, 15:16, 50:3, 55:15, 64:8, 71:19.
knows 8:2, 27:12.
.
.
< L >.
lab 21:18, 24:25, 53:5, 72:13, 72:14.
laboratory 5:22.
labs 5:19, 6:16, 26:18, 66:1, 72:9, 72:10.

Ladies 3:19, 15:10, 18:1, 42:3.
lady 9:11.
laid 45:9.
language 4:11, 85:15, 87:24.
languages 69:24.
large 13:3, 71:5, 71:12, 91:9, 96:5, 96:8, 96:10, 97:7.
large-scale 72:10.
largest 97:9.
last 17:21, 21:23, 23:4, 24:11, 25:24, 26:11, 60:7, 65:12, 92:10, 93:1, 93:9, 93:22.
lasted 65:18.
later 25:16, 36:19, 36:20.
laundered 19:7.
laundering 22:11, 69:16, 69:19, 69:20, 69:21.
law 44:17, 68:11, 74:19.
lawful 51:8.
laws 73:22.
lawyer 18:8, 18:14.
laymen 70:8.
leader 33:15, 71:17, 71:18.
leaf 72:1, 72:3.
learn 11:18, 26:18, 27:1,

27:20.
least 70:15, 73:5, 73:6.
leave 40:21.
leaving 92:12.
left 20:17, 69:12, 83:4, 105:13.
legal 43:24, 47:20, 72:19.
legislation 64:8.
legitimate 62:20, 62:23, 63:1, 63:11, 74:3.
length 57:17.
Leon 91:10.
less 16:24.
letter 34:19, 81:15, 83:1.
license 21:6.
licit 62:8.
lied 20:25.
life 22:15, 22:19, 22:24, 33:15.
light-skinned 38:1.
Limited 47:9, 93:22, 94:6.
line 39:15, 46:12, 57:16, 88:18, 88:22, 91:2, 91:6, 91:23, 92:3, 92:14, 93:7, 93:13, 94:6, 95:22, 97:6, 101:15, 102:19.
lines 64:7, 64:12, 64:14, 65:17.
List 15:22, 62:6, 73:25,

74:2, 74:5, 79:22, 80:7, 84:25, 99:18, 99:22, 99:23, 99:24.
listed 75:23, 84:20, 85:13, 98:14, 98:15, 98:18, 100:16, 104:9.
listen 12:22, 51:17, 52:14, 52:17.
listened 12:12, 65:23.
listening 48:10, 48:11, 52:3, 53:1, 53:4.
lists 80:9, 80:24.
Little 16:24, 18:12, 25:6, 42:4, 42:6, 68:2, 70:4, 71:1, 73:16, 86:24, 88:19, 89:14, 99:15, 101:9, 101:11, 102:14, 104:17, 104:20.
live 25:5, 79:25.
lived 25:3, 25:6, 29:20, 29:22.
living 29:7, 29:25.
located 91:9, 97:8.
locations 73:7.
locker 58:11, 58:12, 58:15, 58:18, 58:19.
long 31:11,

43:4, 43:13, 43:17, 49:7, 51:3, 54:22, 65:16, 68:1, 68:22, 70:24, 86:24.
longer 37:9, 49:25.
look 9:6, 9:7, 23:10, 37:25, 38:2, 75:1, 77:9, 78:8, 80:18, 81:4, 87:15, 101:23, 103:3.
looked 84:22.
Looking 75:19, 78:9, 81:9, 94:22, 99:24.
looks 21:25, 92:11, 97:18.
Lorena 95:14, 95:17, 96:17.
Los 67:23, 67:24, 70:25, 73:14, 98:4.
losing 35:9.
lot 11:7, 21:11, 26:15, 33:8, 34:9, 34:11, 34:20, 42:5, 86:16.
lot. 90:25, 96:24.
LTD 93:22.
luck 90:6.
.
.
< M >.
M21 21:17, 21:18.
machine 1:49.
mad 33:18.
Madrigal 41:13,

41:14, 42:12, 42:23.
magazine 21:13.
magazines 4:9.
magistrate 43:23, 44:5, 53:2.
main 6:7, 35:23, 35:24, 36:3, 51:12.
mainly 25:6.
maintained 49:23, 50:10.
maintains 46:15, 46:17, 46:20.
male 10:14.
man 19:23, 20:22, 21:2.
managed 5:25.
managing 6:16.
manufacture 22:7, 22:12, 35:18, 36:18, 70:13, 72:4, 73:23, 74:4, 74:6.
manufactured 71:7, 72:7, 72:9, 72:16, 72:22, 73:11.
manufacturing 35:14, 36:6, 37:13, 89:11.
Manzanilla 7:13.
Manzanillo 6:19, 6:25, 7:2, 7:18, 7:21, 13:16, 14:16, 32:23, 89:10.

March 29:10.
maritime 68:11.
marked 14:20, 16:11, 16:13, 17:12, 17:14, 23:2, 23:22, 39:10, 59:9, 75:1, 87:15, 103:3.
market 72:22.
Martin 1:39, 12:3, 12:6, 24:9, 24:12, 26:25, 27:19.
matter 2:3, 97:1, 105:20.
matters 55:10.
maximum 65:6.
Mayo 33:9, 33:10, 33:11, 34:1, 34:9, 34:10, 34:17, 34:25, 35:5, 35:6.
MB 79:24, 80:12, 81:11, 82:12, 82:13, 83:10.
mean 13:6, 44:9, 46:9.
meaning 31:12.
means 57:14.
Media 89:6.
meet 12:4, 30:3, 34:1.
meeting 10:2, 10:8, 12:9, 13:1, 13:10, 13:14, 13:19, 29:12, 29:17, 38:5.
meeting. 89:3.
meetings 10:5, 10:11, 14:4,

29:18, 30:25, 38:13.
member 5:1.
Men 10:3, 10:17, 10:18, 24:4, 24:7, 24:9, 24:15, 24:18, 24:21, 37:18, 37:23, 37:25.
Mencho 5:3, 5:16, 7:2, 7:5, 7:6, 7:7, 8:4, 8:5, 8:10, 8:11, 8:16, 19:18, 20:17, 20:24, 21:1, 27:1, 29:1, 31:4, 32:22, 33:8, 33:25, 34:10, 34:13, 34:15, 34:17, 34:19, 34:20, 35:4, 71:19.
mentioned 13:15, 35:10, 37:5, 65:15, 72:18.
message 34:10, 35:5, 91:23.
messages 87:11, 87:24, 88:16, 88:22, 88:23, 89:17, 91:12, 91:18, 92:3, 92:4.
messed 20:2.
met 6:17, 11:12, 12:6, 12:24, 13:4, 13:7, 13:12, 14:6, 29:9, 57:23.
meth 5:19, 6:5, 8:4, 8:11, 8:16, 24:25, 26:3, 26:15,

26:17, 26:21, 26:23, 27:17, 53:5, 66:1, 72:2.
method 25:1, 36:21.
methods 37:17.
methylamine 74:5.
Metrican 25:9.
Mexican 36:23, 44:13, 47:17, 47:20, 48:17, 50:2, 51:3, 51:7, 56:22, 60:5, 60:6, 60:15, 61:16, 64:8, 71:13, 83:3, 85:3, 97:7, 97:8.
mgmexico@prodig y.net.mx 102:17, 102:23.
microphone 70:16, 98:21.
middle 72:11.
million 19:7, 23:17, 27:25, 28:1, 28:3, 28:8.
mind 54:12, 78:21, 78:22.
mine 17:25.
minimum 96:3.
minute 6:20, 31:8.
minutes 41:23, 66:10, 67:2.
minutes. 92:7.
Misaul 42:12, 42:23.
missing 99:21.

misunderstood 4:20.
mix 35:21, 72:4.
mixed 71:23.
mixture 22:7.
moment 8:13, 36:15, 43:16, 49:11, 58:3, 63:18, 100:25.
momentarily 23:12.
moments 42:6.
money 19:8, 22:11, 23:20, 28:20, 28:23, 29:3, 38:24, 69:15, 69:19, 69:20, 69:21, 91:12, 94:3, 96:1, 96:12.
Monomethylamine 6:12, 28:12, 36:3, 36:11, 36:13, 37:1.
Monterrey 91:7, 91:8, 91:9.
month 11:6.
monthly 58:5.
months 23:25, 24:1, 29:10, 65:7, 65:18.
Mora 24:3, 24:14, 24:18, 37:24, 38:4, 38:10, 38:12.
morning 2:13, 2:18, 86:25, 87:4, 89:1, 89:4, 93:15, 93:19, 95:11, 95:14, 105:10, 105:12.
mostly 5:22.

mother 25:4.
motivated 57:13.
mountainous 72:12.
move 3:4, 5:12, 14:21, 70:16, 70:17, 76:4, 79:1, 79:5, 81:23, 86:13, 99:4.
moved 34:3.
moves 60:17, 60:24, 75:11, 77:19, 86:4, 88:1, 103:13.
moving 2:24, 100:15.
MR. NGUYEN 53:20, 54:5, 54:7, 58:24, 59:1, 59:7, 59:8, 60:8, 60:11, 60:23, 61:5, 61:7, 66:6, 66:13.
MS. SAHNI 15:4, 31:14, 32:3, 32:6, 32:11, 32:13, 36:5, 36:17, 40:24, 41:6, 41:8, 45:23, 75:15, 75:18.
MTY 90:21, 91:6, 91:7.
much. 89:6, 95:16.
murders 19:13, 20:15.
mutually 34:3.
.
.
< N >.
N-O-V-I-C-K 67:18.
name 5:15,

24:11, 24:14, 37:23, 42:21, 43:4, 54:8, 54:9, 55:20, 55:23, 56:1, 56:25, 67:17, 67:18, 71:15, 88:17, 88:20.
namely 69:7.
names 2:6, 6:13, 59:16, 59:19, 59:23.
Narcotic 1:27.
narcotics 69:8.
national 68:10.
Navo 35:8.
NE 1:28.
Near 73:6, 73:13, 73:14.
necessary 3:21, 64:17.
need 42:10, 53:6, 57:13, 63:23, 65:9, 78:15, 94:23, 96:11.
needed 7:10, 14:13, 28:17, 37:14, 58:14, 74:4.
needs 57:4, 64:15, 78:17.
negotiate 14:9.
neighborhood 80:3, 80:4.
Nemesio 5:3, 71:18.
New 14:15, 26:18, 26:21, 27:13, 37:16, 74:22, 75:5, 75:6, 75:8,

75:21, 75:25, 76:13, 77:2, 94:10, 94:22, 101:20, 101:22.
news 4:11, 4:14, 4:16, 4:18, 78:25.
news. 97:21.
newspapers 4:8.
next 41:11, 42:5, 53:19, 66:17, 67:7, 82:18, 88:25, 95:1, 100:6, 102:19, 104:5.
NGUYEN 1:25, 2:9, 57:10, 59:4, 60:17.
Nhan 1:25, 2:9.
nickname 10:17, 19:24.
nicknamed 24:7.
nicknames 6:3, 14:7, 14:8.
nitro- 28:12.
Nitroethane 28:15, 35:11, 35:22, 35:23, 36:2, 36:5, 36:20, 36:25, 37:11, 37:14.
No. 1:5, 2:4, 4:22, 8:13, 25:15, 26:25, 31:7, 35:23, 59:9, 59:17, 60:3, 60:13, 60:18, 100:9.
none 38:15, 38:17.
noon 97:3.

nothing 30:20, 30:22, 31:10, 40:2, 40:8, 53:8, 53:14, 66:4.
notice 16:23.
notified 89:7.
Novick 1:36, 2:11, 66:19, 67:9, 67:10, 67:18, 68:12, 69:4, 70:16, 76:6, 79:15, 80:19, 82:9, 83:14, 85:23, 85:25, 98:20, 101:24.
Nueva 5:1.
Nueve 70:23.
Nuevo 91:10.
number 30:12, 30:13, 39:7, 51:18, 51:21, 53:11, 64:24, 64:25, 80:9, 84:8, 84:11, 84:17, 84:20, 85:7, 85:12, 85:13, 88:19, 88:20, 99:14, 103:16, 104:6.
numbers 38:23, 50:4, 56:8, 56:11, 56:16, 64:24, 80:6, 80:7, 84:6, 84:25, 85:4, 100:16.
numerous 19:12.
NW 1:45.
.
.
< O >.
O'brien 67:1, 78:15, 78:24.
Oath 3:24,

12:23, 18:24, 99:8.
obey 5:11, 5:13.
objection 15:4, 45:6, 60:19, 60:21, 61:2, 61:3, 75:12, 75:13, 77:21, 77:22, 79:6, 79:8, 82:1, 82:2, 86:7, 86:8, 86:9, 88:3, 88:4, 100:19, 100:23, 102:7, 102:9, 103:15, 103:16.
objections 86:14.
objective 57:13, 63:23.
obtain 56:24, 63:21, 85:3.
obtained 27:1, 27:19, 57:1, 103:11.
obtaining 63:19.
obvious 70:4.
occasions 5:21, 44:3, 65:17.
occur 40:20, 48:24.
occurred 20:15.
office 13:2, 13:4, 44:13, 48:18, 49:1, 49:5, 49:18, 49:21, 49:24, 50:11, 51:20, 52:3, 52:22, 55:9, 61:23, 65:1, 67:22, 81:16,

83:3.
officer 43:16, 68:6, 68:8.
offices 34:1, 58:9.
Official 1:42, 105:24.
often 46:24, 48:20, 48:22, 104:12.
old 69:2.
omitted 89:6.
on-the-job 69:14.
Once 12:20, 26:18, 44:12, 44:15, 44:18, 51:14, 52:8, 57:7, 58:8, 58:18, 64:13, 64:15.
ones 6:7, 35:16, 51:12.
open 45:21, 63:4, 79:3.
operated 5:25, 39:2.
operates 39:6, 45:11, 69:20.
operating 48:14.
operations 43:16, 43:20, 45:16, 68:9, 68:10, 69:22.
opinion 38:2.
order 5:12, 23:3, 23:17, 27:20, 44:15, 44:20, 45:12, 50:15, 56:24, 58:16, 63:20, 65:9, 71:23, 92:10, 98:14.
ordered 29:5.
orders 5:11,

5:13, 19:18, 44:7, 94:23.
organization 5:4, 5:16.
organizations 55:14.
organize 10:10.
organized 43:2, 55:10, 55:13.
origin 89:10, 89:13.
original 49:4.
originally 32:15, 87:24.
Oseguera 5:3, 71:18.
others 19:16, 37:15, 87:21.
otherwise 78:8.
outcome 40:15.
outside 47:11.
own 82:14.
owned 24:23.
oxalic 89:7, 89:8, 89:9.
.
.
< P >.
Paco 26:25, 27:20.
page 17:21, 21:23, 21:25, 23:4, 31:24, 40:1, 40:24, 76:4, 76:15, 76:25, 79:12, 79:15, 79:17, 79:21, 80:6, 80:11, 80:14, 80:17, 80:18, 82:7, 82:13,

82:18, 83:4,
88:25.
paid 28:8,
28:17,
94:24.
paperwork
58:15.
paragraph 40:1,
40:14,
75:19.
Paralegal 1:35,
2:10.
parallel 56:4,
61:17.
part 2:22,
31:20, 31:25,
32:4, 36:4,
41:4, 43:11,
56:7, 60:7,
62:9, 73:21,
74:21, 77:5,
81:1, 83:23,
86:13.
particular
37:3,
62:11.
particularly
53:8.
Partida 12:3.
parties
14:19.
partner 9:16,
80:13.
parts 17:10.
pattern 104:21,
104:23.
Pause 3:16.
paused 100:2.
pay 20:25,
23:19, 34:4,
34:16,
34:20.
paying 7:3,
28:25,
34:18.
Payment 90:20,
92:9, 95:13,
104:25,
105:5.
PCN-044-2019.

92:10.
pending 40:16,
77:20.
penultimate
93:3.
People 5:10,
5:11, 5:12,
7:4, 11:22,
20:16, 20:20,
26:9, 26:22,
26:24, 37:21,
39:2, 53:5,
57:18, 58:3,
61:19, 63:5,
64:16, 64:20,
69:3.
Per 26:10,
26:12, 26:23,
27:4, 27:10,
104:6,
104:14,
104:16,
104:17,
104:18,
104:20.
percentage
27:2, 27:14,
32:23, 34:5,
34:16, 34:18,
39:1.
Perez 53:21,
53:22, 53:24,
54:10,
54:11.
Perfect
93:25.
Perfume 6:11,
28:12, 35:11,
35:22, 35:23,
36:2, 36:5,
36:19, 36:24,
37:9.
perhaps 4:20,
9:5, 53:4,
87:4.
Period 49:2,
49:12, 49:15,
49:19, 51:1,
52:8, 65:4,
65:6.

periods 50:3,
51:3, 84:7.
Permission 7:6,
26:5, 32:22,
32:24, 35:3,
75:15, 77:24,
79:10, 82:4,
82:21, 88:6,
101:1, 102:4,
102:11,
103:20.
permit 21:8.
person 11:12,
39:4, 39:6,
39:7, 48:6,
51:9, 53:10,
55:20, 55:23,
56:1, 56:25,
57:15, 58:17,
58:18.
personally
5:10, 5:23,
5:25, 19:19,
19:20,
37:20.
Peteto 24:9,
25:19,
25:21.
pharmaceutical
72:18.
pharmaceutical-
type 72:14.
phones 51:21.
photo 8:20.
photos 9:3.
physical
69:8.
pick 9:2.
picked 20:17.
Picoso 6:3.
pictured
79:14.
place 46:13,
57:17,
57:18.
Plaintiff
1:7.
plant 72:1.
platelets
97:2.

platform 44:25,
45:2, 46:2,
46:7, 46:13,
46:15, 46:17,
46:18, 46:21,
46:23, 46:24,
47:1, 47:11,
48:2, 48:4,
48:6, 48:7,
48:8, 48:12,
49:7, 49:13,
49:21, 49:22,
49:25,
50:14.
play 12:19,
38:13.
played 12:13,
14:3,
38:16.
Plea 15:15,
17:10, 17:12,
17:15, 21:21,
22:6, 31:20,
32:4, 39:12,
39:16, 40:15,
40:18.
pleading
22:22.
pled 17:9,
18:5, 22:6,
22:10,
22:21.
point 14:22,
105:7.
police 64:11,
65:22.
polishing
89:11.
Port 6:19,
6:25, 7:2,
7:4, 7:17,
7:21, 11:22,
14:16, 32:23,
35:2,
62:13.
portion 104:4,
104:7.
portions
31:24.
ports 8:6,

8:12, 34:17.
position 43:15, 52:22, 83:7.
pound 73:12, 73:15, 73:17, 73:19.
powerful 5:6.
precursor 35:2, 62:4, 90:11.
prefer 45:16.
preferable 16:4.
preparation 29:9.
prepare 52:5.
prepared 52:9, 77:15.
prepares 57:8.
presence 71:12, 71:13.
Present 1:35, 20:20, 52:10, 57:6.
presented 64:15.
President 76:21.
pretty 5:12, 72:2.
prevents 40:2, 40:9.
previously 8:5, 8:12, 32:14, 37:5, 39:11, 59:8.
price 72:24, 73:2.
prices 14:9.
Primarily 70:22, 85:16.
primary 35:14, 35:19, 36:17, 43:19, 74:3.
Prior 22:21,

38:4, 38:13, 68:5.
prison 4:12, 4:15, 4:21.
Pro 75:4, 75:6, 75:20, 76:19, 77:1, 92:5, 93:25, 94:10, 94:24, 95:4, 95:15, 98:13.
probability 64:16.
probable 63:6.
probably 66:20.
problem 32:21.
problems 90:4.
procedures 50:7.
proceed 3:3, 42:18, 45:22, 54:4.
Proceedings 1:49, 43:24, 43:25, 45:21, 67:4, 79:3, 105:16, 105:20.
proceedings. 3:16.
process 27:11, 27:12, 27:18.
processing 25:2, 25:10.
prochemieny@yah oo.com 98:10.
produce 6:4, 26:8, 27:3.
produced 1:49, 6:9, 26:3, 72:13.
producer 26:17.

product 35:23, 35:24, 36:3, 71:25.
production 66:1.
productive 64:7.
products 11:21, 28:21, 93:4.
prohibited 62:6.
prolific 71:3.
promote 22:11.
proper 34:4.
prosecute 55:12, 55:16.
prosecuting 40:3, 40:9.
prosecution 40:19, 43:1, 58:5.
prosecutors 11:3, 11:7, 52:6, 52:10, 52:13, 52:16, 52:20, 52:24, 55:4.
protected 18:12.
protection 56:22.
proven 27:7.
provide 40:4, 40:10, 48:17, 48:25, 96:11.
provided 48:23, 49:4, 62:24, 63:10, 64:21, 64:22, 81:20, 98:19.
provisionally 78:18.
proximity 73:10.
pseudo 25:11.

pseudoephedrine 25:10.
public 55:11, 82:21.
publish 17:23, 75:16, 75:17, 76:1, 77:24, 79:10, 79:11, 82:4, 82:6, 86:11, 88:7, 88:9, 101:1, 102:11, 102:12, 103:20, 103:21.
Publishing 75:18, 89:21, 90:13.
purchase 92:10.
purchased 90:12.
purchaser 63:1.
purchasers 62:20, 63:10, 63:11.
purjurious 40:4, 40:11.
purpose 12:15, 76:6, 76:8.
pursuant 87:8, 99:8.
Purtida 24:9, 24:12.
put 10:21, 52:15, 64:3, 66:17.
.
.
< Q >.
Quantico 68:3, 68:20, 69:6.
quantities 71:5.
question 8:8, 9:18, 11:23, 13:6, 18:16,

29:23, 45:15,
45:24, 46:1,
46:16, 47:19,
51:14, 52:12,
52:13, 63:19,
70:4.
questions
50:17,
61:7.
quickly 5:12,
54:11, 85:24,
86:13.
quote 98:2.
.
.
< R >.
raise 18:3.
ran 5:18,
5:22.
ranch 24:4,
24:23, 25:7,
37:5,
37:18.
range 22:24.
Raul 26:25,
27:20.
read 23:13,
39:15, 78:11,
88:22, 88:23,
90:17, 91:18,
91:19, 92:3,
92:4, 92:20,
93:13, 93:14,
94:16, 95:9,
95:22, 95:23,
96:16, 97:14,
99:14.
reading 89:25,
90:16, 92:19,
94:16, 95:9,
96:16,
97:14.
ready 32:9.
real 24:14,
37:23.
really 89:6,
94:19.
reason 8:3,
8:10, 37:9.
reasons

47:14.
recall 17:8,
33:20,
38:7.
Receipt
79:20.
receive 44:12,
65:21,
68:15.
received 22:24,
44:15, 61:18,
62:2, 69:11,
69:13, 69:15,
79:19, 92:25,
93:16.
receiver 104:4,
104:9,
104:10.
receiving
28:20.
recess 4:16,
4:17, 31:18,
66:15.
recipe 27:12,
27:13,
37:12.
recipes 37:17,
37:19.
recipient
39:8.
recognition
12:15.
recognize
17:21, 59:10,
59:12, 77:10,
81:7, 101:4,
103:5.
recognized
8:24.
recommended
96:5, 96:8.
record 2:7,
22:3, 42:22,
45:2, 46:2,
48:12, 48:15,
52:22, 54:8,
67:17, 99:16,
105:20.
record. 45:5,
78:5.

recorded 1:49,
45:14, 46:13,
48:13, 48:25,
49:3, 49:17,
49:20, 51:25,
53:12.
recordings
12:12, 12:20,
12:21, 14:1,
38:14, 58:2,
58:6,
59:14.
records 49:8,
58:4, 74:23,
77:7, 81:2,
83:24.
recover 8:5,
8:12.
recovered
98:16.
red 38:1.
redact 31:23.
Redirect 31:11,
31:13, 31:17,
32:10, 32:12,
41:7, 53:15,
66:5.
refer 24:4,
43:5, 91:4.
reference
93:7.
references
39:23,
88:18.
referring
10:18.
refers 48:21.
refresh 42:4.
refund. 94:5.
regarding
10:11, 13:15,
18:12, 56:5,
70:12.
regards 61:19,
64:6.
Regards.
96:1.
regions
72:12.
registered

75:20, 76:12,
76:13.
registry
58:19.
regular
21:13.
regulate
73:22.
rejected
94:4.
related 63:6,
69:15, 70:22,
98:23.
relationship
32:19, 33:23,
34:12,
34:24.
relatives
80:20.
release
83:12.
released 83:17,
97:18.
relevant
31:24.
remain 3:24.
remind 37:23,
82:10.
removed 49:13,
49:22.
repeat 17:6,
24:11, 39:18,
40:6, 45:25,
46:16, 47:19,
60:6,
83:15.
repeated
36:15.
repeats
26:13.
repetition 8:8,
28:14,
36:1.
reply 104:25.
Report 11:20,
11:24, 12:1,
28:22, 28:25,
31:3, 33:1,
34:17, 52:6,
52:9, 52:10,

52:13, 52:16, 53:7, 53:9.
Reported 1:41, 12:6, 28:24, 31:3, 35:5, 35:7.
Reporter 1:42, 68:13, 105:24.
reports 49:14, 53:3.
Republic 43:2.
Request 47:22, 57:4, 57:6, 57:12, 58:4, 58:5, 62:22, 64:4, 64:6, 65:13, 81:1, 83:24.
requested 57:1.
requesting 83:11, 83:12, 83:16.
requests 6:20, 8:7, 28:13, 36:1.
require 36:10, 37:12.
required 33:1.
requirement 57:15.
requirements 57:8, 57:11, 57:12, 57:20, 57:23, 65:14.
requires 2:19, 44:17.
requisites 57:7, 63:20.
rescue 68:10.
research 66:22.
resecured 63:14.
respect 33:1,

34:3, 34:18, 35:9.
respecting 34:13.
responsibilitie s 43:20, 73:21.
responsibility 45:17.
responsible 39:3, 58:21.
Rest 5:24, 6:1, 92:12.
rest. 97:5.
restaurant 20:8.
resting 27:18.
restrict 36:22.
restricting 36:23, 36:24, 36:25.
restriction 51:8, 51:11.
restrictions 51:7.
restroom 41:25.
results 40:19, 98:3, 99:5.
resume 3:22.
retrieve 32:15.
return 98:14.
returned 63:16, 93:17.
returns 101:21.
review 44:16, 77:6, 85:23, 89:9, 89:10.
reviewed 18:6, 44:18, 59:16, 59:25, 63:13.
reviewing

62:14.
reviews 45:8.
Rhee 2:13, 3:22, 6:24, 15:8, 16:10, 16:13, 17:7, 17:23, 20:14, 23:8, 26:14, 26:15, 31:20, 32:3, 50:19, 58:25, 66:24, 78:12, 78:20, 79:7, 100:18.
Riding 76:5, 76:15, 76:24, 79:13, 79:18, 82:7, 88:11, 88:24, 101:10, 101:18, 102:13, 103:22.
Ridings 1:35, 2:10.
rifle 21:17.
Rizhao 91:20, 91:23.
role 74:11, 76:19, 80:11, 82:19.
room 13:22, 41:15, 41:19, 41:22.
RPR 1:41, 105:18.
Ruben 5:3.
Rule 99:8.
running 16:24, 26:17.
rustic 27:11.
.
.
< S >.
S. 1:32.
Safe 92:13.
safeguarded 58:9.
safely 90:4.
SAHNI 1:24,

2:10, 32:9, 39:14, 39:20.
Salazar 3:8.
Salvador 53:20, 53:24, 54:9.
Sandi 2:13.
Sandi S. Rhee 1:31.
saved 88:17.
saw 31:7.
saying 14:14, 17:4, 29:23, 34:19, 35:5, 46:11, 98:21.
says 9:12, 23:19, 39:16, 40:2, 40:8, 40:14, 40:18, 80:13, 99:25, 102:20.
schedules 3:21.
screen 18:4, 23:12, 40:22, 80:21, 82:13.
screens 18:2, 18:3, 75:16.
Sealed 17:15, 31:20, 32:4, 39:16.
search 68:9, 74:18, 87:7, 87:9, 98:13, 98:14, 98:15, 99:2, 99:5, 103:11.
seated 42:16, 54:3, 67:14.
second 15:17, 23:7, 31:24, 65:18, 68:22, 79:12, 96:10, 104:7.
secret 17:17.

Section 1:27.
sections
   17:11.
secure 58:12.
secured 59:20,
   60:4.
security
   68:11.
seen 31:6,
   95:11.
seized 6:18,
   7:14, 7:17,
   7:20, 8:5,
   8:12, 89:7.
seized. 6:22,
   6:23.
seizures
   74:17.
select 85:22.
self-identifyin
   g 84:19.
send 33:25,
   34:19, 35:5,
   38:23, 50:2,
   52:17, 52:19,
   52:21, 52:23,
   90:23, 90:24,
   102:22,
   104:24.
sender 102:18,
   104:3,
   104:8.
sending
   11:21.
sends 44:24,
   45:3, 45:8,
   46:3, 46:7,
   58:6.
senior 4:25.
sense 56:23.
sent 12:3,
   25:18, 28:23,
   34:10, 49:18,
   49:21, 53:12,
   58:8, 78:8,
   88:22, 88:23,
   91:22, 92:3,
   92:4, 92:23,
   93:6, 101:8,
   101:13,

103:8,
   105:5.
sentence 23:25,
   33:15,
   40:24.
sentencing
   22:15.
September
   88:14, 89:15,
   89:18.
serving 33:15,
   54:24.
set 10:6.
seven 48:24,
   98:2.
share 8:4,
   8:10.
shares 82:9,
   82:13,
   82:16.
Shelley 1:38.
shipment
   97:18.
shipments
   83:13.
shoot 21:1.
short 66:9.
shorthand
   1:49.
shot 20:22,
   21:2.
shouting
   13:23.
show 15:6,
   16:13, 23:2,
   23:4, 26:21,
   39:10, 40:1,
   62:20,
   96:11.
showed 59:1.
showing
   34:18.
shown 8:19,
   58:25.
shows 23:24,
   93:1,
   96:25.
sibling 80:24,
   80:25.
sic 11:18.

sicarios 19:11,
   20:21.
side 35:7.
sign 23:24,
   58:19,
   96:20.
signature
   17:21, 21:23,
   23:5,
   39:21.
signed 18:11,
   18:22, 18:25,
   19:7, 21:25,
   23:19, 44:13,
   76:17, 81:15,
   83:2,
   102:21.
significance
   90:10.
signing
   18:16.
similar
   61:18.
similar-type
   72:13.
simple 18:16.
Simultaneous
   2:20, 3:1,
   3:3, 3:10,
   16:18, 46:8,
   46:9,
   46:11.
simultaneously
   5:19,
   51:25.
Sinaloa 7:10,
   32:16, 32:18,
   32:20, 32:24,
   33:3,
   33:16.
single 21:25.
sir 42:16,
   67:14.
sitting 42:6.
situation
   62:14.
six 9:3, 65:7,
   65:18, 68:2,
   68:25, 71:1,
   104:18.

sixth 75:19.
size 72:10,
   72:11.
slowly 33:18,
   54:12,
   68:12.
small 101:11,
   103:23.
soft 89:13.
sold 72:15,
   72:21.
Sole 82:20,
   83:8.
somebody 16:7,
   72:10.
Someone 10:18,
   19:20, 19:24,
   34:1, 34:23,
   35:1, 37:16,
   41:21, 50:2,
   52:3,
   58:14.
Sometimes
   41:23,
   69:2.
soon 91:1,
   96:25.
Sorry 2:16,
   4:20, 8:7,
   10:3, 23:25,
   26:11, 39:17,
   68:14, 86:18,
   93:14, 98:22,
   100:6,
   104:15.
Sosa 6:3,
   37:15.
sources 69:10,
   74:17.
South 71:9.
southwest 73:7,
   73:13,
   73:14.
Spanish 3:9,
   4:9, 4:11,
   4:19, 16:22,
   39:15, 69:25,
   78:7, 78:9,
   85:17, 87:25,
   89:22.

Spanish. 16:16, 57:5.
Speaking 16:16, 54:12.
SPECIAL 1:36, 43:1, 66:19, 67:9, 67:10, 67:20, 68:2, 68:5, 69:22.
specialist 66:23.
specialized 55:8, 55:10, 57:2, 68:15, 70:18, 70:21, 70:22.
specific 28:7, 43:5.
specified 22:12.
spend 42:5.
spoke 9:24, 14:7, 38:20.
sponsor 7:11.
spreadsheet 103:8, 104:1, 104:7.
staff 48:9, 48:14.
stage 64:9.
stand 41:25, 42:3, 42:8, 66:17, 66:19, 78:17, 78:19, 97:6.
Standard 64:8, 93:15.
standing 13:1.
stands 91:7, 97:7.
start 8:14, 16:11, 42:5, 58:3, 86:24, 88:10.
started 10:1, 10:3, 10:5, 11:6, 25:9,

61:16, 61:22, 61:25.
Starting 2:7, 87:3, 88:22, 92:3, 93:13, 95:22.
starts 88:14, 89:23, 90:15, 91:17, 92:2, 92:18, 93:12, 94:15, 95:8, 96:15, 97:13.
State 2:6, 42:21, 54:8, 67:17, 71:13, 71:15, 74:22, 75:5, 75:8, 80:1, 91:9, 97:8.
stated 19:11.
statement 16:14, 17:13, 17:19, 19:3, 19:6, 19:10, 21:16, 45:20, 81:15, 83:2, 83:7.
statements 84:19.
States 1:1, 1:5, 1:19, 1:43, 2:4, 2:9, 22:10, 29:20, 29:25, 33:14, 56:22, 62:1, 64:10, 68:6, 68:8, 71:8, 71:9, 72:16, 72:22, 72:25, 73:7, 76:14, 77:3, 80:20, 83:23, 102:17.
stay 90:7, 98:20.
stemming 65:20.
stenographic 105:19.

step 42:8, 53:23.
stepped 41:19.
steps 98:23.
stipulate 78:13, 78:23.
stipulated 66:25.
stop 50:25, 105:8.
stopping 105:7.
stored 48:5, 49:3, 49:7, 49:8, 58:8, 58:10, 58:11.
Street 1:28, 1:32, 75:25.
stretch 42:4, 42:6.
structure 76:9.
subject 101:15.
submit 52:6, 52:13.
submitted 81:10, 82:11.
subpoena 74:22.
subpoenas 74:17.
subscriber 98:15.
subsequent 87:8.
substance 22:8, 22:9, 52:12.
Substances 62:7, 70:6, 74:5.
substantially 50:11.
summarizes

103:8.
summary 103:10.
summation 104:2.
Super 21:7, 21:9, 21:11, 21:12, 21:13.
supervise 48:10, 50:2.
supervising 43:21.
supervisor 48:8.
supplied 23:10.
suppliers 55:16.
supplies 90:11.
supply 91:24, 92:15, 93:8, 94:7.
support 55:4.
supporting 55:5, 68:10.
supposed 35:8.
surveillance 65:20, 69:8.
Susana 1:39.
swore 18:24.
sworn 4:2, 42:13, 53:25, 67:11.
synthetic 71:22.
.
.
< T >.
T. 1:41, 105:23.
table 2:10.
tactics 69:9.
taken. 31:18, 66:15.

talked 17:14,
  30:18.
tall 38:1.
targeting
  83:19.
Taroke 92:9,
  92:14.
Taroke.
  92:24.
task 42:25.
team 14:10,
  14:15, 30:15,
  31:3.
technical
  42:25,
  57:20.
technically
  47:25.
techniques
  57:2, 74:14,
  74:16.
Telcel 50:3.
telecommunicati
  ons 50:3,
  57:3.
telephone
  44:19, 44:22,
  44:24, 46:7,
  51:15, 56:14,
  56:16, 58:4,
  64:12, 64:23,
  64:24, 64:25,
  65:17,
  80:6.
telephones
  64:5.
ten 5:19, 26:8,
  26:18, 66:10,
  67:2.
ten-minute
  31:16.
tend 73:5.
terms 70:8.
territory
  34:14.
testified 4:3,
  5:18, 6:17,
  6:24, 7:9,
  7:14, 12:9,
  19:19, 24:6,

25:18, 26:2,
  27:25, 29:6,
  32:14, 42:14,
  43:24, 54:1,
  61:13,
  67:12.
testify 54:20,
  78:24.
testimony 2:20,
  3:10, 30:2,
  40:5, 40:11,
  66:20,
  67:1.
tests 97:3.
Text 87:22,
  87:23.
Thanks 89:6,
  90:25, 93:19,
  95:16, 96:2,
  96:24.
Thanks. 92:25,
  96:18,
  97:17.
THE CLERK 2:3,
  42:16,
  54:3.
THE INTERPRETER
  60:6, 60:9,
  62:22.
THE WITNESS
  53:18, 66:8,
  68:24.
Theresa 3:8.
they'll 88:4.
third 80:9.
though 22:24.
Three 11:13,
  17:10, 18:10,
  29:18, 31:7,
  35:25, 36:4,
  36:6, 36:9,
  36:12, 36:13,
  36:14, 36:16,
  66:20, 80:8,
  104:3, 104:4,
  104:14,
  104:15,
  104:16,
  104:17,
  104:20.

throughout
  71:12.
thrown 21:2.
Tijuana 32:25,
  34:15.
Today 16:21,
  54:20, 66:12,
  66:21, 86:20,
  93:10, 94:19,
  96:2, 96:23,
  97:19.
today. 95:13,
  96:22.
together
  89:19.
Tomorrow 78:24,
  86:25, 87:4,
  94:4, 94:20,
  95:2, 96:24,
  96:25, 97:2,
  105:10.
tomorrow.
  94:2.
ton 71:5.
tons 89:7,
  89:8, 89:9,
  89:12.
Tony 27:20.
took 5:23,
  20:6,
  27:25.
tool 64:18.
top 82:24,
  83:4, 101:9,
  101:11,
  104:4,
  104:9.
topics 10:12,
  69:7.
tortures
  19:13.
total 82:16.
touch 90:7.
town 25:6.
Trading 79:24,
  81:11, 82:12,
  83:10.
traffic 71:5.
trafficker
  23:20.

trafficking
  70:9, 70:10,
  71:3.
training 68:15,
  68:19, 69:5,
  69:6, 69:11,
  69:13, 69:14,
  69:15, 69:18,
  71:20,
  96:7.
transaction
  39:8.
transcribe
  52:19.
TRANSCRIPT
  1:17, 1:49,
  87:14,
  105:19.
transcription
  1:50,
  87:20.
transcripts
  85:21,
  86:12.
transfer 28:4,
  90:20, 91:22,
  92:6, 92:22,
  93:3, 93:22,
  94:3,
  94:25.
transfer/deposi
  t 94:23.
transferred
  96:23.
transferring
  91:12.
transfers 28:5,
  29:4, 39:1,
  91:20,
  94:8.
translated
  16:22,
  85:18.
translation
  2:19, 2:21,
  2:25, 3:1,
  3:3, 3:5,
  3:10, 16:19,
  42:10, 77:15,
  78:7, 78:10,

81:12, 81:18, 83:1, 89:22, 102:3, 102:5.
translations 82:3, 85:22, 86:5, 86:12, 87:20.
transmit 44:22.
transmits 44:7.
transport 32:24.
transported 71:9.
transporting 13:16.
travel 54:19.
travels. 92:13.
tree 72:2.
trial 29:9.
tried 35:2.
trip 34:21.
trouble 12:24, 33:8, 34:9.
true 6:13, 19:4, 19:10, 21:16, 21:20, 23:16, 24:17, 31:5.
truth 41:5.
try 3:20.
Turn 49:8, 52:10, 76:15, 76:24, 79:12, 80:17, 82:7, 87:3, 91:25.
Turning 50:1, 79:17, 79:21, 80:11, 80:14, 91:15, 92:16, 93:9, 94:13, 95:6, 95:19, 96:13, 97:11.
twice 8:4, 8:10.

Two 4:17, 7:12, 11:4, 17:11, 24:18, 33:23, 38:5, 38:8, 47:13, 50:3, 51:20, 65:17, 84:7, 89:11, 91:20, 94:22.
type 48:3, 103:23.
types 55:11, 70:5, 70:19, 72:6, 74:14, 84:2.
Typically 71:6, 72:8, 73:6, 73:20, 96:9.
.
.
< U >.
unable 9:2, 47:14.
undercover 69:22.
underneath 73:16.
understand 15:6, 15:9, 17:20, 23:15, 39:17, 40:6, 47:13, 47:18, 51:24, 79:2, 79:6.
understanding 40:5, 40:12, 40:16, 41:1, 47:21, 56:13, 65:4.
undisputed 71:18.
unique 48:14, 51:5.
unit 55:7, 55:8, 55:16.
United 1:1, 1:5, 1:19, 1:43, 2:4,

2:9, 22:9, 29:20, 29:25, 33:14, 56:22, 62:1, 64:10, 68:6, 68:8, 71:8, 71:9, 72:16, 72:22, 72:25, 80:20, 83:23.
unjust 34:11.
unlawful 22:12.
Unless 78:20.
unnecessarily 67:3.
unsure 10:17.
until 34:13, 34:22, 78:18, 105:9.
untruthful 40:4, 40:11.
updated 46:24.
updates 46:15, 46:17, 46:20.
upper 104:1.
USD 90:20, 91:4.
user 48:12, 84:11, 84:17, 85:6, 85:12.
uses 74:3.
using 2:20, 102:16.
.
.
< V >.
VA 1:33.
variety 69:7, 74:15.
various 68:9, 71:23.
vary 73:2.
varying 72:9.
Vazquez 2:5, 9:15, 9:24, 10:3, 55:20,

55:23, 56:9, 57:24, 58:22, 74:9, 74:13, 79:16, 81:16, 83:2, 83:19.
Vera 89:8, 89:9, 89:13.
version 78:7.
versus 2:4.
Vico 24:15, 37:22.
Victor 24:3, 24:14, 24:18, 24:23, 25:3, 25:8, 37:24, 38:4, 38:10, 38:12.
Victoria 1:37.
violations 70:6.
violence 19:12, 19:16.
violent 71:4.
Virginia 16:15, 17:9, 68:20, 69:6.
Visa 77:13, 77:14, 77:15, 84:21, 84:22, 85:1, 85:13.
visit 11:11.
visited 11:15, 11:25.
visiting 90:21.
visitor 11:19.
voice 12:15, 12:24, 43:22, 47:4, 47:12, 87:22.
vs 1:8.
.
.
< W >.
waiting 3:14,

80:15, 80:16.
wanted 4:8, 10:9, 10:13, 13:6, 13:18, 16:6, 29:13, 30:3, 30:25, 31:22, 34:12, 34:15, 50:22.
warehouse 12:10, 12:25, 13:9, 13:13, 20:6, 20:9, 20:14, 20:20, 21:5, 28:21.
warehouses 72:11.
warrant 87:9, 98:13, 98:15, 99:2, 99:6, 103:11.
warrants 74:18.
Washington 1:10, 1:29, 1:32, 1:46, 54:19, 73:18, 73:19, 89:2, 89:16.
Washington. 89:5.
ways 36:6, 36:9.
Wednesday 102:2.
week 9:1, 95:1, 104:16, 104:17, 104:18, 104:20.
weeks 24:18, 38:5, 38:8.
Welcome 3:18.
Whatsapp 47:5, 47:15, 47:18, 47:21, 47:22, 47:25, 66:25, 87:11, 87:21,

88:13, 89:17, 89:23, 90:14, 91:11, 91:16, 92:1, 92:17, 93:9, 93:11, 94:10, 94:14, 95:7, 95:20, 96:14, 97:12.
wheelchair 20:3.
whenever 34:2.
whereas 72:3.
whom 57:1.
wide 69:7.
wife 25:5, 95:18.
wifi 90:5.
wind 94:20.
Wiretap 43:22, 44:15, 50:22, 51:4, 51:15, 56:8, 56:13, 57:18, 57:22, 58:1, 58:2, 58:22, 59:21, 60:5, 60:8, 60:9, 60:15, 63:20, 63:21, 64:3, 64:4, 65:5, 65:9, 65:12, 65:13, 65:16, 83:18, 83:24, 84:3, 85:22.
wiretaps 43:23, 44:5, 44:6, 51:3, 51:7, 56:16, 57:24, 65:19, 65:21, 85:3.
wish 90:6.
withdraw 95:25, 96:4.
within 49:2, 67:24, 71:11, 76:9, 80:3, 80:4.
Without 7:5,

35:3, 35:9, 86:18.
witnesses 66:11, 74:17.
word 20:1, 40:7.
words 27:8, 55:14.
work 27:21, 32:21, 42:25, 43:5, 97:1.
worked 24:9, 43:13.
worker 12:4, 24:6, 25:8.
workers 6:2, 27:6.
working 7:4, 8:14, 18:4, 29:6, 48:8, 50:14, 55:8.
works 39:4.
world 45:17.
worries 23:13.
worry 96:4.
write 99:18.
writing 57:8.
written 57:6.
Wu 66:23, 66:24.
.
.
< Y >.
Yahoo 98:13, 103:11.
Yantai 92:9, 92:14.
year 25:16, 104:6, 104:11, 104:13, 104:15, 104:16.
years 11:4, 22:25, 24:2, 43:14, 43:18, 54:23, 68:3,

68:25, 71:1.
yelling 13:22.
yesterday 2:20, 3:1, 4:25, 5:18, 6:17, 7:3, 12:9, 12:13, 12:23, 13:15, 14:1, 14:2, 16:18, 17:14, 19:19, 24:6, 25:18, 27:23, 29:6, 30:3, 31:6, 93:2.
yield 26:3, 26:22, 27:1, 27:4, 27:7, 27:10, 27:17.
yielded 27:2.
York 74:22, 75:5, 75:6, 75:8, 75:21, 75:25, 77:2, 94:11, 101:20, 101:22.
yourself 42:4, 97:5.
yourselves 105:11.
.
.
< Z >.
Zambada 33:11, 34:1.
zero 15:13, 82:15, 94:19.
zoom 101:10, 101:17, 102:13, 103:22.